RECEIVED

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

AUG 2 3 2006

CLERK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | |
|---|---|
| In the Matter of the Extradition of <br> MARIA del ROSARIO MORENO-VAZQUEZ, <br> a/k/a MARIA COONLEY | ) <br> ) <br> ) <br> ) <br> ) |

3:06CV761-MEF

## United State's Initial Extradition Memorandum

The United States files this initial extradition memorandum to assist this Court concerning the procedural background, legal issues and applicable law pertaining to the request of the Government of the United Mexican States for the extradition of Maria del Rosario Moreno-Vazquez, who is a citizen of that country charged with criminal offenses under the laws of Mexico.

Upon faithfully applying the applicable law in this case, the Court will conclude that, despite what are admittedly very sympathetic facts, Moreno-Vazquez must be extradited. A valid extradition treaty is in force between the United States and Mexico, which encompasses the pending criminal charges against Moreno-Vazquez in Mexico, and probable cause exists to believe Moreno-Vazquez committed the crimes charged. While the United States would like to make exceptions for cases like Moreno-Vazquez's, the treaty and the laws of the United States, unfortunately do not allow such a result.

# I. <u>Overview of the Individual Criminal Charges</u>

The United States believes that the evidence at the hearing will show the following:

1.    According to the information provided by the requesting state in the form authorized by the extradition treaty, Moreno-Vazquez is charged in Mexico with the trafficking of minors.  The offense is covered and punishable by Article 366-quater in relation to Article 366-ter of the Federal Penal Code of Mexico. On September 27, 2004, the Seventh district Judge in the State of Mexico, residing in Naucalpan de Juarez, issued a warrant for the arrest of Moreno-Vazquez in criminal case number 72/2004.  The arrest warrant in this matter is located at Exhibit 53 of the formal extradition packet, a translated copy of which is attached hereto as Exhibit A.

2.    As set forth in Mexico's formal request for the extradition of Moreno-Vazquez, while Moreno-Vazquez was married to Jose Fernando Castillo-Tapia, the two of them had one child, known in this proceeding as L.F.C.M., born in 1989.  After they were divorced, they had another child, known in this proceeding as M.F.C.M., born in 1994.  On October 1, 1991, Moreno-Vazquez and Castillo-Tapia  entered into a child custody agreement whereby they each had certain custody rights, referred to as "*patria potestad*," relating to their son, who resided with his mother.  After the birth of M.F.C.M., Castillo-Tapia and Moreno-Vazquez applied all of the benefits and guarantees of the custody agreement to their daughter.

3.    On February 28, 2004, Jose Fernando Castillo-Tapia  went to visit his children

at their mother's home at San Jorge, # 15, Lomas Verdes, Naucalpan, Mexico; that date was the scheduled date that Castillo-Tapia was to visit his children. When Castillo-Tapia arrived at the residence, Moreno-Vazquez's mother, Maria Elena Vazquez Saucedo, informed Castillo-Tapia that the children were not at home, adding that she did not know where they were located. Vazquez-Saucedo then handed Castillo-Tapia a letter from Moreno-Vazquez in which Moreno-Vazquez stated that she and the children had left the city; no information related to the location of either her or the children was provided in the letter.

4.      An investigation into the matter revealed that the children had been taken out of Mexico and were residing in the United States with Moreno-Vazquez and her new husband, an individual identified as a Mr. Coonley, believed to be a United States citizen. It was also learned that passports for the children had been obtained through fraud and that their authorization to travel outside of Mexico, which must be signed by both parents, likewise had been obtained through fraudulent means.[1] Specifically, the necessary signatures of Jose Fernando Castillo-Tapia, as the father of the children L.F.C.M. and M.F.C.M., had been forged. It was learned that on February 27, 2004, Moreno-Vazquez, L.F.C.M., and M.F.C.M. had flown from Mexico to Atlanta, Georgia, on Aeromexico flight number 636.

5.      Taking a child from a custodial parent, or a parent who has joint custody of the child, without that parent's consent, constitutes an extraditable offense under Article 2, Appendix Item 4, of the Extradition Treaty between the United States and Mexico.

---

[1] A second arrest warrant for forging a public document is currently pending at the U.S. State Department in relation to this conduct.

3

6.      Moreno-Vazquez is a Mexican citizen born in 1961, in the Federal District of Mexico. Deputy United States Marshal Robert Wood has a photograph of Moreno-Vazquez and is familiar with the fugitive.

## II. General Discussion of Extradition Procedure

### A.      Overview of the Extradition Process

While explained in further detail below, generally, the first stage of an extradition proceeding is a determination mandated by 18 U.S.C. § 3184, in which the facts are presented to a district or magistrate judge who decides whether there is probable cause to believe that the person before the court is extraditable. Upon such a finding, the judicial officer issues a "certificate of extraditability."[2] The certification is then directed to the Secretary of State, who decides finally whether the fugitive should be extradited and issues, or declines to issue, a surrender warrant. In the next stage, the decision is reviewed. The person may also obtain collateral review by filing a writ of habeas corpus in the district court. The decision on whether that writ is granted or denied is appealable. If that decision is affirmed, the matter is reviewed by the Secretary of State, who takes final action, the signing of the surrender warrant. Once the Secretary signs the surrender warrant, transfer arrangements are made by the U.S. Marshals' Service.

---

[2]      The certification of extraditability constitutes the court's finding that the fugitive is extraditable. It normally also contains an order remanding the fugitive to the custody of the marshal pending the decision by the Secretary of State to surrender the fugitive. A certification of extraditability includes findings of fact and conclusions of law addressing all the elements necessary for extradition, with specific findings for each count or group of counts for which extradition is requested. *Caplan v. Vokes*, 649 F.2d 1336, 1344 (9th Cir. 1981).

The extradition hearing may be held before any United States District Court Judge, or any United States Magistrate Judge, if the Magistrate Judge is authorized by local rule to do so. See 18 U.S.C. § 3184. The local rules of the Middle District are silent on this matter, although a review of Eleventh Circuit case law confirms that the hearing is customarily held before a United States Magistrate Judge. *See, e.g., Afanasjev v. Hurlburt*, 418 F.3d 1159 (11th Cir. 2005) (extradition hearing held in front of U.S. Magistrate Judge); *Kastnerova v. United States*, 365 F.3d 980 (11th Cir. 2004) (same); *United States v. Valenzuela*, 286 F.3d 1223 (11th Cir. 2002) (same); *Hill v. United States*, 737 F.2d 950 (11th Cir. 1984) (same).

## B.    Unique Features of Extradition Proceedings

### 1.    Purpose of the Hearing

The purpose of the hearing is given in the statute, 18 U.S.C. § 3184: the magistrate must hear and consider the evidence of criminality presented by the requesting state and determine whether it suffices to sustain the charge under the treaty. To simplify analysis, the task is sometimes broken into its constituent parts or elements. Although these number three, four or five, depending on whose version one accepts, the most important function of the extradition hearing is to decide if there is probable cause to believe that a crime was committed and that the person whose extradition is requested committed it.

### 2.    Burden of Proof

The complainant[3] bears the burden of establishing that the conditions for extradition

---

[3] Here the United States is acting on behalf of the Mexican Government.

specified in the treaty and the essential elements identified in our case law have been fulfilled. *United States v. Barr*, 619 F.Supp. 1068 (E.D.Pa. 1985); *In re Locatelli*, 468 F.Supp. 568 (S.D.N.Y. 1979).

### 3.    Standard of Proof

The federal probable cause standard applies:  "Probable cause signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *Barr*, 619 F.Supp. at 1071; *Sindona v. Grant*, 619 F.2d 167 (2d Cir. 1980). Although a preponderance of the evidence standard prevails in most preliminary matters such as probable cause determinations, a reviewing court will sustain the finding of probable cause in an extradition case if there is "any evidence" to support it. *Mirchandani v. United States*, 836 F.2d 1223 (9th Cir. 1988).

### 4.    Necessary Elements

Cases identify three, four or five elements needed to establish a fugitive's extraditability. *See, e.g. Ornelas v. Ruiz*, 161 U.S. 502 (1896); *accord Bingham v. Bradley*, 241 U.S. 511 (1916); *McNamara v. Henkel*, 226 U.S. 520 (1913); *Zanazanian v. United States*, 729 F.2d 624 (9th Cir. 1980); *Afanasjev*, 418 F.3d 1159; *Kastnerova*, 365 F.3d 980. They generally list some combination of the following:

    (a)    jurisdiction (personal and subject matter),

    (b)    existence of treaty currently in force,

    (c)    existence of charges,

(d)    extraditable offense and

(e)    probable cause (including identity).

## C.    Nature of Proceeding and Applicable Rules

The extradition hearing is not a criminal trial or an adjudication of the merits of the charges underlying the request for extradition. *Benson v. McMahon*, 127 U.S. 457, 463 (1888). The constitutional guarantees pertaining to criminal prosecutions therefore do not apply. *See, e.g., Glucksman v. Henkel*, 221 U.S. 508, 512 (1911).[4] The Eleventh Circuit has described them as "in the nature of a preliminary hearing." *Kastnerova*, 365 f.3d at 987 (citing *Sayne v. Shipley*, 418 F.3d 679, 685 (5th Cir. 1969). Statutes and case law regulating criminal trials, *e.g.*, production of *Brady* material, likewise do not control in extradition cases. The Federal Rules of Criminal Procedure and the Federal Rules of Evidence expressly exclude extradition proceedings from their operation. Fed.R. Crim.P., R.54(b)(5); Fed.R.Ev., R.1101(d)(3); *see also Afanasjev*. 418 F.3 at 1164.

### 1.    Defenses Not Permitted

Because an extradition hearing does not serve to determine the fugitive's guilt or innocence, the fugitive may not attack the prosecution or its witnesses (*e.g.*, by showing bias, prejudice, or inaccurate recall) or set up affirmative defenses or legal impediments to conviction that either establish his or her innocence or prevent a finding of guilt. The

---

[4] In Justice Holmes' majority opinion, he said, "It is common in extradition cases to attempt to bring to bear all the factitious niceties of a criminal trial at common law. But it is a waste of time." *Glucksman v. Henkel*, 221 U.S. at 512.

fugitive is also precluded from asserting that conditions in the foreign country, including the lack of U.S. constitutional protections in the foreign criminal proceeding, permit the court to discharge him or her.[5]  The only defenses relate to a negation of the elements for extradition or a treaty-based defense.[6]

## 2.    Humanitarian Exemptions Generally Not Allowed

Finally, while no Court has ever refused to issue a certification of extraditability based on the fugitive's expectation that the requesting country would torture him upon his return, at least some circuits have pondered the idea of doing so.  *Cornejo-Barreto v. Seifert*, 218 F.3d 1004, 1010 (9th Cir. 2000); *Gallina v. Fraser*, 278 F.2d 77, 79 (2nd Cir. 1960) (containing dicta that suggests the Court could refuse to certify an extradition request if the fugitive "would be subject to procedures or punishment so antipathetic to a federal court's sense of decency").  Generally, the rule of non-inquiry (discussed in note 5) precludes the Courts from considering a fugitives anticipated treatment upon return to the requesting state as such determinations are to be made solely by the executive branch.  *Mainero v. Gregg*, 164

---

[5] The refusal to examine the procedures that await a fugitive in the requesting state is known as the rule of non-inquiry.  The Second Circuit observed 30 years ago in ill-considered dicta that there were theoretical limits on the extent of this rule (*Gallina v. Fraser*, 278 F.2d 77 (2d Cir. 1960)); thereafter, various fugitives attempted to establish that their cases went beyond the theoretical boundary posited in *Gallina*. *See, e.g., Extradition of Singh*, 123 F.R.D. 131 (D. N.J. 1987).  No court has found that the limit has been reached, and the circuit that generated the rule has repudiated it.  *Ahmad v. Wigen*, 910 F.2d 1063 (2d Cir. 1990).

The only viable issue in this area concerns convictions *in absentia*, which are routine in civil law countries. (The conviction *in absentia* tolls the statute of limitations; in most continental European countries, a person convicted in absentia has an unrestricted right to appeal the finding of guilt, appeal the sentence or receive a new trial.)  The requesting state must provide assurances that the fugitive will receive a new trial if he asks for one unless the conviction in absentia was entered under the circumstances described in Rule 43(b)(1), Fed.R.Crim.P.

[6] If the Court desires, the United States can brief these defenses, should they become an issue in the case.

8

F.3d 1199, 1210 (9th Cir. 1999).

### 3.    Evidentiary Rules

"Unique rules of 'wide latitude' govern the reception of evidence in Section 3184 hearings." *Sayne*, 418 F.2d at 685. Although the Federal Rules of Evidence do not apply in extradition proceedings, some rules of evidence are peculiar to extradition cases. They include the following:

### a.    Hearsay Admissible

The requesting state must present "evidence sufficient to sustain the charge." 18 U.S.C. § 3184. Since 1848, Congress has allowed properly certified "depositions, warrants or other papers" to be received in evidence in extradition cases. Act of August 12, 1848, c. 167, §2, 9 Stat. 302, *codified as* 18 U.S.C. § 3190 (with minor changes: section 3190 now mandates the receipt in evidence of depositions, warrants and other papers if they are certified by the "principal diplomatic or consular officer of the United States resident in such foreign country" as being "legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped . . .") Documents certified in accordance with section 3190 are conclusively admissible. *Cucuzzella v. Keliikoa*, 638 F.2d 105, 106-07 (9th Cir. 1981); *see also United States v. Fernandez-Morris*, 99 F.Supp.2d 1358, 1361 (S.D. Fla. 1999).

### b.    Contradictory Evidence Inadmissible

This rule derives from the familiar maxim that evidence must be relevant to be

9

admissible. Fed.R.Ev., R. 402. In extradition proceedings the court decides probable cause, not guilt or innocence; as a corollary, the fugitive may not offer evidence tending to establish innocence, *i.e.*, he or she may not introduce evidence of an alibi or any other affirmative defense because such matters are irrelevant to the issue before the court. Extradition Magistrate Judges are not expected to sort out and decide conflicting factual claims made by the requesting state on the one hand and the fugitive on the other. The fugitive may only introduce evidence that clarifies or explains the requesting state's evidence in such a way that it bears on probable cause. *Collins v. Loisel*, 259 U.S. 309 (1922); *Fernandez-Morris*, 99 F.Supp.2d at 1361.

### c.    Defendant's Circumscribed Right to Challenge Evidence

A fugitive's right to challenge the evidence introduced against him is very circumscribed; it is "limited to testimony which explains rather than contradicts the demanding country's proof." *Hooker v. Klein,* 573 F.2d 1360, 1368 (9th Cir.), *cert. denied,* 439 U.S. 932 (1978). The fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the demanding state, *Collins v. Loisel*, 259 U.S. 309, 315-17 (1922); *United States ex rel Petrushansky v. Marasco*, 325 F.2d 562, 567 (2nd Cir. 1963) (no error from exclusion of defense evidence at extradition hearing that witness spoke to decedent two days after alleged murder), or that impeaches the credibility of the demanding country's witnesses, *In re Locatelli*, 468 F.Supp. 568 (S.D. N.Y. 1979); or that establishes an alibi, *Abu Eain v. Adams*, 529 F. Supp. 685 (N.D. Ill.); or that is aimed at establishing an insanity

defense, *Hooker v. Klein*, 573 F.2d at 1368. These limitations on the extradition hearing

preclude converting it into a full trial on the merits. *Collins v. Loisel*, 259 U.S. 309, 316

(1922) and *Charlton v. Kelly*, 229 U.S. 447, 461 (1913) (both citing *In re Wadge*, 15 F.Supp.

864, 866 (S.D. N.Y. 1883)); *see also United States v. Linson*, 88 F. Supp. 2d 1123, 1126 (D.

Guam 2000) ("Generally, evidence that explains away or completely obliterates probable

cause is the only evidence admissible at an extradition hearing . . . ."; citing *Charlton v.

Kelly*, 229 U.S. 447, 457-458 (1913)); *accord Sindona v. Grant*, 619 F.2d 167, 175 (2nd Cir.

1980) (no magistrate error in refusal to hold hearing on fugitive's claim that he would be

killed if extradited to Italy).

> **d.    Strong Favor for Documentary Submissions and Affidavits;
> Strong Disfavor for Live Witness Testimony**.

Extradition treaties do not contemplate the introduction of testimony of live witnesses

at extradition proceedings because to do so "would defeat the whole object of the treaty."

*Yordi v. Nolte*, 215 U.S. 227, 231 (1909); *accord Bingham v. Bradley*, 241 U.S. 511, 517

(1916). In *Bingham*, the Supreme Court rejected the respondent's claim that *ex parte* witness

affidavits submitted in support of his extradition to Canada should not be considered because

he had not had the opportunity to cross-examine those witnesses. The Court referred to the

applicable treaty language, which obligated the United States to extradite "upon such

evidence of criminality as, according to the laws of the place where the fugitive or person so

charged shall be found, would justify his apprehension and commitment for trial, if the crime

11

or offense had there been committed." *Bingham v. Bradley*, 241 U.S. at 517.[7]

In fact, a finding of extraditability may be and typically is based entirely on documentary evidence and sworn affidavits. *See, e.g., Bovio v. United States*, 989 F.2d 255, 259-61 (7th Cir. 1993) (Swedish investigator's affidavit sufficient to establish probable cause); *Eain v. Wilkes*, 641 F.2d 504, 509-511 (7th Cir. 1981) (affidavits of cooperator, corroborated by police officer affidavit and affidavit of second civilian witness sufficient); *O'Brien v. Rozman,* 554 F.2d at 783; *Shapiro v. Ferrandina,* 478 F.2d at 902-03; *Matter of Extradition of Mainero*, 990 F. Supp. 1208, 1212-13 (S.D. Cal. 1997) (affidavits of co-conspirators and other witnesses sufficient in extradition to Mexico for murder); *Bobadilla v. Reno*, 826 F. Supp. 1428, 1433-34 (S.D. Fla. 1993) (documents and affidavits sufficient for extradition to Honduras), *aff'd.* 28 F.3d 116 (11th Cir. 1994); *In re Edmonson*, 352 F. Supp. 22, 24 (D. Minn. 1972).[8]

## III. Application of the Elements to this Case

An application of the previously described  elements for extradition mandate that Moreno-Vazquez be extradited to Mexico.  First, the Court has jurisdiction.  Moreno-

---

[7]    That language is similar to the language in the Treaty. *See* Treaty, Article 3.

[8]    Not surprisingly then, Courts have frequently ordered extradition based on documentary evidence. *See, e.g., Ntakirutimana v. Reno*, 184 F.3d 419 (5th Cir. 1999) (affirming extradition finding in case where government's evidence presented solely through documents); *Jimenez v. Aristeguieta*, 311 F.2d 547, 560 (5th Cir. 1962) (documentary presentation supported district court's extradition order in case involving charges of financial crimes by former Venezuelan chief executive). The Court of Appeals in *Escobedo v. United States*, 623 F.2d 1098, 1104 (5th Cir. 1980), emphasized that "the existence of properly authenticated documents establishing probable cause" supports extradition. That court rejected a "narrow and technical" construction of the applicable treaty that would exclude such materials, citing the "familiar rule that the obligations of treaties should be liberally construed so as to give effect to the apparent intention of the parties." *Id.* (citing *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 10 (1936)).

Vazquez is currently residing within the Middle District and the Court is an appropriate body to hear this case. Second, a current and valid extradition treaty exists between the United States and the requesting country, Mexico. *See Extradition Treaty with the United Mexican States*, 1978 U.S.T. Lexis 317. Third, there are charges pending against Moreno-Vazquez in the requesting country. On September 27, 2004, the Seventh district Judge in the State of Mexico, residing in Naucalpan de Juarez, issued a warrant for the arrest of Moreno-Vazquez in criminal case number 72/2004 for trafficking of minors. *See* Attachment A. This is an extraditable offense under the treaty. *See Extradition Treaty with the United Mexican States*, 1978 U.S.T. Lexis 317 at Article 2 & App. Item 4. Finally, there is probable cause to believe both that the person arrested is Moreno-Vazquez and that she committed the offense alleged. To the extent that it is an issue, Deputy United States Marshal Robert Wood is familiar with the fugitive and can testify to her identity.

Moreover, a review of the documents in the extradition request demonstrate that there is probable cause to believe that Moreno-Vazquez committed the offense charged. On October 1, 1991, Moreno-Vazquez and Castillo-Tapia entered into a valid child custody agreement whereby they each had joint custody rights, referred to as "*patria potestad*," relating to their son, who resided with his mother. *See* Exhibits 6 & 8 of the formal extradition packet. Later those rights were extended to Moreno-Vazquez's daughter. In addition to her own admission, located at Exhibit 5 of the formal extradition packet, there are admissible statements of Moreno-Vazquez's mother and ex-husband, which establish this

13

conduct.  *See* Exhibits 20 & 4 of the formal extradition packet.  Additional evidence supporting this charge is located in the formal extradition packet and will be presented at the hearing.

Based upon these valid proofs of evidence and regardless of any other humanitarian considerations, Moreno-Vazquez took her children in violation of the couple's custody agreement and in violation of Mexican law.  Because she meets all of the elements for extradition, under the terms of the treaty, she must therefore be extradited to Mexico to face these charges.

Respectfully submitted this 24th day of August, 2006.

LEURA G. CANARY
UNITED STATES ATTORNEY


CHRISTOPHER A. SNYDER
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax: (334)223-7135
E-mail: christopher.a.snyder@usdoj.gov

**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **In the Matter of the Extradition of** | ) | |
| **MARIA del ROSARIO MORENO-VAZQUEZ,** | ) | **3:06CV761-MEF** |
| **a/k/a MARIA COONLEY** | ) | |
| | ) | |

---

### Certificate of Service

I hereby certify that I have served a copy of the foregoing upon:
Mr. Ben Elton Bruner
P.O. Box 231419
Montgomery , AL 36123-1419
Fax: (334) 323-4463

attorney for Ms. Moreno-Vazquez, via facsimile.

All on this the 24th day of August, 2006.

CHRISTOPHER A. SNYDER

15

# EXHIBIT A

131

*In the top left corner, a stamp containing the Great Seal of México.*
*In the left margin, illegible stamps.*

### WARRANT FOR ARREST C.P. 108/04/III

**Mexico, Federal District, on the third of August two thousand and four.**

**HAVING SEEN** the files of criminal action number 108/04-III to resolve on the justification of the warrant for arrest requested by the Agent for the Public Ministry of the Federation of the Unit Specializing in the investigation of Child Trafficking, Undocumented Persons and Agencies of the Attorney General's office of the Republic against **MARIA DEL ROSARIO MOENO VAZQUEZ** as considered presumed guilty in commissioning the offense of **CHILD TRAFFICKING**, provided for and punished under article 366 quater (hypothesis of penalty) in concordance with article 366 ter section III of the Federal Criminal Code in relation with 7, first paragraph (hypothesis of action) section II (continuous or permanent offense); 8 (hypothesis of fraudulent action); 9, first paragraph (hypothesis of acting fraudulently even when aware of the illegality of the action, as described by law), and 13 section II (those automatically implemented) of the Federal Criminal Code, committed to the injury of the children ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ **(sic).**

**FIRST.-** Under official communication number SIEDO/2216/04 of the nineteenth of July two thousand and four, received that same day at the clerk's office of the District Courts for Federal Criminal Processes in the Federal District, located at Reclusorio Norte, the Agent of the Public Ministry of the Federation consigned the preliminary investigation number SIEDO/UEITMIO/023/2004, in which criminal action was taken against **MARIA DEL ROSARIO MORENO VAZQUEZ** as presumed guilty of commissioning the offense indicated at the beginning of the present document, asking that the corresponding warrant for arrest be issued against her.

**SECOND.-** once the investigation mentioned had been located, it was accorded legal processing and a notification of commencement given to the hierarchical superior, legal intervention to the attached Agent for the Public Ministry of the Federation, and it was ordered that account again be given to the warrant requested by the consigning Agent for the Public Ministry of the Federation.

**THIRD.-** The following are outstanding for their importance of the documents existing in the present criminal action:

1- Statement by the plaintiff **JOSE FERNANDO CASTILLO TAPIA** before the Agent for the Public Ministry of the Federation on the twenty second of March two thousand and four, in which he declared that with Mrs. **MARIA DEL ROSARIO MORENO VAZQUEZ** he procreated his minor children named ▓▓▓▓▓▓▓▓and ▓▓▓▓▓▓▓▓. both surnamed ▓▓▓▓▓▓▓▓▓▓▓▓, of fourteen and nine years of age, respectively, who lived with their mother after he had divorced her, according to the formal judgment returned by the Tenth Judge for Family Matters in the Federal District: but that on February 26 this year, at approximately 17:00 hours, I presented myself as was my custom to collect my children at the domicile where both Mrs. **MORENO VAZQUEZ** and my children lived, located at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓aucalpan, State of Mexico, C.P. 53120, and received from Mrs. **MARIA ELENA VAZQUEZ SAUCEDO,** mother of ROSARIO, a letter written by Mrs. **MARIA DEL ROSARIO MORENO VAZQUEZ** informing me that she had taken my children from that



132

domicile to leave the city, without mentioning their destination. In view of the foregoing, I suspected that she had moved to another country, possibly the United States of America, since Mrs. MORENO VAZQUEZ had commented to me in the month of October 2003 that she had married a North American individual whom she had met through the Internet, and asked my permission to take my children out of the country. I refused, telling her it was better that they first establish themselves as a couple and that afterwards with pleasure we would agree on the permission and reciprocal visits, a situation she refused to accept, saying that she would think about it at that time, October 2003. In view of the foregoing I appeared before the Agent for the Public Ministry of Common Jurisdiction in the city of Naucalpan, State of Mexico, on February 29 this year, opening File NJ/II/816/04-02, to whom I declared what I have just stated, and also informed said authority what I now repeat, that the undersigned had neither authorized nor consented to my minor children ████████ and ████████ both surnamed CASTILLO MORENO, leaving the country, nor did I in any way authorize nor agree to their obtaining a passport from the Ministry of Foreign Affairs. I then, on March 01 this year, went to the schools where my children studied, the Colegio La Salle in the State of Mexico, where from talking with their schoolmates I found out that Mrs. MARIA DEL ROSARIO MORENO VAZQUEZ and my minor children had left the country by air on February 27, 2004 two thousand and four, utilizing the services of the company Aeromexico, flight 636, destination Atlanta, Georgia, since my children had commented that their final destination was the city of Salem, Alabama, at the address 97 Lee Road number 434, belonging to or registered in the name of Mr. RONALD COONLEY, who is the person who Mrs. ROSARIO MORENO VAZQUEZ married. In this respect and from the information available on said person from the Internet they may have as domicilies those listed below: ████████ Phenix City AL., ████████ Columbus GA 31903, and Berrian Springs, Michigan, together with that located at 9 Wilkins Ave., Albany, NY ████ all in the United States of America, and that from talks I have had with my son's companions, he has contacted them through the Internet and has told them that they may possibly travel outside the United States of America, without my knowing their destination nor when this trip is to take place. By reason of the foregoing I also appeared before the Tenth Court for Family Matters in the Federal District, before which I asked to be granted the custody of my minor children ████████████████ ████████████), in the terms of the application I attach to this document, and also wish to notify that authority and declare that, in view of my doubts as to whether my children had left the country, I went to the information window of the Naucalpan Delegation of the Ministry of Foreign Affairs in the State of Mexico to find out whether any passport had been issued in their favor, and a person at that office took pity on me when I explained my problem, and told me verbally that said documents had been issued in favor of ████████████████████████ on February 27, 2004, that that office possessed legal documentation supporting my permission, and I therefore ask you to verify the foregoing since the undersigned gave no permission, either verbally or in writing nor by means of any document, and for this reason I repudiate as of now any signature or authorization contained in the files of that office. By reason of the foregoing I hereby present ordinary copies of the complaint filed before the Tenth Family Court consisting of 6 six pages, an ordinary photocopy of the denouncement of facts which I filed in the State of Mexico consisting of two pages, the page of the letter which I mentioned at the beginning of this document addressed to the undersigned bearing the name of ROSARIO, consisting of a single sheet, an ordinary photocopy of the accord which we, the undersigned and Mrs. MARIA DEL ROSARIO MORENO VAZQUEZ, filed with respect to the voluntary divorce and referring to the custody of my minor sons ████████ ████████ consisting of two pages, an ordinary photocopy of a letter dated March 16, 2004, issued by an operator of Colegios La Salle, signed by the Professor ANA



133

CECILIA ESQUIVEL HERNANDEZ, in which she mentions my minor daughter ████, AN ORDINARY PHOTOCOPY OF THE DIVORCE SENTENCE DATED January 29, 1992 one thousand nine hundred and ninety two, in favor of Mrs. MARIA DEL ROSARIO MORENO VAZQUEZ and the undersigned, issued by the Tenth Family Court for the Federal District. I also present original Birth Certificate number 4521638, in favor of my minor son ████ issued by the Central Judge for the Civil Register in the Federal District, and original Birth Certificate number A2929095 dated March 12, 2003 two thousand and three in favor of my minor daughter ████ issued by C. official number 02 of the Civil Register, ATTORNEY MARGARITA MARISCAL DE OLVERA of the Government of the State of Mexico. I also present three colored photocopies of my minor son ████, two colored photographs of ████ and three color laser photographs of my minor daughter ████ (pages 4 to 7 and ...to 10)

2.- Diligence of inspection effected by th Agent for the Public Ministry of the Federation on the twenty second of March two thousand and four, where he attested to having before him the following:

a)- ordinary copies of the complaint filed with the Tenth Judge for Family Matters, wherein JOSE FERNANDO CASTILLO TAPIA CLAIMED FROM Mrs. MRIA DEL ROSARIO MORENO VAZQUEZ a change in custody of the person for the guardianship and custody of the child ████, and full custody of the child ████ consisting of six pages.

b).- ordinary copy of the denouncement of facts presented by JOSE FERNANDO TAPIA in the state of Mexico, before the Agent for the Public Ministry in Naucalpan, State of Mexico, consisting of two pages.

c) Page of the letter addressed to "Fernando", signed by "Rosario".

d) ordinary photocopy of the agreement reached between JOSE FERNANDO CASTILLO TAPIA and MARIA DEL ROSARIO MORENO VAZQUEZ, PRESENTED TO THE CONSIDERATION OF THE Family Judge in the Voluntary Divorce action, with reference to the custody in connection with their minor son ████ consisting of two pages.

e) ordinary copy of the letter dated the sixteenth of March two thousand and four, issued by the Director of the Colegio La Salle, signed by Ana Cecilia Esquivel Hernandez, in which she mentions that ████ was entered at that school during the 2003-2003 (sic) course in the second grade and in 2003 and 2004 in the third grade, until the twenty sixth day of February two thousand and four, ████ being shown in the official records as her father.

f) ordinary copy of the divorce sentence of the twenty-ninth of January one thousand nine hundred and ninety two, in favor of ████ and the plaintiff, issued by the Tenth Court for Family Matters in the Federal District.

g) Original birth certificate number 4521638 in favor of ████ issued by the Central Judge for the Civil Register in the Federal District.



134

h)  Original birth certificate number A2929095 dated the twelfth of March two thousand and three, in favor of MARIA DE FATIMA CASTILLO MORENO, issued by official number zero two of the Civil Register, the attorney Margarita Mariscal De Olvera, of the Government for the State of Mexico.

i).- Three color laser photographs of LUIS FERNANDO CASTILLO MORENO.

j).- Two color photographs of MARIA DEL ROSARIO.

k).- Three color laser photographs of MARIA DE FATIMA.

3.- Statement of MARIA ELENA VAZQUEZ SAUCEDO on the seventh of April two thousand and four, who declared before the Agent for the Public Ministry of the Federation that I am the mother of MARIA DEL ROSARIO MORENO VAZQUEZ, who was married to Mr. JOSE FERNADO CASTILLO TAPIA, with whom she procreated two children named ▉▉▉▉▉▉▉and ▉▉▉▉▉▉▉ of 14 and 9 years of age, respectively. They are currently divorced.   And I declare that effectively on February 28, 2004, at approximately 1700 or 1800 hours, Mr. FERNANDO CASTILLO TAPIA came to my domicile, since it appears that on that day he was going to see his children ▉▉▉ and▉▉▉▉▉▉▉▉▉▉ since he visited them approximately every 15 days.  On arrival he asked me for his children and I told him they were not there, at which time I delivered a letter to him in a sealed envelope from my daughter's place of work, it appeared to bear the logotype of the company where my daughter worked, therefore I did not know nor do I know the contents of said letter.  Said letter was delivered to me by my daughter MARIA DEL ROSARIO on February 28, 2004,   and she did not tell me where she was going and it was understood that she was taking her children. She handed the letter to me and told me to deliver the letter to FERNANDO, without saying anything further, and the fact is that on March (sic) 27, 2004, it being approximately 07:00 hours, she left taking her children with her, reiterating that at no time did she tell me where she was going, and saying when I asked her where she was going, she replied reluctantly saying "that is my business" .  She left and has not returned, after that time I have had communication on two or three occasions, in the month of March this year she telephoned only to ask how I was, I asked her how the children were and she said "well", I asked her where she was but she did not tell me at what place, since communication with my daughter was nil.  I do not know whether my daughter had a passport, nor if my grandchildren had passports (pages 44 to 47)

4.- Official communication number DGAPII/-3818/04/0550/04-AAH dated the fourteenth of April two thousand and four signed by the Agent for the Public Ministry of the Federation attached of the Directorate General for International Police Matters INTERPOL, a dependency of the office of the Attorney General for the Republic, in which he indicates among other things the following:  In this respect, allow me to advise you that this Administrative Unit possesses an administrative file in connection with the location of the minor children Castillo Moreno, which was opened on March 2 this year, by reason of the petition filed in this Office by C. FERNANDO CASTILLO TAPIA, the children's father, who declared that he presumed his children has been transferred to the United States of America by their mother MARIA DEL ROSARIO MORENO VAZQUEZ.   In view of the foregoing, this Office commenced the corresponding investigations and managed to find that the children and their mother landed in the City of Atlanta, Georgia, United States of America on February 27, 2004, via flight 836 of the airline Aeromexico, for which reason contact was made with Interpol-Washington for the purpose of requesting their



135

collaboration in locating Mrs. **MARIA DEL ROSARIO MORENO** and her minor children ███████████ both surnamed Castillo Moreno.   On March 26 last, Interpol-Washington informed this Administrative Unit that the Alabama State Police sent an investigating agent to interview Mrs. **MARIA DEL ROSARIO MORENO**, who verified having the custody of her minor children, and likewise stated that the father of the children had called to threaten her, and she had therefore decided to change domicile and telephone number, for which reason the United States authorities state that for the safety and well-being of the family they are not authorized to reveal their whereabouts (page 50).

5.-  In an unnumbered official communication dated the fourteenth of April two thousand and four, the Director for Standardization of the Ministry for Foreign Affairs remitted certified copies of the following documents:.

a)    A certified copy of the ordinary Mexican passport application in the name of MORENO VAZQUEZ MARIA DEL ROSARIO, containing an illegible photograph (page 57).

b)    A certified copy of illegible passport number 6706406, in the name of MARIA DEL ROSARIO MORENO VAZQUEZ (page 58).

c)    Two applications for ordinary Mexican passports (OP-7), numbers 6290 and 6289, in the names of the children ████████████████████ and ████████████ in the square entitled SIGNATURE OF THE COMPLAINANT (sic) the name of ████████████████ given, in the square reading: SIGNATURE IN ACCORDANCE WITH THE DATA CONTAINED IN THE PASSPORT ON RECEIVING SAME, an illegible signature dated the sixteenth of October two thousand and four, indicating as location Naucalpan, State of Mexico. On the following page, giving the details of father or guardian, the square marked "as father" is marked with an "X"; for processing he identified himself with passport 033400323568, issued by the Ministry for Foreign Affairs on the sixth of November two thousand and three, having an illegible signature together with the fingerprints of the left and right index fingers and, in the details of the mother or guardian, an "X" appears in the square indicated as Mother, identifying herself for processing with passport number 03350056604, issued by the Ministry for Foreign Affairs on the twenty second of September two thousand and three, bearing an illegible signature and the fingerprints of the left and right index fingers (pages 60, 61, 65 and 66).

d).- A certified copy of birth certificate number 01433, in the name of ██████████████████ (PAGE 62)

e)    A certified copy of passport number 03340032358 in the name of ████████████ issued by the Ministry for Foreign Affairs (page 63).

f)    A certified copy of passport number 03350056604 in the name of MORENO VAZQUEZ MARIA DEL ROSARIO (page 64)

g)    A certified copy of birth certificate number A2929095 in the name of ██████████ (page 67)

h)    A certified copy of passport number 97380053111 in the name of ██████

136

███████████████████, issued on the seventeenth of December one thousand nine hundred and ninety seven and with expiry date the seventeenth of December two thousand and two, in Naucalpan, Mexico (68)

6.- Official statement by **FERNANDO CASTILLO TAPIA** on the twenty third of April two thousand and four, in which he declared that as indicated in his appearance on the twenty second of March this year, I gave no authorization for passports to be issued in favor of the children, therefore at this moment the documentation remitted by the Ministry of Foreign Affairs is placed before him, giving the name and signature of the person requesting issue of the passports in favor of the children ███████████████████ both having the surnames ███████████████, together with a copy of the passport containing the name of JOSE FERNANDO CASTILLO TAPIA, who supposedly authorized the issue of said document, therefore the defendant, after checking the documents on file, states that he does not know who signed on his behalf, nor does he know who the fingerprint appearing on both applications for the children belongs and, therefore, that he was not physically present to present the application or sign or authorize the issue of the passports for his minor children, clarifying that he only recognizes that the copy of the passport in favor of the child ███████████████████ date of issue 17 seventeenth of December in the year 1997, one thousand nine hundred and ninety seven, was processed together with Mrs. MARIA DEL ROSARIO MORENO VAZQUEZ at that time, and he therefore signed in his handwriting. In the same way he states that the handwriting contained in the applications is that of Mrs. MARIA DEL ROSARIO MORENO VAZQUEZ, mentioning that he remembers that some days before his children were taken by their mother, he stated that his passport was kept in the bedroom of his private residence and that he found it in a different place but did not think it important, but that his son named ███████████████████ had copies of the keys to his house, and he therefore thinks that his son or daughter of the children's mother could have taken is passport and returned it to its place, since they had access to the house of the deponent and since the latter, for reasons of work, is not at home during the day, he did not know when it could have been taken but that he did not know that it had been utilized to process the issue of passports in favor of the children. In the same way he mentions that as regards the statement contained in the INTERPOL document dated April 12 this year, he only accepts this in part since effectively I presented myself to ask for help, since I imagined that my children had been taken out of the country by Mrs. MARIA DEL ROSARIO MORENO VAZQUEZ, as I also indicated before the Public Ministry for the State of Mexico on the day I discovered that my children were no longer living at the house in Plaza de San Jorge 15, Altefia Two in Lomas Verdes, considering that some months ago MARIA DEL ROSARIO MORENO told him that she had married a person called RONALD COONLEY, of American nationality, and that she was thinking of taking her children to live in the United States, and he had therefore told her that he was not in agreement in her taking the children and that he would not give them permission to go at that time, since Mrs. MARIA ROSARIO MORENO had told hi that she had met Mr. COONLEY through the Internet, and that he knows that this is her second marriage after his which she enters into with people she meets through the Internet, and that he did not comment on the matter again with Mrs. ROSARIO MORENO until he learned from his son's schoolmates that ███████████████ was going to live in the city of Salem, Alabama, and he remembered the conversation he had had with Mrs. MARIA DEL ROSARIO MORENO, and he therefore thinks that she took them abroad, forging his signature; he does not the place where his minor children ███████████ and ███████████████, both surnamed ███████████████ are physically to be found. He only believes that they could be at the domiciles he referred to in his statement of the twenty second of March this year, delivering copies of the Internet information to be

ped

137

added to the file; yes he has remained in contact with his minor children by Internet, sending messages to his son's mail address which is HYPERLINK, mail to: ▆▆▆▆▆▆▆▆▆ HYPERLINK, ▆▆▆▆▆▆▆ since they were taken, but to date he has not replied; with regard to his daughter, he has not been able to have communication with her; that since before the twenty eighth of February this year to date, he has not seen nor has he had contact and knows nothing of Mrs. MARIA DEL ROSARIO MORENO VAZQUEZ, since she has not contacted him, since he does not know where to look for her, since even though he obtained some addresses by Internet of her supposed husband, he does not know whether that is the correct address; Mrs. MARIA DEL ROSARIO MORENO VAZQUEZ has a court order from the year one thousand nine hundred and ninety one, which to date has not been amended, wherein the Tenth Judge for Family Matters with residence in the Federal District resolved to grant joint custody of ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, but the patria potestas is exercised by both parents. As regards his daughter ▆▆▆ nothing has been declared, since at that time she had not yet been born, therefore the custody and the patria potestas is exercised by both, documents held on file and which he himself presented; that he was willing to undergo calligraphic and dactilar tests to verify his statement, since he neither signed nor affixed his fingerprints (pages 73 to 75).

7.- Official communication without number dated the twenty second of April two thousand and four, received at the Clerk's office of the Assistant Attorney General for Investigation Specializing in Organized Crime on the twenty sixth of this same month and year, signed by the attorney Antonio Jauregui Quintana, Manager for Lawsuits and Fleet of Aerovias de Mexico, under which ordinary copies of flight coupons were attached in favor of ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, utilized on the Mexico-Atlanta route flight six hundred and thirty six on the twenty seventh day of February two thousand and four (pages 100 and 101).

8.- Opinion on graphoscopic identification dated the tenth of June two thousand and four, signed by the experts Praxedis Irma Garcia Guerrero and Rosa Flores Vazquez, attached to the Directorate-General for the Coordination of Expert Services, a dependency of the Attorney General's office of the Republic, in which they obtained as results: 1) On making the study corresponding to the decadactilar card in the name of C. Castillo Tapia José Fernando, presenting the following dactylscopic formula I:3343-I-2222 on the right hand, thumb, index, middle and little fingers belong to the third basic type presilla externa, the second hand corresponds to the second basic type presilla interna. The morphology of the right ring finger corresponds to the fourth basic type **VERTICE**, **SUB-TYPE CONCENTRIC**, and therefore only this was checked since it corresponded with the same basic type shown in the 0P7 forms.

II.- On studying the dactylograms stamped on forms 0P7 corresponding to the father or guardian, reading left index finger, this corresponds to the fourth basic type **VERTICE**, **SUB-TYPE LEFT INCLINING SPIRAL.**

The dactylograms reading right index figure correspond to the fourth basis type.

On comparing the dactylogram of the right anular of the decadactilar card in the name of C. Castillo Tapia José Fernando against the dactylograms inserted in the forms 0P7, these do not correspond to the subtype, nor therefore to the characteristic points.

138

The photographs of the fingerprints on forms PO7 were passed to the AFIS for making an eliminating comparison against the data base of said system, giving positive results with the following data.

BARRERA HERNANDEZ ARTEMIO, offence falsification of official documents. P.I. 9545/D/94. Authority Agent for the Public Ministry of the Federation in charge of Office IX-D, 39 years if age, date of birth 20 October 1955, with domicile at the street of Cantera No. 1, Santa Cruz Xochintepec, Xochimilco Federal District, whose decadactilar card forms part of the files of this institution. A comparative study was therefore made, taking as a base for the comparison all the middle right and left fingers based on the fundamental type, sub-type and location of characteristic points. Photographs were taken of the decadactilar card together with photographic enlargements of same, in order to effect a comparison with the fingerprints stamps on the OP7 formats of the children Maria de Fatima and Luis Fernando, both surnamed Castillo Moreno. from all of this it was concluded: FIRST: The dactylograms printed on the decadactile card in the name of C. Castillo Tapia José Fernando DO NOT CORRESPOND to the fingerprints stamped on the OP7 forms, with the right and left index fingers of the children Maria de Fatima and Luis Fernando, both surnamed Castillo Moreno. SECOND.- The dactylograms stamped on the OP7 forms reading right and left index fingers of the children Maria de Fatima and Luis Fernando, both surnamed Castillo Moreno, DO CORRESPOND to the fingerprints of the right and left middle fingers on the decadactilar card in the name of Barrera Hernandez Artemio (pages 137 to 148).

9.- An opinion on graphoscopics, dated the fifteenth of June two thousand and four, signed by the expert L. Aldo Chisanto Molina, attached to the Directorate General for the Coordination of Expert Services, a dependency of the Attorney General's office for the Republic, in which he concluded: FIRST. THE SIGNATURES SHOWN AS BELONGING TO C. JOSE FERNANDO CASTILLO TAPIA ON THE DOCUMENTS DESCRIBED AS QUERIED IN THE PRESENT OPINION DO NOT CORRESPOND TO HIM, WITH RESPECT TO THE SIGNATURES PROVIDED AS BASIS FOR THE COMPARISON. SECOND.- THE HANDWRITING CONTAINED IN THE DOCUMENTS DESCRIBED AS QUERIED IN THE PRESENT OPINION, DO NOT CORRESPOND TO C. JOSE FERNANDO CASTILLO TAPIA, WITH RESPECT TO THE HANDWRITING PROVIDED AS A BASIS FOR THE COMPARISON..." attaching photographic images in color, a Sample of the Handwriting of C. José Fernando Castillo Tapia, consisting of two pages (pages 151 to 165).

## CONCLUSIONS OF LAW:

FIRST.- From examining the documents forming the preliminary investigation consigned, it can be appreciated that this Third District Court for Federal Criminal Processes is legally incompetent by reason of territory, to hear the present proceedings, since the facts forming the subject matter of the offense in question took place on the twenty-eighth of February two thousand and four in Naucalpan de Juarez, State of Mexico, since it can be seen from the statements made by the plaintiff JOSE FERNANDO CASTILLO TAPIA, that on that date he went to the domicile located at Retorno San Jorge number fifteen Fraccionamiento Lomas Verdes, Naucalpan de Juarez, State of Mexico, domicile inhabited by the children ████████ and ████████, both surnamed ████████ at which place the mother of MARIA DEL ROSARIO MORENO VAZQUEZ delivered a letter to him in which the latter told him that she had taken her children from this place to leave the city, and he therefore supposed that she went to the United States of North America, since he was aware that the accused



139

contracted marriage with a person from that country; subsequently he leaned that it was at the sub delegation of the Ministry for Foreign Affairs located at Naucalpan de Juarez, State of Mexico, where the arrangements were made to obtain the corresponding passports; therefore in accordance with resolution 23/2001 of the Council of the Federal Judicature with respect to the determination and territorial limits of the circuits into which the territory of the Mexican Republic is divided and to the number, the territorial jurisdiction and specialization by subject matter of the Collegiate and Unitary Circuit Courts and of the District Courts, therefore the present matter should be heard by the District Court on duty in the State of Mexico with residence at Naucalpan de Juarez, since this city comes within its territorial limits; therefore, taking as grounds article 6 of the Federal Civil Procedures Code, the files should be remitted to the District Judge on duty with residence in Naucalpan de Juarez, State of Mexico, since this is the legally competent authority, through the Public Ministry attached, in order that it be a Judge of that locality who resolves as applicable on the petition by the consigning social representative, in the terms of article 16 of the General Constitution of the Republic.

Without this being an obstacle to the above determination, the fact that the investigating agency in the consignment has established that since the reform of the twenty third of December one thousand nine hundred and ninety three, to article 10 of the Federal Criminal Procedures Code, the competence was established by reason of territory which permits the Social Representative of the Federation to select "ad libitum" the jurisdictional agency which should hear a process, even when this is not that of the place where the delinquent acts occurred, therefore in his judgment the competence by exception provided in article ten, third paragraph of the Federal Criminal Procedures Code is updated; that is, that federal Criminal Processes Judge in the Federal District on duty is competent to hear the present facts, even when this differs from the place where the facts considered delinquent took place, invoking the Thesis which reads:

"TERRITORIAL COMPETENCE OF EXCEPTION (ARTICLE 10, THIRD PARAGRAPH OF THE FEDERAL CRIMINAL PROCEDURES CODE). THE DECLARATION THAT THE REQUIREMENT OF COMPLIANCE "WITH OTHERS WHICH PREVENT GUARANTEEING THE DEVELOPMENT OF THE PROCESS..." MUST BE SPECIFIED AND EVIDENCED..."

however, the argument is unfounded, since said authority does not specify nor how for what reasons of security the accused should be confined in an imprisonment center in this City of Mexico, Federal District, in the event she is apprehended, since this is a woman whose personal characteristics are not those requiring confinement in a maximum security institution, or who represents a serious problem for a suitable development of the process; nor is it accredited much less, even by indication, that some penitentiary in the city of Naucalpan de Juarez does not possess the necessary security for her custody.

In consequence, since the hypothesis to which article 10, third paragraph of the federal Criminal Procedures Code refers has not been accredited in kind , and as constitutional article 16 establishes that the warrant for arrest must be issued by a competent authority, in the present case the authority legally empowered for such purpose is a District Judge on duty, with residence in Naucalpan de Juarez, State of Mexico, in the terms established under the preceding paragraphs.

The foregoing is supported by the thesis of Jurisprudence 1a./J. 2/2000, upheld by the First Chamber of the Supreme Court of Justice for the Nation, published in the Judicial

140

Weekly of the Federation and Gazette, Ninth Period, Tome XI, February 2000, appearing on page 15 under the following heading and text:

"COMETENCE, TERRITORIAL DE EXCEPTION, CONTAINED IN ARTICLE 10, THIRD PARAGRAPH, OF THE FEDERAL CRIMINAL PROCEDURES CODE, SHOULD BE BASICALLY REASONED AND ACCREDITED.   Even though the third paragraph mentioned provides that: "A District Judge other than that at the place the offense was commissioned will also be competent to hear an issue, if by reason of security at the prisons, depending on the nature of the act imputed,  the person circumstances of the accused and others which prevent a guaranty of a suitable development of the process, the fact that the Federal Public Ministry considers it necessary to carry exercise of the criminal action before another Judge", should not be understood in the sense that this suffices and is sufficient to place the competence by exception herein established, since we are dealing with a hypothesis of competence by exception <u>the motives and logical reasoning accrediting the assumptions called for by said number should be explained, providing evidence to support their statements, since an updating of the competence by exception in question cannot derive from an indiscriminate, arbitrary or merely subjective potestas by the consignor, which would be neither logical nor juridical.</u>   To the contrary, the exercise of this potestas should be implemented in strict compliance with established legal norms, together with the parameters of logic and rationality , for the purpose of concluding in reasonable, logical and congruent form the need to accord competence to a District Court other than that where the offense was commissioned. Therefore, the sole pretension of the Public Ministry to exercise criminal action before a District Court other than that of the place where the offense was committed, without sufficiently and suitably reasoning said petition, does not suffice to supply the supposition of competence by exception established in the third paragraph to article 10 of the Federal Criminal Procedures Code."

Together with thesis XII/98, published in the Judicial Weekly of the Federation and Gazette, Ninth Period, Tome VII, March 1998, visible on page 249 with the epigraph:

"TERRITORIAL COMPETENCE BY EXCEPTION. THE AGENT FOR THE PUBLIC MINISTRY IS OBLIGED TO SATISFY THE REQUIREMENTS ESTABLISHED IN THE THIRD PARAGRAPH TO ARTICLE 10 OF THE FEDERAL CRIMINAL PROCEDURES CODE.-  If the third paragraph to article 10 of the Federal Criminal Procedures Code specifies certain requirements for territorial competence by exception to take effect before a specific Judge, and the agent of the Federal Public Ministry consigns the investigation to someone other than where the delinquent actions took place, he is obliged to satisfy these requirements.  If this is not done, the judicial authority before whom the consignment was made should be considered incompetent,  and refuse to continue hearing the criminal case in question and, in consequence, remit the files of the action to to the Judge of the place where the acts were committed, since if the contrary is accepted, he subjective appreciation of the social representative will suffice to determine the place where the criminal proceedings are to be established, violating the rules of competence established in the foregoing legal ordinance."

Equally, Jurisprudence 1a/J.26/99, appearing on page 267, Criminal Matters, of the Judicial Weekly of the Federation and Gazette IX, May 1999, First Chamber, Ninth Period, entitled and reading:

"WARRANT FOR ARREST, MUST COME FROM A COMPETENT JUDICIAL AUTHORITY.  Constitutional article 16,  second  paragraph,  establishes  among

141

requirements with respect to a warrant for arrest, that it must be issued by a judicial authority; in turn, the first paragraph of said Constitutional precept guarantees individual freedom by requiring that any act involving same must original from a competent authority, that is, one legally empowered to issue the act in question. Therefore, is the warrant for arrest is an act affecting the individual, since its purpose is to provisionally restrict their personal or ambulatory liberty, the judge issuing same must also be legally competent to hear any criminal process which may arise from the offense or offenses for which it is issued, naturally in accordance with the criteria for establishing competence, that is, by territory, subject matter, amount or connection."

With its being necessary to hear the opinion of the Agent for the Public Ministry attached, as indicated in article 443 of the Federal Criminal Procedures Code, since this was done at the moment of consignment before this District Court.

The foregoing is supported by the contents of thesis number 50, published on page 28 of the Appendix to the Judicial Weekly of the Federation 1917-1985 under the heading:

"DULY SUPPORTED COMPETENCE BY DECLINATORY, OMISSION OF THE OPINION OF THE PUBLIC MINISTRY. Should the judge before whom the Public Ministry made the consignment state an incident of incompetence by declinatory without the Agent for the Public Ministry declaring as convenes his representation, this omission is irrelevant, because the holder of the persecutory action expresses his judicial opinion by the consignment, which leads one to conclude that the declinatory proposed is duly supported in this respect." Together with the other appearing on page 129 of said appendix, under the heading: "COMPETENCE BY DECLINATORY WITHOUT CONSULTING THE PUBLIC MINISTRY Even when, by claiming incompetence by declinatory in favor of another, the opinion of the Public Ministry is not consulted in the terms of article 443 of the Federal Criminal Procedures Code, said omission lacks judicial relevance for the action since the Public Ministry already gave its opinion by consigning the preliminary investigation by exercising criminal action against the accused, and the proposed i9ncompetence by declinatory should be considered duly supported".

SECOND.- Once the competence declined by this jurisdictional agency has been accepted and after making the respective annotations in the book of government carried in this Court for such purpose, the papers should be formally filed as a matter fully and formally concluded.

THIRD.- Taking as grounds the second point of General Resolution 87/2003 returned in full session by the Council of the Federal Judicature, together with circular 1/2004, item B, number 1, of the Executive Secretariat for the Judicial Career, Appointment and Creation of New Agencies of the Federal Judicature, this resolution is contained in the Comprehensive System for Follow-up on Files and the respective record should be attached to the files.

In view of the foregoing and also supported by articles 104, section 1, of the General Constitution of the Republic; 6 of the Federal Criminal Procedures Code and 50, section 1, insert a) of the Organic Law on the Judicial Power of the Federation, it should be and is hereby resolved:

FIRST.- this Third District Court for Federal Criminal Processes in the Federal District, DECLARES ITSELF LEGALLY INCOMPETENT BY REASON OF TERRITORY to hear the facts dealing with CHILD TRAFFICKING, provided for and penalized in article

142

366 I, second paragraph (hypothesis of action, transfer of minor under sixteen years of age outside of national territory) and penalized in article 366 quater (hypothesis of penalty) in concordance with article 366 ter section III of the Federal Criminal Code in relation with 7, first paragraph (hypothesis of action) section II (continuous or permanent offense); 8 (hypothesis of fraudulent action); 9, first paragraph (hypothesis of acting fraudulently even when aware of the illegality of the action, as described by law), and 13 section II (those automatically implemented) of the Federal Criminal Code, for which the investigating agency exercised criminal action against **MARIA DEL ROSARIO MORENO VAZQUEZ** as considered presumed guilty of commissioning same.

**SECOND.-** The original file and a duplicate should be remitted to the District Judge on Duty in the State of Mexico with residence in Naucalpan de Juarez, through the Agent for the Public Ministry attached to this jurisdictional agency, for all applicable legal purposes.

**THIRD.-** Once the competence declined by this jurisdictional agency has been accepted and annotations made in the book of government carried by this Court for such purpose, said papers are to be formally filed as a matter fully and formally concluded.

**FOURTH.-** Taking as grounds the second point of General Resolution 87/2003 returned in full session by the Council of the Federal Judicature, together with circular 1/2004, item B, number 1 of the Executive Secretariat for the Judicial Career, Appointment and Creation of New Agencies of the Federal Judicature, this resolution should be captured in the Comprehensive System for Follow-up on Files, and the respective records attached to file.

To be notified solely and exclusively to the attached Agent for the Public Ministry.

The foregoing was resolved and signed by Attorney ARTURO CESAR MORALES RAMIREZ, Third District Judge for Federal Criminal Processes in the Federal District, who acts before the Secretary Attorney Alma Araceli Rosas Gutierrez, who authorizes and attests.
(illegible signatures)



In 4-August-04 10:00
This Court notified the C. Agent for the Public Ministry who stated: that he heard same and signed.- I attest.
(illegible signatures)