RECEIVED

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

2008 MAY -2 P 2: 28

In the Matter of the Extradition of            )
MARIA del ROSARIO MORENO-VAZQUEZ     )        3:06-CV-761-MEF-CSC
        a/k/a MARIA COONLEY                )

## RESPONSE TO THE UNITED STATES' SUPPLEMENTAL EXTRADITION MEMORANDUM

### *Status of the Case*

Initially, the United States filed an extradition document alleging that the respondent had taken her two children out of the country without their father's permission in violation of Mexican law and she was charged in Mexico with that offense. The first document was ridiculous on its face as to be so charged in Mexico with that offense there has to be a joint custody order. In this instance, the order as to custody provided custody exclusively to the respondent. Therefore it was on its face not a violation of the Mexican statute to remove the children from Mexico without the father's permission.

It should be pointed out that the father in this instance is one of the top two or three officials in the Mexican federal Attorney General's office. This Court should take judicial notice of the fact that the United States Department of State recognizes that Mexican law enforcement and other officials regularly engage in harassment, mistreatment and extortion. Exhibit A. Undoubtedly such conduct explains how the Attorney General's office in Mexico can obtain a facially improper charge without any hesitation.

Upon realizing that the United States may have a problem with such an absurd charge, the Mexican Attorney General's office filed a new petition alleging in essence that the respondent had forged the name of her husband on the children's passport applications. He seeks to prove that with his own employees masquerading as experts as to the authenticity of the documents at issue. Once again, the protagonist's own office with his own employees professing to be experts, obtained a charge of fraudulent documents. This is after he sought to obtain an order under the Hague Convention to return the children (of which prosecution was refused) and sought to have the respondent and her children deported from the United States (which is administratively stayed pending final ruling on their application for permanent residency).

On April 4, 2008, a status and scheduling conference was held on this case. Prior to that counsel for the respondent had provided the Government with a 16 page analysis of its petitions for extradition which pointed out that there were translation errors, numerous illegible copies and missing pages throughout. Exhibit B. At the status conference the United States seemed to make the argument that this was irrelevant. It states in its brief that "In the end, this extradition is a rather straightforward matter". It is not.

### Legal Standards

While the Middle District of Alabama has no precedent decisions regarding extradition, there is a full and complete body of law set forth in 11th Circuit precedent cases. Under established precedent, a Magistrate Judge has great discretion in determining extraditability. He may only be overturned if (1) there is no jurisdiction; (2)

the offense charged is not within contemplation of the treaty; or (3) there is no evidence of a reasonable ground to find the accused guilty of the alleged crime. Kastnerova v. United States, No. 03-14119 (11th Cir. 04/08/2004). (All cited cases are attached hereto Exhibit C); See Also, Afaanasjev. V. Hurlburt Jr. No. 04-13303 (July 26, 2005). As regards this case, the respondent does not contest the jurisdiction or venue of this Court to hear the case and would agree that it is in the proper court.

Whether the offense charged is within contemplation of the treaty is an element which is a mixed question of fact and law.   In essence, what must be proven by the United States is that the crime alleged to have been violated in Mexico is equally criminalized within the United States. See, In re Commissioner's Subpoenas, 325 F.3d 1287) (11th Cir. 2003). The burden of proof is on the United States to establish that fact by a preponderance of the evidence. Id. In other words, it is not enough for the United States to merely prove that the respondent has been charged in Mexico.  It must prove that the charge in Mexico is dually criminal within both Mexico and the United States. The offense for which the foreign state seeks assistance must also constitute a crime in the requested state. Id at 9.  No showing has been made in this matter on either of the petitions and as such there would be insufficient proof of the second factor (the offense charged being in contemplation of the treaty).

The third factor - evidence of a reasonable ground to find the accused guilty of the crime charged - is obviously the most litigated.  This requires the Magistrate judge to find (a) reliable evidence and (b) a reasonable ground or theory of the case. See, Valenzuela v. United States, 286 F.3d 1223 (11th Cir. 2002). The Valenzuela case is particularly instructive.  In that case the magistrate judge found a lack of properly

submitted evidence and therefor a lack of probable cause. Id at 2. The United States seeing that the case was failing attempted to file certain documents not submitted with the petition and therefor not subject to the relaxed evidentiary rules as these new documents (which came from a proffer session evidently and were not to be used against the respondents). The judge found them inadmissable as not arising from the Italian petition. Id.

The United States then, having lost on the first application submitted a second application containing the previously excluded proffer documents and submissions. Over the respondent's objections, the Court accepted these documents and ordered the respondents extradited. Id at 3. The respondent then filed a petition for habeas corpus with the District Court which was denied (such is the appropriate was to appeal an extradition order as there is no direct appeal of such to the Circuit Court or from a magistrate to the Article Three Judge) which was denied. An appeal of that denial followed to the Eleventh Circuit.

The Court found that the use of the proffer statements which were not to be disclosed rendered the extradition hearing "fundamentally unfair and denied them due process of law". Id at 4. The Eleventh Circuit then overruled the magistrate judge and denied extradition. Id.

It should be clear from this case that the Government's assertion that this extradition is a "straightforward matter" intimating that it is a paperwork function for which there is nothing for this Court to consider is nonsense. An extradition is a hearing requiring proof, and proper evidence which is convincing. It is not a hearing where a criminal standard of "beyond the reasonable doubt" is imposed, but it is not a routine

ministerial function as the government seeks this court to believe.  There are at least 20 reported cases in the Eleventh Circuit alone on extradition matters.  In <u>Valenzuela</u>, there is the imposition of due process rights on the respondents as well.

In this case the United States must prove by a preponderance of the evidence that the charges meet the requirement of duel criminality.  It must then prove that there is reliable evidence establishing a reasonable theory of the case under the probable cause standard.  It has done neither to date.

Respectfully submitted,

Ben Bruner
Attorney at Law
505 S. Perry Street
Montgomery, Alabama  36104
(334) 323 4463

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document on the parties shown below by placing a copy of the same in the U.S. Mail, properly addressed and postage prepaid.

Done this ____ day of _____, 2008.

Ben Bruner

Leura Canary, Esq.
United States Attorney
P.O. Box 197
Montgomery, Alabama  36101

# EXHIBIT A



## Mexico
### Country Specific Information

Mexico  Travel Alert
Recent Embassy Notices for American Citizens

On this page »

Country Description
Entry/Exit Requirements
Safety and Security
Crime
Information for Victims of Crime
Medical Facilities and Health Information
Medical Insurance

Traffic Safety and Road Conditions
Aviation Safety Oversight
Special Circumstances
Criminal Penalties
Children's Issues
Registration/Embassy Location

International Travel Home

A-Z Index of Topics

New Requirements for U.S. Citizens

International Travel Information

Tips for Traveling Abroad

Document Requirements

Living Abroad Tips

Additional Resources

About Overseas Citizens' Services

**September 13, 2007**

**COUNTRY DESCRIPTION:**  Mexico is a Spanish-speaking country about three times the size of Texas, consisting of 31 states and one federal district.  The capital is Mexico City.  Mexico has a rapidly developing economy, ranked by the World Bank as the twelfth largest in the world.  The climate ranges from tropical to desert, and the terrain consists of coastal lowlands, central high plateaus, and mountains of up to 18,000 feet.

Many cities throughout Mexico are popular tourist destinations for U.S. citizens.  Travelers should note that location-specific information contained below is not confined solely to those cities, but can reflect conditions throughout Mexico.  Although the majority of visitors to Mexico thoroughly enjoy their stay, a small number experience difficulties and serious inconveniences.  Please read the State Department's background notes on Mexico for additional information.

Back to Top

**ENTRY/EXIT REQUIREMENTS:** For the latest entry requirements, contact the Embassy of Mexico web site at http://portal.sre.gob.mx/usa/ or contact the Embassy of Mexico at 1911 Pennsylvania Avenue NW, Washington, DC  20006, telephone (202) 736-1000 or any Mexican consulate in the United States for the most current information.

All Americans traveling by air outside the United States are required to present a passport or other valid travel document to enter or re-enter the United States .  This requirement will be extended to sea travel (except closed loop cruises), including ferry service, by the summer of 2009.  Until then, U.S. citizens traveling by sea must have government-issued photo identification and a document showing their U.S. citizenship (for example, a birth certificate or certificate of nationalization), or other WHTI compliant document such as a passport card for entry or re-entry to the U.S.   Sea travelers should also check with their cruise line and countries of destination for any foreign entry requirements.

Applications for the new U.S. Passport Card are now being accepted.  Based on current projections, we expect to begin production of the passport card in June 2008 and be in full production in July 2008. **The card may not be used to travel by air and is available only to U.S. citizens.** Further information on the U.S. Passport Card is available at http://travel.state.gov/passport/ppt_card/ppt_card_3926.html and upcoming changes to U.S. passport policy can be found on the Bureau of Consular Affairs web site at

http://travel.state.gov/travel/cbpmc/cbpmc_2223.html. We strongly encourage all American citizen travelers to apply for a U.S. passport well in advance of anticipated travel. American citizens can visit travel.state.gov or call 1-877-4USA-PPT (1-877-487-2778) for information on how to apply for their passports.

U.S. legal permanent residents in possession of their I-551 Permanent Resident card may board flights to the U.S. from Mexico.

**Minors:** Mexican law requires that any non-Mexican citizen under the age of 18 departing Mexico must carry notarized written permission from any parent or guardian not traveling with the child to or from Mexico. This permission must include the name of the parent, the name of the child, the name of anyone traveling with the child, and the notarized signature(s) of the absent parent(s). The State Department recommends that the permission should include travel dates, destinations, airlines and a brief summary of the circumstances surrounding the travel. The child must be carrying the original letter – not a facsimile or scanned copy – as well as proof of the parent/child relationship (usually a birth certificate or court document) – and an original custody decree, if applicable. Travelers should contact the Mexican Embassy or closest Mexican Consulate for current information.

**Tourist Travel:** U.S. citizens do not require a visa or a tourist card for tourist stays of 72 hours or less within "the border zone," defined as an area between 20 to 30 kilometers of the border with the U.S., depending on the location. U.S. citizens traveling as tourists beyond the border zone or entering Mexico by air must pay a fee to obtain a tourist card, also known as an FM-T, available from Mexican consulates, Mexican border crossing points, Mexican tourism offices, airports within the border zone and most airlines serving Mexico. The fee for the tourist card is generally included in the price of a plane ticket for travelers arriving by air.

**Business Travel:** Upon arrival in Mexico, business travelers must complete and submit a form (Form FM-N) authorizing the conduct of business, but not employment, for a 30-day period. Travelers entering Mexico for purposes other than tourism or business or for stays of longer than 180 days require a visa and must carry a valid U.S. passport. U.S. citizens planning to work or live in Mexico should apply for the appropriate Mexican visa at the Mexican Embassy in Washington, D.C., or nearest Mexican consulate in the United States.

**Vehicle Permits:** Tourists wishing to travel beyond the border zone with their vehicle must obtain a temporary import permit or risk having their vehicle confiscated by Mexican customs officials. At present the only exceptions to the requirement are travel in the Baja Peninsula and in the state of Sonora only for vehicles entering through the Nogales port of entry. Travelers are advised that the "Sonora Only" exception through the Nogales port of entry will expire at the end of 2007. To acquire a permit, one must submit evidence of citizenship, title for the vehicle, a vehicle registration certificate, a driver's license, and a processing fee to either a Banjercito (Mexican Army Bank) branch located at a Mexican Customs (Aduanas) office at the port of entry, or at one of the Mexican Consulates located in the U.S. Mexican law also requires the posting of a bond at a Banjercito office to guarantee the export of the car from Mexico within a time period determined at the time of the application. For this purpose, American Express, Visa or MasterCard credit card holders will be asked to provide credit card information; others will need to make a cash deposit of between $200 and $400, depending on the make/model/year of the vehicle. In order to recover this bond or avoid credit card charges, travelers must go to any Mexican Customs office immediately prior to departing Mexico. Despite any advice, official or unofficial, to the contrary, vehicle permits cannot be obtained at checkpoints in the interior of Mexico.

Travelers should avoid individuals outside vehicle permit offices offering to obtain the permits without waiting in line, even if they appear to be government officials. There have been reports of fraudulent or counterfeit permits being issued adjacent to the vehicle import permit office in Nuevo Laredo and other border areas. If the proper permit is not obtained before entering Mexico and cannot be obtained at the Banjercito branch at the port of entry, do not proceed to the interior. Travelers without the proper permit may be incarcerated, fined and/or have their vehicle seized at immigration/customs checkpoints. For further information, contact Mexican Customs about appropriate vehicle permits.

**DUAL NATIONALITY:** Mexican law recognizes dual nationality for Mexicans by birth, meaning those born in Mexico or born abroad to Mexican parents. U.S. citizens who are also Mexican nationals are considered to be Mexican by local

authorities. Dual-nationality status could hamper U.S. Government efforts to provide consular protection. Dual nationals are not subject to compulsory military service in Mexico. Travelers possessing both U.S. and Mexican nationalities must carry with them proof of their citizenship of both countries. Under Mexican law, dual nationals entering or departing Mexico must identify themselves as Mexican. For additional information, read our information on dual nationality and prevention of international child abduction.

Back to Top

**SAFETY AND SECURITY:**  Sporadic outbursts of politically motivated violence occur from time to time in certain areas of the country, particularly in the southern states of Chiapas, Guerrero and Oaxaca.

**Demonstrations:** The Mexican Constitution prohibits political activities by foreigners, and such actions may result in detention and/or deportation. Travelers should avoid political demonstrations and other activities that might be deemed political by the Mexican authorities. Even demonstrations intended to be peaceful can turn confrontational and escalate into violence. U.S. citizens are urged to avoid the areas of demonstrations, and to exercise caution if in the vicinity of any protests.

**Chiapas:** The Department of State recommends U.S. citizens traveling to the southern state of Chiapas remain cautious at all times. Armed rebels and armed civilian groups are present in some areas of the state, and there is often no effective law enforcement or police protection. Violent criminal gang activity along the state's southern border – mostly aimed at illegal migrants – continues to be a concern. U.S. citizens traveling to Chiapas are encouraged to contact the U.S. Embassy for further security information prior to traveling to the region.

**General Safety:**  Standards of security, safety, and supervision may not reach those expected in the United States. This has contributed to deaths of U.S. citizens in automobile accidents, after falls from balconies or into open ditches, by drowning in the ocean as well as in hotel pools, and in water-sports mishaps, among others.

The Department of State urges American citizens to take responsibility for their own personal security while traveling overseas. For the latest security information, Americans traveling abroad should regularly monitor the Department's travel web site where the current Worldwide Caution, Travel Warnings, and Travel Alerts can be found. Please visit the Safety Issues section for additional safety information.

Up-to-date information on safety and security can also be obtained by calling 1-888-407-4747 toll free in the United States, or, for callers outside the United States and Canada, a regular toll line at 1-202-501-4444. These numbers are available from 8:00 a.m. to 8:00 p.m. Eastern Time, Monday through Friday (except U.S. federal holidays).

Back to Top

**CRIME:** Crime in Mexico continues at high levels, and it is often violent, especially in Mexico City, Tijuana, Ciudad Juarez, Nuevo Laredo, Monterrey, Acapulco, and the state of Sinaloa. Other metropolitan areas have lower, but still serious, levels of crime. Low apprehension and conviction rates of criminals contribute to the high crime rate. U.S. citizen victims of crime in Mexico are encouraged to report the incident to the nearest police headquarters and to the nearest U.S. consular office.

In many countries around the world, counterfeit and pirated goods are widely available. Transactions involving such products may be illegal under local law. In addition, bringing them back to the United States may result in forfeitures and/or fines. More information on this serious problem is available at http://www.cybercrime.gov/18usc2320.htm.

**Personal Property:** Travelers should always leave valuables and irreplaceable items in a safe place, or not bring them at all. All visitors are encouraged to make use of hotel safes when available, avoid wearing obviously expensive jewelry or designer clothing, and carry only the cash or credit cards that will be needed on each outing. There are a significant number of pickpocket, purse snatching, and hotel-room theft incidents. Public transportation is a particularly popular place for pickpockets. When renting a vehicle, ensure that advertisements or labels for the rental agency are not prominently displayed on the vehicle. Avoid leaving valuables such as identification, passport and irreplaceable property in rental vehicles, even when locked.

A number of Americans have been arrested for passing on counterfeit currency they had earlier received in change. If you receive what you believe to be a counterfeit bank note, bring it to the attention of Mexican law enforcement.

**Personal Safety:** Visitors should be aware of their surroundings at all times, even when in areas generally considered safe. Women traveling alone are especially vulnerable and should exercise caution, particularly at night. Victims, who are almost always unaccompanied, have been raped, robbed of personal property, or abducted and then held while their credit cards were used at various businesses and Automatic Teller Machines (ATMs). U.S. citizens should be very cautious in general when using ATMs in Mexico. If an ATM must be used, it should be accessed only during the business day at large protected facilities (preferably inside commercial establishments, rather than at glass-enclosed, highly visible ATMs on streets). U.S. and Mexican citizens are sometimes accosted on the street and forced to withdraw money from their accounts using their ATM cards.

Kidnapping, including the kidnapping of non-Mexicans, continues at alarming rates. So-called express kidnappings, an attempt to get quick cash in exchange for the release of an individual, have occurred in almost all the large cities in Mexico and appear to target not only the wealthy, but also the middle class. U.S. businesses with offices in Mexico or concerned U.S. citizens may contact the U.S. Embassy or any U.S. consulate to discuss precautions they should take.

Criminal assaults occur on highways throughout Mexico; travelers should exercise extreme caution at all times, avoid traveling at night, and may wish to use toll ("cuota") roads rather than the less secure "free" ("libre") roads whenever possible. Always keep your car doors locked and your windows up while driving, whether on the highway or in town. When in heavy traffic or when stopped in traffic, leave enough room between vehicles to maneuver and escape, if necessary. In addition, U.S. citizens should not hitchhike with, accept rides from or offer rides to, strangers anywhere in Mexico. Tourists should not hike alone in backcountry areas, nor walk alone on lightly-frequented beaches, ruins or trails.

**Street Crime:** Armed street crime is a serious problem in all of the major cities. Some bars and nightclubs, especially in resort cities such as Cancun, Cabo San Lucas, Mazatlan, Acapulco, and Tijuana, can be havens for drug dealers and petty criminals. Some establishments may contaminate or drug drinks to gain control over the patron.

All bus travel should be during daylight hours and on first-class conveyances. Although there have been several reports of bus hijackings and robberies on toll roads, buses on toll roads have a markedly lower rate of incidents than buses (second- and third-class) that travel the less secure "free" highways. The Embassy advises caution when traveling by bus from Acapulco toward Ixtapa or Huatulco. Although the police have made some progress in bringing this problem under control, armed robberies of entire busloads of passengers still occur.

**Harassment/Extortion:** In some instances, Americans have become victims of harassment, mistreatment and extortion by Mexican law enforcement and other officials. Mexican authorities have cooperated in investigating such cases, but one must have the officer's name, badge number, and patrol car number to pursue a complaint effectively. Please note this information if you ever have a problem with police or other officials. In addition, tourists should be wary of persons representing themselves as police officers or other officials. When in doubt, ask for identification. Be aware that offering a bribe to a public official to avoid a ticket or other penalty is a crime in Mexico.

It is increasingly common for extortionists to call prospective victims on the telephone, often posing as law enforcement or other officials, and demand payments in return for the release of an arrested family member, or to forestall a kidnapping. Prison inmates using smuggled cellular phones often place these calls. Persons receiving such calls should be extremely skeptical since most such demands or threats are baseless, and should contact the U.S. Embassy or closest U.S. consulate, or the Department of State for assistance.

U.S. citizens may refer to A Safe Trip Abroad for ways to promote a trouble-free journey.

Back to Top

**INFORMATION FOR VICTIMS OF CRIME:** The loss or theft abroad of a U.S. passport should be reported immediately to the local police and the nearest U.S. Embassy or Consulate. If you are a victim of a crime while overseas, you should report it immediately to the nearest U.S. consular office and make a report to Mexican authorities. Do not rely on hotel/restaurant/tour company management to make the report for you. The Embassy/Consulate staff can, for example, assist you to find appropriate medical care, contact family members or friends and explain how funds could be transferred. Although the investigation and prosecution of the crime is solely the responsibility of local authorities, consular officers can help you to understand the local criminal justice process and to find an attorney if needed. Under the best of circumstances, prosecution is very difficult (a fact some assailants appear to exploit knowingly), but no criminal investigation is possible without a formal complaint to Mexican authorities.

Victims of crime may also report the crime to the Mexican Embassy or nearest consulate after arriving in the United States. Before doing so, please contact the U.S. Embassy or consulate in Mexico for assistance in coordinating with Mexican consular officials to obtain an official appointment for the victim or witness with the Mexican Embassy or consulate. Travelers are encouraged to report crimes as soon as possible. Delays in reporting the crime may hinder or even prevent prosecution in some cases.

**Crime in Mexico City:** In Mexico City, the most frequently reported crimes involving tourists are taxi robbery (see below), armed robbery, pick pocketing, and purse-snatching. In several cases, tourists have reported that men in uniforms perpetrated the crime, stopping vehicles and seeking money, or assaulting and robbing tourists walking late at night. As in any large city, individuals should exercise caution and be aware of their surroundings, especially when walking anywhere in the city.

Business travelers should be aware that theft occurs even in what appears to be secure locations. Theft of such items as briefcases and laptops occur frequently at the Benito Juarez International Airport and at business-class hotels. Arriving travelers who need to obtain pesos at the airport should use the exchange counters or ATMs in the arrival/departure gate area, where access is restricted, rather than changing money after passing through Customs, where they can be observed by criminals.

Metro (subway) robberies are frequent in Mexico City. If riding the Metro or the city bus system, U.S. citizens should take extreme care with valuables and belongings. Avoid using Metro during busy commuting hours in the morning or afternoon. Tourists and residents alike should avoid driving alone at night anywhere in Mexico City.

Robbery and assault on passengers in taxis are frequent and violent in Mexico City, with passengers subjected to beating, shooting, and sexual assault. U.S. citizens visiting Mexico City should avoid taking any taxi not summoned by telephone or contacted in advance. When in need of a taxi, please telephone a radio taxi or "sitio" (regulated taxi stand – pronounced "C-T-O"), and ask the dispatcher for the driver's name and the cab's license plate number. Ask the hotel concierge or other responsible individual to write down the license plate number of the cab that you entered. Sitio taxis may be distinguished from other taxis in Mexico City by the letter "S" that precedes the identification numbers on the side of the car and on the license plate.

Passengers arriving at Mexico City's Benito Juarez International Airport should take only airport taxis (which are white with a yellow stripe and a black airplane symbol) after pre-paying the fare at one of the special booths inside the airport.

**Crime in Cancun, Acapulco, and Other Resort Areas:** There have been a significant number of rapes reported in Cancun and other resort areas. Many of these have occurred at night or in the early morning. Attacks have also occurred on deserted beaches and in hotel rooms. Acquaintance rape is a serious problem. In other cases, hotel workers, taxi drivers, and security personnel have been implicated. Please refer to our information for <u>Victims of Crime</u>.

Drug-related violence, including shooting and kidnapping, has increased in Acapulco recently. Although this violence is not targeted at foreign residents or tourists, U.S. citizens in these areas should be vigilant in their personal safety.

Crime in Border Cities: Visitors to the U.S. – Mexico border region, including cities

such as Tijuana, Ciudad Juarez, Nuevo Laredo, Nogales, Reynosa, Matamoros, and Monterrey, should remain alert and be aware of their surroundings at all times.

Some border cities have seen an increase in violence over the past year, some of which has been directed against U.S. citizens. Local police forces have been ineffective in maintaining security in some regions along the border. Drug-related violence has increased dramatically in recent months, and shows no sign of abating. While U.S. citizens not involved in criminal activities are generally not targeted, innocent bystanders are at risk from the increase in violence in the streets of border cities.

In Ciudad Juarez, Monterrey, Nuevo Laredo, and Tijuana, shootings have taken place at busy intersections and at popular restaurants during daylight hours. The wave of violence has been aimed primarily at members of drug-trafficking organizations, criminal justice officials, and journalists. However, foreign visitors and residents, including U.S. citizens, have been among the victims of homicide and kidnapping in the border region. In recent months, the worst violence has been centered in the city of Nuevo Laredo in the Mexican state of Tamaulipas, where numerous citizens were kidnapped and/or murdered. U.S. citizens are urged to be especially aware of safety and security concerns when visiting the border region and exercise commonsense precautions such as visiting only legitimate business and tourist areas of border towns during daylight hours. U.S. citizens who frequently make routine visits to border cities should vary their routes and times and are urged to park in well-lighted, paid, and guarded parking lots. Exercise caution when entering or exiting your vehicle and instruct all fellow travelers to enter and exit the vehicle safely and quickly.

Mexican authorities have failed to prosecute numerous crimes committed against U.S. citizens, including murder and kidnapping. Local police forces suffer from a lack of funds and training, and the judicial system is weak, overworked, and inefficient. Criminals, armed with an impressive array of weapons, know there is little chance they will be caught and punished. In some cases, assailants have been wearing full or partial police uniforms and have used vehicles that resemble police vehicles, indicating some elements of the police might be involved.

Visitors are very vulnerable when visiting the local "red-light districts," particularly if they are departing alone in the early hours of the morning. In Ciudad Juarez and Tijuana, there has also been a rise in automobile accidents in which municipal police extort money from U.S. citizen victims.

Back to Top

**CRIMINAL PENALTIES:** While in a foreign country, a U.S. citizen is subject to that country's laws and regulations, which sometimes differ significantly from those in the United States and may not afford the protections available to the individual under U.S. law. The trial process in Mexico is different from the trial process in the United States, and procedures may vary from state to state. Penalties for breaking the law can be more severe than in the United States for similar offenses. Persons violating Mexican laws, even unknowingly, may be expelled, arrested or imprisoned. Penalties for possession, use or trafficking in illegal drugs in Mexico are severe, and convicted offenders can expect long jail sentences and heavy fines.

For more information, please see our information on Criminal Penalties.

**Sexual Offenses:** Engaging in sexual conduct with children or using or disseminating child pornography in a foreign country is a crime, prosecutable in the United States. Soliciting the services of a minor for sexual purposes is illegal in Mexico, and is punishable by imprisonment. The Mexican government has announced an aggressive program to discourage sexual tourism. Police authorities in the state of Baja California recently began enforcement of anti-pedophile legislation.

**Arrests & Notifications:** The Mexican government is required by international law to notify the U.S. Embassy or the nearest U.S. consulate promptly when a U.S. citizen is arrested, if the arrestee so requests. In practice, however, this notification can be delayed by months or may never occur at all, limiting the assistance the U.S. Government can provide. U.S. citizens should promptly identify themselves as such to the arresting officers, and should request that the Embassy or nearest consulate be notified immediately.

**Prison Facilities:** Prison conditions in Mexico can be extremely poor. In many

facilities food is insufficient in both quantity and quality, and prisoners must pay for adequate nutrition from their own funds. Most Mexican prisons provide poor medical care, and even prisoners with urgent medical conditions receive only a minimum of attention. U.S. citizens who are incarcerated in Mexico are sometimes forced to pay hundreds and even thousands of dollars in "protection money" to fellow prisoners.

**Prisoner Treatment/Interrogations:** Mexican police regularly obtain information through torture and prosecutors use this evidence in courts. The Mexican Constitution and the law prohibit torture, and Mexico is party to several international anti-torture conventions, but courts continue to admit as evidence confessions extracted under torture. Authorities rarely punish officials for torture, which continues to occur in large part because confessions are the primary evidence in many criminal convictions. U.S. citizens have been brutalized, beaten, and even raped while in police custody. Since the beginning of 2002, 21 U.S. citizens have died in Mexican prisons, including five apparent homicides.

**Drug Penalties and Prescription Medications:** Penalties for drug offenses are strict, and convicted offenders can expect large fines and jail sentences up to 25 years. The purchase of controlled medication requires a prescription from a licensed Mexican physician; some Mexican doctors have been arrested for writing prescriptions without due cause. In those instances, U.S. citizens who bought the medications have been held in jail for months waiting for the Mexican judicial system to decide their fate. The Mexican list of controlled medication differs from that of the United States, and Mexican public health laws concerning controlled medication are unclear and often enforced selectively. To determine whether a particular medication is controlled in Mexico, and requires a prescription from a Mexican doctor for purchase, please consult the website of the Mexican Federal Commission for Protection Against Health Risks (Comisión Federal para la Protección contra Riesgos Sanitarios - COFEPRIS) at Listado de Medicamentos Controlados, http://www.cofepris.gob.mx/pyp/estpsic/es.htm. This site is in Spanish only.

**Buying Prescription Drugs:** The U.S. Embassy recommends that U.S. citizens not travel to Mexico for the sole purpose of buying prescription drugs. U.S. citizens have been arrested and their medicines confiscated by the Mexican authorities when their prescriptions were written by a licensed American physician and filled by a licensed Mexican pharmacist. There have been cases of U.S. citizens buying prescription drugs in border cities only to be arrested soon after or have money extorted by criminals impersonating police officers. Those arrested are often held for the full 48 hours allowed by Mexican law without charges being filed, then released. During this interval, the detainees are often asked for bribes or are solicited by attorneys who demand large fees to secure their release, which will normally occur without any intercession as there are insufficient grounds to bring criminal charges against the individuals. In addition, U.S. law enforcement officials believe that as much as 25 percent of medications available in Mexico are counterfeit and substandard. Such counterfeit medications may be difficult to distinguish from the real medications and could pose serious health risks to consumers. The importation of prescription drugs into the United States can be illegal in certain circumstances. U.S. law generally permits persons to enter the United States with only an immediate (about one-month) supply of a prescription medication.

**Criminal Penalties for Possession:** The U.S. Embassy cautions that possession of any amount of prescription medication brought from the United States, including medications to treat HIV, and psychotropic drugs such as Valium, can result in arrest if Mexican authorities suspect abuse or if the quantity of the prescription medication exceeds the amount required for several days' use. Individuals should consider carrying a copy of the prescription and a Mexican doctor's letter explaining that the quantity of medication is appropriate for their personal medical use.

**Importing Medicine to Mexico:** To import prescription medication into Mexico for personal use, a foreigner must obtain a permit from the Mexican Health Department prior to importing the medicine into Mexico. Additional information in Spanish is available at http://www.cofepris.gob.mx. For a fee, a customs broker can process the permit before the Mexican authorities on behalf of an individual. If using the services of a customs broker, it is advisable to agree upon the fees before telling the broker to proceed. Current information on local customs brokers (agencias aduanales) is available at the Mexico City yellow pages at http://www.seccionamarilla.com.mx.

**Pirated Merchandise:** Counterfeit and pirated goods are widely available in Mexico. Their sale is largely controlled by organized crime. Purchase for personal use is not criminalized in Mexico; however, bringing these goods back to the United States may result in forfeitures and/or fines. For more information on this serious problem visit the Special 301 Report at http://www.ustr.gov/Document_Library/Reports_Publications/2006/2006_Special_301_Review/Section_Index.html.

**FIREARMS PENALTIES:** The Department of State warns U.S. citizens against taking any type of firearm or ammunition into Mexico without prior written authorization from the Mexican authorities. Entering Mexico with a firearm, some kinds of knives or even a single round of ammunition is illegal, even if the weapon or ammunition is taken into Mexico unintentionally. The Mexican government strictly enforces its laws restricting the entry of firearms and ammunition along all land borders and at airports and seaports. Violations have resulted in arrests, convictions, and long prison sentences for U.S. citizens.
Vessels entering Mexican waters with firearms or ammunition on board must have a permit previously issued by the Mexican Embassy or a Mexican consulate. Mariners do not avoid prosecution by declaring their weapons at the port of entry. Before traveling, mariners who have obtained a Mexican firearm permit should contact Mexican port officials to receive guidance on the specific procedures used to report and secure weapons and ammunition.

**CUSTOMS REGULATIONS:** Please refer to our information on customs regulations. U.S. citizens bringing gifts to friends and relatives in Mexico should be prepared to demonstrate to Mexican customs officials the origin and the value of the gifts. U.S. citizens entering Mexico by the land border can bring in gifts with a value of up to $50.00 duty-free, except for alcohol and tobacco products. U.S. citizens entering Mexico by air or sea can bring in gifts with a value of up to $300.00 duty-free.

**Personal Effects:** Tourists are allowed to bring in their personal effects duty-free. According to customs regulations, in addition to clothing, personal effects may include one camera, one video cassette player, one personal computer, one CD player, 5 DVDs, 20 music CDs or audiocassettes, 12 rolls of unused film, and one cellular phone. Any tourist carrying such items, even if duty-free, should enter the "Merchandise to Declare" lane at the first customs checkpoint. The tourist should be prepared to pay any assessed duty. Failure to declare personal effects routinely results in the seizure of the goods as contraband, plus the seizure of the vehicle in which the goods are traveling for attempted smuggling. The recovery of the seized vehicle involves the payment of substantial fines and attorney's fees.

**Temporary Imports/Exports:** Mexican customs authorities enforce strict regulations concerning temporary importation into or export from Mexico of items such as trucks and autos, trailers, antiquities, medications, medical equipment, business equipment, etc. Prior to traveling, contact the Mexican Embassy or one of the Mexican consulates in the United States for specific information regarding customs requirements.

**Property Donations:** U.S. citizens traveling to Mexico with goods intended for donation within Mexico, or traveling through Mexico with goods intended for donation in another country, should be aware of Mexican Customs regulations prohibiting importation of used clothing, textiles, and other used goods into Mexico. These regulations apply even to charitable donations. Individuals or groups wishing to make such donations should check with Mexican Customs for the list of prohibited items, and should hire an experienced customs broker in the U.S. to ensure compliance with Mexican law. The charitable individual or group, not the customs broker, will be held responsible for large fines or confiscation of goods if the documentation is incorrect. The website for Mexican Customs (Aduanas) is in Spanish only at Acerca de Aduana Mexico ("About Mexican Customs") at http://www.aduanas.sat.gob.mx/aduana_mexico/2007/A_body.htm. Mexican authorities require that all international transit through Mexico of persons and merchandise destined for Central or South America be handled only at the Los Indios Bridge located south of Harlingen, Texas on Route 509. The U.S. Consulate in Matamoros is the closest consulate to Los Indios Bridge and may be contacted for up-to-date information by calling 011-52-868-812-4402, ext. 273 or 280, or by checking their web site, http://matamoros.usconsulate.gov/ which lists in English the most common items prohibited from entry into Mexico. Additional customs information can be found on the U.S. Customs and Border Protection web site at http://www.cbp.gov.

Back to Top

**MEDICAL FACILITIES AND HEALTH INFORMATION:** Adequate medical care can be found in major cities. Excellent health facilities are available in Mexico City, but training and availability of emergency responders may be below U.S. standards. Care in more remote areas is limited. Standards of medical training, patient care and business practices vary greatly among medical facilities in beach resorts throughout Mexico. In recent years, some U.S. citizens have complained that certain health-care facilities in beach resorts have taken advantage of them by overcharging or providing unnecessary medical care. Elective medical procedures may be less expensive than in the United States. However, visitors are cautioned that facilities may lack access to sufficient emergency support. The U.S. Embassy encourages visitors to obtain as much information about the facility and the medical personnel as possible when considering surgical or other procedures. In addition to other publicly available information, U.S. citizens may consult the U.S. Embassy's web site for a list of doctors in Mexico Cithy at http://mexico.usembassy.gov/eng/eacs_doctors.html and a list of hospitals in Mexico City at http://mexico.usembassy.gov/eng/eacs_hospitals.html or contact the U.S. Embassy, U.S. consulate, or consular agency prior to seeking non-emergency medical attention. The U.S. Embassy, U.S. consulates, and consular agencies maintain lists of reputable doctors and medical facilities that are available to assist U.S. citizens in need of medical care.

**Water Quality:** In many areas in Mexico, tap water is unsafe and should be avoided. Bottled water and beverages are safe although visitors should be aware that many restaurants and hotels serve water unless bottled water is specifically requested. Ice may also come from tap water and should be used with caution. Visitors should exercise caution when buying food or beverages from street vendors.

The quality of water along some beaches in or near Acapulco or other large coastal communities may be unsafe for swimming because of contamination. Swimming in contaminated water may cause diarrhea and/or other illnesses. Mexican government agencies monitor water quality in public beach areas but their standards and sampling techniques may differ from those in the United States.

**Altitude:** In high-altitude areas such as Mexico City (elevation 7,600 feet or about 1/2 mile higher than Denver, Colorado), most people need a short adjustment period. Reaction signs to high altitude include a lack of energy, shortness of breath, occasional dizziness, headache, and insomnia. Those with heart problems should consult their doctor before traveling. Air pollution in Mexico City and Guadalajara is severe, especially from December to May, and combined with high altitude could affect travelers with underlying respiratory problems.

**Other Health Issues:** Information on vaccinations and other health precautions, such as safe food and water precautions and insect bite protection, may be obtained from the Centers for Disease Control and Prevention's hotline for international travelers at 1-877-FYI-TRIP (1-877-394-8747) or via the CDC's web site at http://wwwn.cdc.gov/travel/default.aspx. For information about outbreaks of infectious diseases abroad consult the World Health Organization's (WHO) web site at http://www.who.int/en. Further health information for travelers is available at http://www.who.int/ith/en.

Back to Top

**MEDICAL INSURANCE:** The Department of State strongly urges U.S. citizens to consult with their medical insurance company prior to traveling abroad to confirm whether their policy applies overseas and whether it will cover emergency expenses such as a medical evacuation. To ensure proper reimbursement of medical expenses by insurance carriers, the U.S. Embassy recommends that patients ensure they have sufficient documentation of their care and treatment before leaving the health care facility.

The Social Security Medicare Program does not provide coverage for hospital or medical costs outside the United States. Please see additional information on medical insurance abroad.

Back to Top

**TRAFFIC SAFETY AND ROAD CONDITIONS:** While in a foreign country, U.S.

citizens may encounter road conditions that differ significantly from those in the United States. The information below concerning Mexico is provided for general reference only, and may not be totally accurate in a particular location or circumstance. Public transportation vehicles, specifically taxis and city buses, often do not comply with traffic regulations, including observing speed limits and stopping at red lights.

**Driving and Vehicle Regulations:** U.S. driver's licenses are valid in Mexico. The Government of Mexico strictly regulates the entry of vehicles into Mexico. Mexican law requires that only owners drive their vehicles, or that the owner be inside the vehicle. If not, the vehicle may be seized by Mexican customs and will not be returned under any circumstances.

**Insurance:** Mexican insurance is required for all vehicles, including rental vehicles. Mexican auto insurance is sold in most cities and towns on both sides of the border. U.S. automobile liability insurance is not valid in Mexico, nor is most collision and comprehensive coverage issued by U.S. companies. Motor vehicle insurance is considered invalid in Mexico if the driver is found to be under the influence of alcohol or drugs.

**Road Emergencies and Automobile Accidents:** If you have an emergency while driving, the equivalent of "911" in Mexico is "060", but this number is not always answered. If you are driving on a toll highway (or "cuota") or any other major highway, you may contact the Green Angels (Angeles Verdes), a fleet of trucks with bilingual crews. The Green Angels may be reached directly at (01) (55) 5250-8221. If you are unable to call them, pull off the road and lift the hood of your car, chances are they will find you.

If you are involved in an automobile accident, you will be taken into police custody until it can be determined who is liable and whether you have the ability to pay any penalty. If you do not have Mexican liability insurance, you may be prevented from departing the country even if you require life-saving medical care, and you are almost certain to spend some time in jail until all parties are satisfied that responsibility has been assigned and adequate financial satisfaction received. Drivers may face criminal charges if injuries or damages are serious.

**Road Safety:** Avoid driving on Mexican highways at night. Even multi-lane expressways in Mexico often have narrow lanes and steep shoulders. Single-vehicle rollover accidents involving U.S. citizens are very common, often resulting in the death or serious injury to vehicle occupants. Use extreme caution when approaching towns, on curves, and when passing large trucks. All vehicle occupants should use seatbelts at all times. Vehicular traffic in Mexico City is restricted in order to reduce air pollution. The restriction is based on the last digit of the vehicle license plate. This applies equally to permanent, temporary, and foreign (U.S.) plates. For additional information refer to http://www.hoynocircula.com.mx/ (Spanish only). Please refer to our Road Safety Overseas for more information.

For additional information in English concerning Mexican driver's permits, vehicle inspection, road tax, mandatory insurance, etc., please contact the Mexican Secretariat of Tourism (SECTUR) at telephone 1-800-44-MEXICO (639-426). Travelers can also consult http://www.mexonline.com/drivemex.htm. For detailed information in Spanish only, visit Mexican Customs' web site Importación Temporal de Vehículos ("Temporary Importation of Vehicles") at http://www.aduanas.sat.gob.mx/aduana_mexico/2007/A_Body_Vehiculos.htm. Travelers are advised to consult with the Mexican Embassy or the nearest Mexican consulate in the United States for additional, detailed information prior to entering Mexico. For travel information for the Baja California peninsula, you can also consult independent web sites Travel to Baja at http://www.traveltobaja.net/ or Discover Baja California at http://www.discoverbajacalifornia.com/.

Back to Top

**AVIATION SAFETY OVERSIGHT:** The U.S. Federal Aviation Administration (FAA) has assessed the Government of Mexico's Civil Aviation Authority as being in compliance with International Civil Aviation Organization (ICAO) aviation safety standards for oversight of Mexico's air carrier operations. For more information, travelers may visit the FAA's Internet web site at http://www.faa.gov/safety/programs_initiatives/oversight/iasa.

Back to Top

**SPECIAL CIRCUMSTANCES:** Weather conditions may vary as they do in various parts of the United States. From June to November, the country may experience strong winds and rains as a result of hurricanes in the Gulf or along the Pacific Coast. Some areas may experience earth tremors. It is prudent to leave a detailed itinerary, including local contact information and expected time-date of return with a friend or family member.

**Water Sports:** Visitors to Mexico, including to local resort areas, should carefully assess the potential risk of recreational activities. Recreational facilities such as pools may not meet U.S. safety or sanitation standards. Do not swim in pools or at beaches without lifeguards. Several U.S. citizens have died in hotel pools in recent years. Swimming pool drain systems may not comply with U.S. safety standards and swimmers should exercise caution. Parents should watch minor children closely when they are in or around water. U.S. citizens have drowned or disappeared at both remote and popular beaches along the southwest coast of Mexico.

Warning flags on beaches should be taken seriously. If black flags are up, do not enter the water. In Cancun, there is often a very strong undertow along the beach from the Hyatt Regency all the way south to Club Med. Several drowning and near-drowning incidents have been reported on the east coast of Cozumel, particularly in the Playa San Martin-Chen Rio area. In Acapulco, avoid swimming outside the bay area. Several U.S. citizens have died while swimming in rough surf at the Revolcadero Beach near Acapulco. Despite U.S.-trained lifeguards, several U.S. citizens have drowned in the area of Zipolite Beach in Puerto Angel, Oaxaca, because of sudden waves and strong currents. Beaches on the Pacific side of the Baja California peninsula at Cabo San Lucas are dangerous due to rip tides and rogue waves; hazardous beaches in this area are clearly marked in English and Spanish. Do not swim alone in isolated beach areas. Beaches may not be well-marked, and strong currents could lead to dangerous conditions for even the most experienced swimmers. Do not dive into unknown bodies of water, because hidden rocks or shallow depths can cause serious injury or death.

Sports and aquatic equipment that you rent may not meet U.S. safety standards or be covered by any accident insurance. Scuba diving equipment may be substandard or defective due to frequent use. Inexperienced scuba divers in particular should beware of dive shops that promise to "certify" you after a few hours' instruction. Parasailing has killed U.S. citizen tourists who were dragged through palm trees or were slammed into hotel walls. Jet-ski accidents have killed U.S. citizen tourists, especially in group-outings when inexperienced guides allowed their clients to follow each other too closely.

**Cancun and Other Resort Areas:** Over 3 million U.S. citizens travel to Cancun and other Mexican beach resorts each year, including as many as 120,000 during "spring break" season, which normally begins in mid-February and runs about two months. Excessive alcohol consumption, especially by U.S. citizens under the legal U.S. drinking age, is a significant problem. The legal drinking age in Mexico is 18, but it is not uniformly enforced. Alcohol is implicated in the majority of arrests, violent crimes, accidents and deaths suffered by U.S. citizen tourists.

In recent years, moped rentals have become very widespread in Cancun and Cozumel, and the number of serious moped accidents has risen accordingly. Most operators carry no insurance and do not conduct safety checks. The U.S. Embassy recommends avoiding operators who do not provide a helmet with the rental. Some operators have been known to demand fees many times in excess of damages caused to the vehicles, even if renters have purchased insurance in advance. Vacationers at other beach resorts have encountered similar problems after accidents involving rented jet-skis. There have been cases of mobs gathering to prevent tourists from departing the scene and to intimidate them into paying exorbitant damage claims.

**Motor Accidents:** Motor vehicle accidents are the leading cause of death of U.S. citizens in Mexico. Motorists should exercise special caution on the heavily-traveled expressway south of Cancun, particularly between Playa del Carmen and Tulum, where the road narrows from 4 divided lanes to two-way traffic on a narrow and poorly-maintained road. For more information, please refer to our information on Road Safety Overseas.

**Mountain Climbing and Hiking:** Travelers who wish to climb Pico de Orizaba in Veracruz should be aware that summer droughts in recent years have removed much of the snow coating and turned the Jamapa Glacier into a high-speed ice

chute, increasing the risk of death or serious injury. At least 17 climbers have died on the mountain and 39 have been injured in recent years, including U.S. citizens. Rescue teams operate without the benefit of sophisticated equipment. Any medical treatment provided in local hospitals or clinics must be paid in cash. While regulation of the ascent is minimal and guides are not required, the U.S. Embassy recommends hiring an experienced guide.

The Colima Volcano, located approximately 20 miles north-northeast of Colima city in the state of Colima on the southwestern coast, is active and erupted several times in 2005. Travelers should not enter the prohibited area within a 4.5-mile radius of the volcano.

When departing on an outing to backcountry areas to hike or climb, it is prudent to leave a detailed itinerary, including route information and expected time and date of return with your hotel clerk or a friend or family member. Similarly, mariners preparing to depart from a Mexican harbor should visit the harbormaster and leave a detailed trip plan, including intended destination and crew and passenger information.

**MARRIAGE REQUIREMENTS IN MEXICO:** In general, to marry a Mexican national in Mexico, a U.S. citizen must be physically present in Mexico and present documents required by the jurisdiction where the marriage will take place. U.S. citizens who marry U.S. citizens or other non-Mexicans are not subject to a residence requirement, but are required to present their tourist cards. For additional information on marriages in Mexico, contact the U.S. Embassy or the nearest U.S. consulate.

Divorce requirements may vary according to jurisdiction. The U.S. Embassy recommends U.S. citizens consult a local attorney and/or the Mexican Embassy or nearest Mexican Consulate for information on divorces in Mexico.

**REAL ESTATE AND TIME-SHARES:** U.S. citizens should be aware of the risks inherent in purchasing real estate in Mexico, and should exercise extreme caution before entering into any form of commitment to invest in property there. Investors should hire competent Mexican legal counsel when contemplating any real estate investment. Mexican laws and practices regarding real estate differ substantially from those in the United States. Foreigners who purchase property in Mexico may find that property disputes with Mexican citizens may not be treated evenhandedly by Mexican criminal justice authorities and in the courts. Time-share companies cannot be sued in U.S. courts unless they have an office or other business presence in the U.S. Consumers should contact a Mexican attorney, the Mexican consumer protection agency PROFECO at http://www.profeco.gob.mx/ or other consumer information agency for information on companies that operate outside of the U.S.

**Ownership Restrictions:** The Mexican Constitution prohibits direct ownership by foreigners of real estate within 100 kilometers (about 62 miles) of any border, and within 50 kilometers (about 31 miles) of any coastline. In order to permit foreign investment in these areas, the Mexican government has created a trust mechanism in which a bank has title to the property but a trust beneficiary enjoys the benefits of ownership. However, U.S. citizens are vulnerable to title challenges that may result in years of litigation and possible eviction. Although title insurance is available in the Baja Peninsula and in other parts of Mexico, it is virtually unknown and remains untested in most of the country. In addition, Mexican law recognizes squatters' rights, and homeowners can spend thousands of dollars in legal fees and years of frustration in trying to remove squatters who occupy their property.

**Labor Laws:** U.S. citizen property owners should consult legal counsel or local authorities before hiring employees to serve in their homes or on their vessels moored in Mexico. Several U.S. citizen property owners have faced lengthy lawsuits for failure to comply with Mexican labor laws regarding severance pay and Mexican social security benefits.

**Time-share Investments:** U.S. citizens should exercise caution when considering time-share investments and be aware of the aggressive tactics used by some time-share sales representatives. Buyers should be fully informed and take sufficient time to consider their decisions before signing time-share contracts, ideally after consulting an independent attorney. Mexican law allows time-share purchasers five days to cancel the contract for unconditional and full reimbursement. U.S. citizens should never sign a contract that includes clauses penalizing the buyer who cancels

within five days. The Department of State and the U.S. Mission in Mexico frequently receive complaints from U.S. citizens about extremely aggressive sales tactics, exaggerated claims of return on investment, lack of customer service and questionable business practices by time-share companies, resulting in substantial financial losses for time-share investors.

A formal complaint against any merchant should be filed with PROFECO, Mexico's federal consumer protection agency. PROFECO has the power to mediate disputes, investigate consumer complaints, order hearings, levy fines and sanctions for not appearing at hearings, and do price-check inspections of merchants. All complaints by U.S. citizens are handled by PROFECO's English-speaking office in Mexico City at 011-52-55-5211-1723 (phone), 011-52-55-5211-2052 (fax), or via email at extranjeros@profeco.gob.mx. For more information, please see the PROFECO "Attention to Foreigners" web page at Profeco (Procuraduría Federal del Consumidor).

**ALIEN SMUGGLING:** Mexican authorities may prosecute anyone arrested for transporting aliens into or out of Mexico for alien smuggling in addition to any charges they may face in the other country involved, including the United States.

Back to Top

**CHILDREN'S ISSUES:** For information on international adoption of children and international parental child abduction, see the Office of Children's Issues web site. Mexico is the destination country of the greatest number of children abducted from the United States by a parent. A party to the Hague Convention on the Civil Aspects of International Child Abduction since 1991, Mexico is not in full compliance with the Convention.

**BEHAVIOR MODIFICATION FACILITIES:** A number of facilities have opened in Mexico that offer behavior modification therapy for teenagers and others suffering from drug addiction and other behavioral or psychological problems. Standards applied by the Government of Mexico and local governments, where they exist, may not meet standards for similar facilities in the United States. Parents planning to enroll their children in these facilities should investigate the facility first. Since 2004, Mexican officials have closed six adolescent behavior modification facilities in Baja California and another in the state of Jalisco due to health code and other violations. This was done on very short notice and caused serious inconvenience for the U.S. citizen students and their families. Another behavior modification facility in Sonora suddenly declared bankruptcy and closed its doors in March 2005, with a similarly disruptive impact on students. For further information, please refer to the State Department's Fact Sheet on Behavior Modification Facilities at http://travel.state.gov/travel/tips/brochures/brochures_1220.html.

Back to Top

**REGISTRATION / EMBASSY LOCATION:** U.S. citizens living or traveling in Mexico for more than one day are encouraged to register with the U.S. Embassy or nearest U.S. consulate through the State Department's travel registration web site, and to obtain updated information on travel and security within Mexico. U.S. citizens without Internet access may register directly with the U.S. Embassy or nearest U.S. Consulate. By registering, U.S. citizens make it easier for the Embassy or consulate to contact them in case of emergency.

The U.S. Embassy is located in Mexico City at Paseo de la Reforma 305, Colonia Cuauhtemoc; telephone from the United States: 011-52-55-5080-2000; telephone within Mexico City: 5080-2000; telephone long distance within Mexico 01-55-5080-2000. You may also contact the Embassy by e-mail at: ccs@usembassy.net.mx. The Embassy's web page is http://mexico.usembassy.gov/eng/main.html.

In addition to the Embassy, there are several United States Consulates and Consular Agencies located throughout Mexico:

**CONSULATES:**

**Ciudad Juarez:** Avenida Lopez Mateos 924-N; telephone (52)(656) 611-3000.
**Guadalajara:** Progreso 175, Col. Americana; telephone (52)(333) 268-2100.
**Hermosillo:** Calle Monterrey 141 Poniente, Col. Esqueda; telephone (52)(662) 289-3500.
**Matamoros:** Avenida Primera 2002 y Azaleas; telephone (52)(868) 812-4402.
**Merida:** Calle 60 No. 338 K x 29 y 31, Col. Alcala Martin; telephone (52)(999) 942-

5700.
**Monterrey:** Avenida Constitucion 411 Poniente; telephone (52)(818) 345-2120.
**Nogales:** Calle San Jose, Fraccionamiento "Los Alamos"; telephone (52)(631) 311-8150.
**Nuevo Laredo:** Calle Allende 3330, Col. Jardin; telephone (52)(867) 714-0512.
**Tijuana:** Avenida Tapachula 96, Col. Hipodromo; telephone (52)(664) 622-7400.

**CONSULAR AGENCIES:**

**Acapulco:** Hotel Continental Emporio, Costera Miguel Aleman 121 - Local 14; telephone (52)(744) 484-0300 or (52)(744) 469-0556.
**Cabo San Lucas:** Blvd. Marina Local C-4, Plaza Nautica, Col. Centro; telephone (52)(624) 143-3566.
Cancun: Plaza Caracol Two, Second Level, No. 320-323, Boulevard Kukulkan, Km. 8.5, Zona Hotelera; telephone (52)(998) 883-0272.
**Ciudad Acuna:** Alfonso Gonzalez Ocampo # 305, Col. Centro; telephone (52)(877) 772-8179.
**Cozumel:** Plaza Villa Mar en El Centro, Plaza Principal, (Parque Juárez between Melgar and 5th Ave.) 2nd floor, Locales #8 and 9; telephone (52)(987) 872-4574.
**Ixtapa/Zihuatanejo:** Hotel Fontan, Blvd. Ixtapa; telephone (52)(755) 553-2100.
**Mazatlan:** Hotel Playa Mazatlán, Playa Gaviotas #202, Zona Dorada; telephone (52)(669) 916-5889.
**Oaxaca:** Macedonio Alcala No. 407, Interior 20; telephone (52)(951) 514-3054 (52) or (951) 516-2853.
**Piedras Negras:** Abasolo 211, Local #3, Col. Centro; telephone (52)(878) 782-5586 or (878) 782-8664.
**Puerto Vallarta:** Paradise Village Plaza, Paseo de los Cocoteros #1, Local #4, Interior #17, Nuevo Vallarta; telephone (52)(322) 222-0069.
**Reynosa:** Calle Monterrey #390, Esq. Sinaloa, Col. Rodríguez; telephone: (52)(899) 923-9331
**San Luis Potosi:** Edificio "Las Terrazas", Avenida Venustiano Carranza 2076-41, Col. Polanco; telephone (52)(444) 811-7802 or (444) 811-7803.
San Miguel de Allende: Dr. Hernandez Macias #72; telephone (52)(415) 152-2357.

Back to Top

\* \* \*

This replaces the Country Specific Information dated February 23, 2007 to update the section on Medical Facilities and Health Information.

Back to Top

# EXHIBIT B

**COONLEY**                                    **Wednesday, April 2, 2008**

## CASE FILE NOTES

### EXHIBIT #1 (Child Trafficking Charging Document)

The text of the Spanish documents is obstructed by various lines, marks, and stamps throughout every page of the exhibit.  Also, there are <u>numerous</u> page numbers on each page which leads to confusion.

The English translation is correct to the best of my knowledge.

pages missing=0

illegible=7 times

### EXHIBIT #2 (Photocopies of Passport Apps and Passports)

The Spanish reproductions of the documents have obtrusive lines, stamps, and marks all over them.  **The photocopies are also of poor quality with much of the Spanish text being illegible.**

Maria Fatima's birth certificate is translated incorrectly into English.  On the translated version of the document she is marked as a **male** instead of a **female.**

The rest of the English translations seem to be correct but it was difficult for me to be certain because the Spanish documents are so difficult to read.

pages missing=0

### EXHIBIT #3 (Computer Database Profiles of Rosario, Maria de Fatima and, Luis Fernando)

Each photocopy has obtrusive lines and markings on it

*There is no English translation needed

pages missing=0

## EXHIBIT #4

The Spanish Documents are difficult to read because they have obtrusive marks, stamps, and lines all over every page.

The English translation is correct to the best of my knowledge.

pages missing=0

illegible= 2

## EXHIBIT # 5 ( Personal Letter from Rosario to Mr. Tapia)

The Spanish document has lines and marks obstructing the text making it difficult to read.

The translation to English is correct to the best of my knowledge.

pages missing=0

illegible=0

## EXHIBIT # 6 (Divorce Document)

The Spanish is almost impossible to read because of the stamps and marks all over the text.

The English translation seems correct

pages missing=0

illegible=2

## EXHIBIT #7 (Letter certifying Maria de Fatima's enrollment at School)

The Spanish document has stamps and marks all over it.

The English translation is correct to the best of my knowledge

pages missing=0

illegible=2

## EXHIBIT #8 (Divorce agreement)

**The Spanish is missing the last page of the divorce agreement**.  There are also the usual lines, marks, and stamps obstructing the text on each page.

The English translation is correct to the best of my knowledge.

pages missing=1

illegible=1

## EXHIBIT #9 (Luis Fernando's Birth Certificate)

The Spanish Birth Certificate has marks, stamps, and lines obstructing the text making it difficult to read.

The English translation is correct to the best of my knowledge.

pages missing=0

illegible=0

## EXHIBIT #10 (Maria de Fatima's Birth Certificate)

The Spanish document has marks and stamps obstructing the text.

The English translation is correct to the best of my knowledge.

pages missing=0

illegible=0

## EXHIBITS #11-15 (Photos of Fatima, Rosario, and Luis)

Each photocopy of the photos are obstructed by lines and marks.

pages missing=0

## EXHIBIT #16 (Reproduction of Mr. Tapia's University ID)

The Spanish document is almost completely illegible.

The English translation is correct but it is difficult for me to be sure because I can hardly compare it to the Spanish.

pages missing=0

illegible= 9

## EXHIBIT #17 (Document requesting that Rosario's Mother give a statement to the Authorities)

The Spanish version is very difficult to read because it has lines and marks all over it.

The English translation is correct to the best of my knowledge.

pages missing=0

illegible=6

## EXHIBIT #18

The Spanish document has lines and marks obstructing the text.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=1

## EXHIBIT #19

The Spanish document has lines and marks obstructing the text.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=2

## EXHIBIT # 20 ( Statement of Rosario's Mother)

The Spanish has obtrusive lines and marks on each page.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=4

## EXHIBIT #21(Mrs. Saucedo's ID Card)

The Spanish document is extremely difficult to read.  The photocopy is very poor quality and there are lines and stamps obstructing the text.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=5

## EXHIBIT #22 (Receipt of Document)

The spanish document has marks and lines obstructing each page of text.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=4

## EXHIBIT #23 (Correspondance)

The Spanish document has marks that obstruct the text so badly that I could not effectively determine whether the English translation is correct or not .

missing pages=0

illegible=2

## EXHIBIT # 24 (Receipt of Document)

The Spanish document has lines and stamps all over it.

The English translation appears to be correct to the best of my knowledge.

missing pages=0

illegible= 8

## EXHIBIT #25 (Rosario's Passport App)

**The Spanish passport application is completely illegible so I am unable to compare the English translation to it.

**The English translation is incomplete.

missing pages=0
illegible=8

EXHIBIT # 26 (Reproduction of Rosario's Passport)

**\*\*The Spanish photocopy is completely illegible! Some of the information such as her name and birth date were translated into English but the photocopy is of horrible quality.**

missing pages=0

illegible=2

## EXHIBIT #27 (Luis Passport App)

The Spanish document has marks and stamps obstructing the text.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=3

## EXHIBIT # 28 (Parents Authorization for issuing a minor a Passport)

The Spanish document has marks all over it.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=1

EXHIBIT # 29 ( Mr. Tapia's Passport)

**The Reproduction of the original is completely illegible!

The **incomplete** English translation is correct to the best of my knowledge but it is difficult to make an effective comparison since the Spanish document is so difficult to read.

missing pages=0

illegible=3

## EXHIBIT # 30 (Fatima's Passport App)

The Spanish document has marks and stamps that obstruct the text.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=3

## EXHIBIT #31 (Parents Consent for Fatima's Passport)

The Spanish document has lines and marks obstructing the text.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=0

## EXHIBIT #32 (Fatima's Passport)

The Spanish as marks and stamps obstructing the text.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=0

## EXHIBIT # 33 (Mr. Tapia's Statement at the Attorney Gen's Office)

The Spanish documents have lines and stamps obstructing the text on every page.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=4

## EXHIBIT #34 (Public Record search for Ronald Coonley)

There are marks and lines on both sets of documents

missing pages=0

illegible =0

## EXHIBIT #35 (Receipt of Document)(Notice of Appearance??)

The Spanish version has marks and stamps obstructing the text.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=3

## EXHIBIT #36 (Document submitted by Mr. Tapia asking that he be informed about the status of the case)

The Spanish documents have obtrusive marks and stamps.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=1

## EXHIBIT #37(Resolution on Proceedings)

There Spanish documents have marks and stamps obstructing the text.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=5

## EXHIBIT #38 (Letter from Aeromexico & Copies of the tickets)

The Spanish letter has marks and stamps obstructing the text.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=1

## EXHIBIT #39 (Summons for Mr. Tapia)

The Spanish document has marks and stamps obstructing some of the text. **~~There is also some illegible handwriting in the top right section of the document that is not explained or documented in the translation.~~

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=2

## EXHIBIT #40 (Report Documenting Retrieval of Passport Apps)

The Spanish has marks and stamps obstructing the text.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=5

## ~~EXHIBIT # 41 (Preliminary Investigation Report)~~

**The Spanish is obstructed with lines and marks.  The Spanish reproductions are of such low quality and are so dark that I am unable to compare it to the English translation to determine whether there are missing pages , or whether the translation is correct.

## EXHIBIT # 42 (Receipt of Document: Fingerprint Expert Analysis)

The Spanish documents have marks and stamps obstructing the text making it almost impossible for me to compare it to the English translation.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=4

## EXHIBIT # 43 (Fingerprint Expert Findings/Opinions)

**The Spanish documents are very difficult to read with lines and stamps all over the pages.

I can not make a complete and thorough comparison between the Spanish and the English because the text on the Spanish documents is too difficult to read.

missing pages=0

illegible=MULTIPLE ILLEGIBLE SIGNATURES AND STAMPS

## EXHIBIT #44 ( Photocopies of Maria de Fatima's Passport App)

**The Spanish reproduction is BLACK and absolutely impossible to read.**

**The English translation tells me nothing because the translator wrote simply "2 illegible pages" of Maria de Fatima's passport application.

missing pages=0

illegible= 2

## EXHIBIT #45 (Photocopies of Luis Fernando's Passport App)

** The Spanish documents are completely black and illegible.**

**The English tells me absolutely nothing because again the translator's notes were simply "contains 2 illegible pages"

missing pages=0

illegible=0

## EXHIBIT #46 (Fingerprint Card of Barrera Hernandez Artemio)

****THE SPANISH DOCUMENT IS LITERALLY 2 BLACK SQUARES AND I CAN DETERMINE NOTHING FROM THIS

## EXHIBIT # 47 (Fingerprints and other Info about Mr. Tapia)

The Spanish has marks and stamps obstructing the pages/text.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=3

## EXHIBIT #48 (Enlarged Middle Fingerprint of Mr. Artemio)

The Spanish has the usual obtrusive lines, marks, and stamps.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=0

## EXHIBIT # 49 (Left Index Print of the two Children)

The Spanish reproductions are very dark with the usual lines, marks, and stamps all over the pages.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=2 (Multiple illegible stamps and signatures)

## EXHIBIT # 50 (Receipt of Document: Report of the Handwriting Expert )

The Spanish documents have marks and stamps obstructing the text.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=4

## EXHIBIT # 51 (Report of Handwriting Expert including Samples)

The Spanish documents have the usual obtrusive lines and marks.

***The English translation is missing the CONCLUSIONS portion of the report.
        *The English translation has only the second conclusion whereas the Spanish has both the first and second expert conclusions.

missing pages=1-2

illegible=6

## EXHIBIT #52 (Resolution on Consignment)

The Spanish documents have obtrusive marks and stamps.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=4

## EXHIBIT #53 (Warrant for Arrest)

The Spanish documents have marks, lines, and stamps all over them.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=3

## EXHIBIT # 54 (Mexican Court Document)

The Spanish documents have the usual marks and lines obstructing the text on every page.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=0

## EXHIBIT # 55 (Child Traff. Charging Doc)

The Spanish documents have marks and lines obstructing the text on every page.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=3

## EXHIBIT # 56 (Arrest Warrant 9/27/04)

The Spanish has obtrusive marks and stamps throughout the exhibit.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=0

## EXHIBIT #57

The Spanish documents have the usual obtrusive lines and stamps on each page.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=2

## EXHIBIT #58 (Mexican Fed. Code of Criminal Procedure)

The Spanish photocopies are dark and very difficult to read.  There are also lines and stamps obstructing the text on each page of the exhibit.

The English translation is correct to the best of my knowledge.

missing pages=0

illegible=0

# EXHIBIT C

## No. 03-14119; Kastnerova v. United States;

JAROSLAVA LORIE KASTNEROVA, PETITIONER-APPELLANT, v. UNITED STATES OF AMERICA, JOHN ASHCROFT, U.S. ATTORNEY GENERAL, UNITED STATES SECRETARY OF STATE, COLIN POWELL, SECRETARY, RESPONDENTS-APPELLEES.

[Cite as Kastnerova v. United States, No. 03-14119 (11th Cir. 04/08/2004)]

[1] IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[2] No. 03-14119

[4] April 8, 2004

[6] Appeal from the United States District Court for the Southern District of Florida D. C. Docket No. 03-60904-CV-ASG

[7] Before Black, Barkett and Stahl fn1 , Circuit Judges.

[8] The opinion of the court was delivered by: Black, Circuit Judge

[9] [PUBLISH]

[10] Appellant Jaroslava Lorie Kastnerova filed a petition for writ of habeas corpus contesting a magistrate judge's issuance of a certificate that permits Kastnerova's extradition to the Czech Republic. The district court denied the petition, concluding that (1) a valid extradition treaty exists between the Czech Republic and the United States, and (2) there was sufficient evidence warranting the magistrate's finding that reasonable grounds exist to believe Kastnerova guilty of the charges. Kastnerova now appeals both the substantive determinations of the district court and the narrow scope of the district court's habeas review of the magistrate's certification. We affirm the district court in all respects.

[11] I. BACKGROUND

[12] A. The Extradition Treaty

[13] Before detailing the events leading to this appeal, it is necessary to summarize briefly the relevant history surrounding the Treaty Concerning the Mutual Extradition of Fugitive Criminals, July 2, 1925, U.S.-Czech., 44 Stat. 2367 [hereinafter, the Treaty]. (fn2) In the aftermath of World War I, Czechoslovakia was created from Bohemia, Moravia, and Slovakia, all subject territories of the former Austro-Hungarian Empire. Shortly thereafter, the Treaty was signed by Czechoslovakia and the United States in Prague. The Treaty was ratified by the United States Senate on March 3, 1926. Article 14 of the Treaty states:

[14] The present Treaty shall remain in force for a period of ten years and in case neither of the High Contracting Parties shall have given notice one year before the expiration of that period of its intention to terminate the Treaty, it shall continue in force until the expiration of one year from the date on which such notice of termination shall be given by either of the High Contracting Parties.

[15] Neither country has ever given notice of its intention to terminate the Treaty. Moreover, the Treaty continues to be included in the U.S. State Department's list of treaties in force. See Office of the Legal

Advisor, U.S. Dep't of State, Treaties in Force 72 (2003).

[16] From its founding until its dissolution in 1993, Czechoslovakia had varied types of governments, ranging from democratic to communist. After the fall of Communism in the early 1990s, the Czech lands (Bohemia and Moravia) and Slovakia agreed to go their separate ways. Thus, on January 1, 1993, in what was called the "velvet divorce" (due to the amicable nature of the separation), Czechoslovakia split to form the Czech Republic and the Republic of Slovakia.

[17] The events leading to the extradition request at issue took place shortly after the formation of the Czech Republic. Kastnerova, then a citizen of the Czech Republic, entered into several business ventures involving fitness equipment and dietary supplements. Kastnerova subsequently immigrated to the United States.

[18] B. Procedural History

[19] On June 29, 2000, Judge Vladimír "ech of the Regional Court of Brno in the Czech Republic issued an arrest warrant charging Kastnerova with three counts of fraud involving several million Czech koruny (CZK), in violation of § 250(1) & (4) of the Czech Criminal Code. (fn3) The warrant alleges that, in late 1994, Kastnerova received an advance payment of 200,000 CZK from Libuse Barková, an agent of the Escade-Seba company, for exercise equipment worth 458,730 CZK. The equipment was not delivered and the advance payment was not returned. The warrant further alleges that, on November 7, 1994, Kastnerova obtained a loan from the Chemitan company for 1,000,000 CZK for the purpose of buying fitness supplements to sell to the K-Mart company. Allegedly, this loan was secured by a pledge agreement bearing a false signature of Josef Hanus, an agent of K-Mart, Prague. Kastnerova did not repay the loan and did not deliver the goods to K-Mart. The warrant finally alleges that, in June 1995, Kastnerova failed to make a contractually required delivery of exercise equipment to Milan Beles...ák after having received 1,003,376.80 CZK from Alfapro, a Czech leasing company that had financed Beles...ák's purchase of the equipment.

[20] On February 26, 2003, the United States government, acting on behalf of the government of the Czech Republic, filed a complaint for Kastnerova's extradition pursuant to 18 U.S.C. § 3184. (fn4) A magistrate judge issued a warrant for Kastnerova to be brought before the court and subsequently conducted an extradition hearing, at which time Kastnerova explained her version of the events leading to the criminal charges filed against her in the Czech Republic. In support of extradition, the Government presented several statements from witnesses in the Czech Republic, statements from Kastnerova, and documents memorializing the subject transactions. After considering the evidence, the magistrate judge issued a certification of extraditability and order of commitment, finding, inter alia, that a valid extradition treaty exists between the United States and the Czech Republic, the charges alleged in the complaint are extraditable offenses under the treaty, and probable cause exists to believe Kastnerova committed the offenses for which extradition was sought.

[21] Shortly thereafter, Kastnerova filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241, (fn5) in which she argued: (1) no valid extradition treaty exists between the United States and the Czech Republic; and (2) the Government failed to demonstrate probable cause to believe that she had committed the charged offenses. The district court denied Kastnerova's petition by order entered on August 5, 2003, and this appeal followed.

[22] II. STANDARD OF REVIEW

[23] We have jurisdiction under 28 U.S.C. § 1291. On review of a denial of a habeas petition pertaining to the issuance of a certification of extraditability, we review factual findings for clear error and questions of law de novo. See Valenzuela v. United States, 286 F.3d 1223, 1229 (11th Cir. 2002).

[24] III. DISCUSSION

[25] On appeal, Kastnerova raises three arguments. First, she asserts the scope of review set out in Martin v. Warden, Atlanta Pen, 993 F.2d 824, 828 (11th Cir. 1993), and applied by the district court was superceded by INS v. St. Cyr, 533 U.S. 289, 121 S. Ct. 2271 (2001). Second, Kastnerova argues there is no valid extradition treaty between the United States and the Czech Republic. Finally, Kastnerova contends the district court erred in finding probable cause to believe she committed the offenses with which she is charged. We address each argument in turn.

[26] A. Scope of Review

[27] In Martin, this Court observed that a district court's review of a magistrate judge's issuance of a certificate of extraditability is narrow. Review of the magistrate's order is limited "to determining 'whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty.'" 993 F.2d at 828 (quoting Fernandez v. Phillips, 268 U.S. 311, 312, 45 S. Ct. 541, 542 (1925) (Holmes, J.)). (fn6)

[28] Kastnerova contends that this formulation of the district court's scope of review has been superceded by the Supreme Court in INS v. St. Cyr. In that case, the Supreme Court stressed that, for habeas corpus relief to be limited in any way, there must--at a minimum--be clear congressional intent to do so. 533 U.S. at 299, 121 S. Ct. at 2278-79. In Kastnerova's view, the extradition statutes do not mention habeas review, see 18 U.S.C. §§ 3181-95, and, therefore, habeas review of the issuance of a certificate of extradition cannot be limited.

[29] This argument fails for several reasons, most importantly because St. Cyr does not stand for Kastnerova's proposition. St. Cyr addressed the following procedural question: whether the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), 110 Stat. 3009, affected the availability of habeas corpus jurisdiction under 28 U.S.C. § 2241. (fn7) 533 U.S. at 292, 121 S. Ct. at 2275. The government in St. Cyr argued that AEDPA and IIRIRA removed federal court jurisdiction over a challenge to the Attorney General's statutory construction of the 1996 acts. Id. at 297, 121 S. Ct. at 2278. The Court rejected this argument, noting that "[i]mplications from statutory text or legislative history are not sufficient to repeal habeas jurisdiction; instead, Congress must articulate specific and unambiguous statutory directives to effect a repeal." Id. at 299, 121 S. Ct. at 2278-79. It is this discussion upon which Kastnerova bases her challenge.

[30] The above-referenced passage, however, speaks to the district court's jurisdiction to hear a habeas petition, not to the district court's scope of review once it asserts jurisdiction over a petition. Indeed, "'it is the scope of inquiry on habeas corpus that differentiates' habeas review from 'judicial review.'" Id. at 312, 121 S. Ct. at 2285 (quoting Heikkila v. Barber, 345 U.S. 229, 236, 73 S. Ct. 603, 607 (1953)).

[31] Additionally, the Supreme Court in St. Cyr favorably cited Terlinden v. Ames, 184 U.S. 270, 22 S. Ct. 484 (1902). In Terlinden, the Supreme Court recognized the limited scope of habeas review of extradition decisions and refused to expand it, noting that the extradition statute "gives no right of review to

be exercised by any court or judicial officer, and what cannot be done directly cannot be done indirectly through the writ of habeas corpus." Id. at 298, 22 S. Ct. at 487. Thus, St. Cyr cannot be read to overrule Terlinden, Martin, or the limited scope of review set forth in these cases.

[32] Finally, even after St. Cyr, this Court has continued to apply the narrow scope of review of magistrate judges' decisions regarding extradition set out in Terlinden. See Valenzuela v. United States, 286 F.3d 1223, 1229 (11th Cir. 2002).

[33] Had the district court concluded it had no jurisdiction over Kastnerova's habeas petition, St. Cyr might be applicable. That is not, however, what occurred. Kastnerova disputes only the narrow scope of review applied by the district court, not its exercise of jurisdiction. St. Cyr, therefore, is inapposite.

[34] The district court properly limited its review of the magistrate's certification to whether the magistrate judge had jurisdiction, whether the offense charged was within the treaty, and whether the Government presented competent evidence upon which the magistrate could find there were reasonable grounds upon which to believe Kastnerova guilty of the charged offenses. (fn8) Terlinden, 184 U.S. at 278, 22 S. Ct. at 487; Martin, 993 F.2d at 828.

[35] B. Validity of the Extradition Treaty

[36] Kastnerova asserts that the Treaty was invalidated when Czechoslovakia split into the Czech Republic and Slovakia on January 1, 1993. She contends that the "unilateral action" by the Executive of recognizing the Treaty as still in place violates the constitutional mandate that two thirds of the United States Senate ratify any treaty between the United States and a foreign nation. In other words, Kastnerova argues that when Czechoslovakia split in 1993 to form the Czech Republic and Slovakia, the Treaty was rendered void because the U.S. Senate had ratified a treaty with Czechoslovakia, not the Czech Republic.

[37] As this Court has previously noted, extradition is a function of the Executive, Martin, 993 F.2d at 829, and "the question whether power remains in a foreign state to carry out its treaty obligations is in its nature political and not judicial, and . . . the courts ought not . . . interfere with the conclusions of the political department in that regard." Terlinden, 184 U.S. at 288, 22 S. Ct. at 491. Indeed, every other Court of Appeals to consider whether a treaty has lapsed has deferred to the Executive's determination. See, e.g., United States ex rel. Saroop v. Garcia, 109 F.3d 165, 171 (3d Cir. 1997); Then v. Melendez, 92 F.3d 851, 854 (9th Cir. 1996); New York Chinese TV Programs, Inc. v. U.E. Enters., Inc., 954 F.2d 847, 852 (2d Cir. 1992); Sabatier v. Dabrowski, 586 F.2d 866, 868 (1st Cir. 1978).

[38] Accordingly, "we begin our analysis by examining the conduct of the United States and [the Czech Republic] . . . to determine whether such conduct evinces an intent" that the nations continue to be bound by the extradition treaty. Blake v. Am. Airlines, Inc., 245 F.3d 1213, 1216 (11th Cir. 2001). There is considerable evidence that the governments of both the Czech Republic and the United States consider the Treaty to be in effect. First, there was an exchange of diplomatic letters between the two nations regarding the Czech Republic's status as a successor state. President Bush sent a letter to the Prime Ministers of the Czech Republic and Slovakia on or about December 30, 1992, advising that the United States recognized both nations and acknowledged their commitment to fulfill the treaty and other obligations of the former Czechoslovakia. In response to this letter, Prime Minister Václav Klaus of the Czech Republic stated: "The Czech Republic is a successor state to the dissolved Czechoslovak federation and is committed to fulfilling the treaty and other obligations of the Czech and Slovak Federal Republic."

[39] It is also significant that the Czech Republic has previously sought extradition under the Treaty. See, e.g., In re Extradition of Platko, 213 F. Supp. 2d 1229 (S.D. Cal. 2002). Such conduct demonstrates the Czech Republic's continued reliance on the Treaty. Although there is no evidence in the record concerning extraditions to the United States, the treaty is listed in the U.S. State Department's Treaties In Force publication. See Office of the Legal Advisor, U.S. Dep't of State, Treaties in Force 72 (2003).

[40] Finally, the U.S. State Department asserted, through a declaration submitted to the magistrate, that "[i]t is the view of the Department of State that both treaties [the 1925 treaty and the 1935 supplementary treaty] remain in effect with the Czech Republic and the Slovak Republic, the two successor States to the former Czechoslovakia."

[41] Given this conduct, the district court did not err in concluding that the Executives of both the Czech Republic and the United States recognize the treaty as valid. Although Kastnerova asserts that the significant geographic and legal differences between the Czech Republic and Czechoslovakia mandate termination of the treaty, "federal courts are not as well equipped as the Executive to determine when the emergence of a new country brings changes that terminate old treaty obligations." Then, 92 F.3d at 854. Moreover, Kastnerova has not effectively countered the Government's conclusion that "there is a legal, geographical, and historical continuity" between Czechoslovakia and the Czech Republic. Id. The agreement of the Executives of both countries that the Treaty still is in effect weighs heavily in favor of the continuing validity of the Treaty. Accordingly, we decline to hold the Treaty invalid. (fn9)

[42] C. Probable Cause

[43] Kastnerova's contention that there was insufficient evidence to warrant the magistrate's finding of probable cause to believe her guilty of the charged offenses is meritless. Extradition hearings under § 3184 "are in the nature of a preliminary hearing." Sayne v. Shipley, 418 F.2d 679, 685 (5th Cir. 1969). (fn10) Accordingly, the Government did "not have to show actual guilt, only probable cause that the fugitive is guilty. The magistrate does not inquire into the guilt or innocence of the accused; he looks only to see if there is evidence sufficient to show reasonable ground to believe the accused guilty." Id. (citations omitted). Upon reviewing the record, we conclude the district court did not err when it determined there was competent evidence to support the magistrate's finding that the Government met its burden to show probable cause for each of the charges alleged in the complaint. See Terlinden, 184 U.S. at 279-80, 22 S. Ct. at 488 (observing that "'the judgment of the magistrate rendered in good faith on legal evidence that the accused is guilty of the act charged . . . cannot be reviewed on the weight of evidence, and is final for the purposes of the preliminary examination unless palpably erroneous in law.'") (quoting Ornelas v. Ruiz, 161 U.S. 508, 509, 16 S. Ct. 689, 691-92 (1896)).

[44] IV. CONCLUSION

[45] We hold that the scope of review of a certificate of extraditability set forth in Terlinden and Martin was not superceded by the Supreme Court's decision in St. Cyr. Additionally, because (1) precedent requires great weight be given to the conduct and determinations of the Executives of the signatory nations when addressing the continuation of treaties, and (2) the conduct of both the Czech Republic and the United States evinces an intent to continue to adhere to the Treaty, we hold the district court did not err in determining the Treaty to be valid.

[46] Finally, we also hold the district court did not err when it found competent evidence to support the magistrate's probable cause determination. For these reasons, we affirm the district court's dismissal of

Kastnerova's habeas petition.

[47] AFFIRMED.

---

Footnotes:

[48] 1. Honorable Norman H. Stahl, United States Circuit Judge for the First Circuit, sitting by designation.

[49] 2. A supplementary extradition treaty enlarging the list of extraditable offenses was signed in Washington on April 29, 1935, and entered into force on August 28, 1935. 49 Stat. 3253.

[50] 3. The certified English translation of Section 250 provided in the arrest warrant reads: Section 250 FRAUD (1) A person who to the detriment of the property of another gains money or property for himself/herself or someone else by misleading (deceiving) another, making use of another's error or concealing substantial facts, and thus causes damage which is not negligible to the property of another, shall be punished by imprisonment for a term not exceeding two years, or by prohibition of his/her (business or professional) activities or by a pecuniary penalty or by forfeiture of a thing. (4) The offender shall be punished by imprisonment for a term ranging from five up to twelve years if he or she, by the offence given in paragraph 1, causes damage of a significant extent.

[51] 4. Section 3184 states: Whenever there is a treaty or convention for extradition between the United States and any foreign government . . ., any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention . . ., issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered. . . . If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention . . ., he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made. 18 U.S.C. § 3184.

[52] 5. There is no direct appeal in extradition proceedings. Martin v. Warden, Atlanta Pen, 993 F.2d 824, 827 n.3 (11th Cir. 1993).

[53] 6. The magistrate's role is also restricted. "The extradition magistrate conducts a hearing simply to determine whether there is 'evidence sufficient to sustain the charge [against the defendant] under the provisions of the proper treaty or convention.'" Martin, 993 F.2d at 828 (quoting 18 U.S.C. § 3184). Once the magistrate determines the evidence is sufficient, the magistrate "makes a finding of extraditability and certifies the case to the Secretary of State." Id.

[54] 7. St. Cyr also involved a substantive question regarding the retroactive effect of AEDPA and IIRIRA. 533 U.S. at 292, 121 S. Ct. at 2275. Kastnerova, however, does not rely on this portion of the opinion.

[55] 8. In any case, we note it is clear from the record that the district court considered de novo the legal question of whether the extradition treaty continued to be valid, devoting several pages of analysis to the issue.

[56] 9. Additionally, this Court has held that "the question of just what constitutes a 'treaty' requiring Senate ratification presents a non-justiciable political question." Made In The USA Found. v. United States, 242 F.3d 1300, 1302 (11th Cir. 2001). Thus, even were we to conclude that the determination of whether a successor nation can agree to continue a treaty in force was not a political question, it is by no means clear that Kastnerova's argument--that the agreement between the executives of the Czech Republic and the United States required Senate ratification--would succeed.

[57] 10. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

---

© Lawriter Corporation. All rights reserved.

The Casemaker™ Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

**No. 04-13303 (11th Cir. 07/26/2005); Afanasjev v. Hurlburt Jr.;**

U.S. Court of Appeals, Eleventh Circuit

July 26, 2005

[PUBLISH] IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 04-13303, No. 04-13309

D. C. Docket No. 03-00610 CV-J-21HTS

D. C. Docket No. 03-00605 CV-J-25-MCR

VALERIJ AFANASJEV, Petitioner-Appellant,
v.
THOMAS D. HURLBURT, JR., United States Marshal, CONDOLEEZZA RICE, Secretary of State, United States of America, Respondents-Appellees.

TATJANA AFANASJEVA, Petitioner-Appellant,
v.
THOMAS D. HURLBURT, JR., United States Marshal, CONDOLEEZZA RICE, Secretary of State, United States of America, Respondents-Appellees.

Appeals from the United States District Court for the Middle District of Florida

(July 26, 2005)

Before BLACK and HULL, Circuit Judges, and HODGES , District Judge. *

BLACK, Circuit Judge:

   The Republic of Lithuania has formally requested the extradition of Appellants Tatjana Afanasjeva and Valerij Afanasjev, a married couple charged with committing fraudulent business practices. After conducting a hearing pursuant to 18 U.S.C. § 3184, a magistrate judge certified their extradition to Lithuania on some, but not all, of the charges. In finding probable cause to extradite, the magistrate judge relied primarily on an unsworn bill of indictment prepared by a Lithuanian investigator. Appellants filed petitions for habeas corpus, arguing the indictment was not competent evidence to establish probable cause. The district court denied habeas relief, concluding there was sufficient evidence to support the magistrate's determination that Appellants were extraditable. We affirm the district court.

   I. BACKGROUND

   A. Facts

   Tatjana Afanasjeva and her husband, Valerij Afanasjev, are Russian nationals who operated a private business in Lithuania during the 1990s. Over the course of several years, the couple allegedly defrauded 81 individuals and misappropriated approximately 1,442,006 in Lithuanian litas (LTL). Appellants were eventually charged with violating several provisions of the Criminal Code of the Republic of Lithuania. On

May 19, 1999, an investigator in Lithuania issued a bill of indictment summarizing the charges and the criminal investigation.

Most of the charges filed against Appellants relate to their alleged involvement with a company named UAB "Grazna," which was established on June 6, 1995. Valerij worked as an accountant for UAB "Grazna," and Tatjana 1 was the company's acting director. From June 1995 until December 1997, Appellants allegedly used their association with this company to fraudulently obtain the personal property of others. While acting as representatives of the company, Appellants borrowed money from private persons and agreed to repay the funds by a specific date. According to the bill of indictment, interest rates were not mentioned in the written agreements; however, to attract lenders, Appellants would verbally agree to pay interest on the borrowed money. As the contracts concluded, Appellants would deny that any interest was promised and assert their only obligation was to return the entrusted money in installments.

The indictment alleges that Appellants misled investors in other ways, as well. For example, Appellants allegedly informed potential lenders that the company's financial situation was strong, even though it was actually experiencing a financial crisis. In addition, several victims stated they were led to believe the invested money would be used to purchase real property. According to the indictment, Appellants often promised investors that their money would be used in such a manner, and UAB "Grazna" was advertised in the local newspaper, "Klaipèda," as a company engaged in the purchase and sale of real estate. Allegedly, Appellants assured lenders that their investments were secure, because the real property could, if necessary, be resold to satisfy the loans. However, despite these assurances, Appellants purportedly failed to use the funds as promised. The indictment alleges that Appellants purchased just two apartments in 1995 and only one in 1996. Furthermore, during the course of the investigation, an employee at UAB "Grazna" stated the company rarely bought real property.

After acquiring the victims' money, Appellants allegedly used the funds for their own personal needs. The indictment asserts lenders suffered significant losses because Appellants often failed to (1) repay loans by the agreed-upon date, (2) pay interest on the borrowed money, or (3) return any portion of the original loans. Based on these actions, Appellants were charged with several counts of fraud, in violation of Article 274(2) and (3) of the Criminal Code of the Republic of Lithuania. Appellants were also charged with violating regulations regarding 2 monetary transactions or transactions in securities, Article 329, and with 3 fraudulent bookkeeping, Article 323(2).

On February 5, 1998, Appellants signed written undertakings not to leave Lithuania pending the resolution of the criminal charges. On June 10, 1999, the Lithuanian authorities referred Appellants for trial. When Appellants failed to appear, the Lithuanian judge suspended the criminal proceedings until the couple could be located.

B. Procedural History

On March 28, 2003, the United States, acting on behalf of the government of Lithuania, filed complaints in federal district court seeking the extradition of Appellants. A magistrate judge immediately issued arrest warrants for Tatjana 4 and Valerij. Appellants were arrested on April 3, 2003, in Ponte Vedra, Florida.

In accordance with 18 U.S.C. § 3184, the magistrate judge held a hearing to determine whether Appellants were extraditable. In support of extradition, the 5 Government submitted, inter alia, the following documents: (1) the bill of indictment; (2) an order from a Lithuanian judge, which summarizes the allegations and the procedural history of the case; and (3) a letter from the Prosecutor General of

Lithuania, which describes the results of the investigation, restates the charges, and quotes the applicable provisions of the Lithuanian Criminal Code. The 106-page bill of indictment provides a detailed account of Appellants' alleged criminal activities. In the indictment, the Lithuanian investigator summarized statements made by victims, employees of UAB "Grazna," and other witnesses. The indictment, however, was not prepared under oath.

After reviewing the evidence, the magistrate judge issued certificates of extraditability, finding Appellants were extraditable on some, but not all, of the charges lodged against them in Lithuania. The magistrate judge concluded the fraud charges were the only extraditable offenses under the treaty. Moreover, the magistrate judge found that probable cause existed to believe Appellants committed the alleged fraudulent acts. In making the probable cause 6 determination, the magistrate judge relied exclusively on the bill of indictment.

Appellants collaterally challenged the magistrate judge's order by filing petitions for writ of habeas corpus pursuant to 28 U.S.C. § 2241. A petition for writ of habeas corpus is a proper method to contest an extradition order because there is no direct appeal in extradition proceedings. Kastnerova v. United States, 365 F.3d 980, 984 n.4 (11th Cir. 2004) (citation omitted). In the petitions, Appellants argued the magistrate judge erred when he determined there was probable cause to believe they were guilty of fraud. The district court denied the habeas petitions, finding there was competent evidence to support the magistrate's probable cause determination. Tatjana and Valerij appealed the district court's denial of their habeas petitions to this Court. We consolidated the two appeals.

## II. STANDARD OF REVIEW

"On review of a denial of a habeas petition pertaining to the issuance of a certification of extraditability, we review factual findings for clear error and questions of law de novo." Id. at 984 (citation omitted).

## III. DISCUSSION

This Court has repeatedly noted "that a district court's [habeas] review of a magistrate judge's issuance of a certificate of extraditability is narrow." Id.; see also Martin v. Warden, Atlanta Pen, 993 F.2d 824, 828 (11th Cir. 1993); Escobedo v. United States, 623 F.2d 1098, 1101 (5th Cir. 1980). As we have 7 explained, a petition for writ of habeas corpus in an extradition case "is not a means for rehearing the magistrate's findings." Escobedo, 623 F.2d at 1101 (citing Fernandez v. Phillips, 268 U.S. 311, 312, 45 S. Ct. 541, 542 (1925)). Rather, "[r]eview of the magistrate's order is limited `to determining [1] whether the magistrate had jurisdiction, [2] whether the offense charged is within the treaty, and [3] by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty.'" Kastnerova, 365 F.3d at 984 (citing Fernandez, 268 U.S. at 312, 45 S. Ct. at 542) (emphasis added). In this case, Appellants have only challenged the magistrate's answer to the third inquiry.

Tatjana and Valerij argue the district court should have granted their habeas petitions because the magistrate judge issued the certificates of extraditability based on inadequate evidence. They contend the Lithuanian bill of indictment, which the magistrate relied heavily upon, was not competent legal evidence to establish probable cause. Appellants assert the indictment lacks competency and reliability for the following reasons: (1) the document was not made under oath; (2) the witness and victim statements constituted hearsay because they were recounted by the investigator; (3) the statements were not sworn or signed by the witnesses and victims; and (4) it was unclear whether the indictment was based on the investigator's personal knowledge because he never explicitly stated that he was the individual who interviewed the

witnesses and victims. Thus, the sole issue on appeal is whether the district court erred in determining there was competent evidence to support the magistrate judge's finding of probable cause.

After reviewing the record, we conclude the district court did not err when it refused to grant habeas relief. We reject Appellants' contention that the bill of indictment was insufficient evidence to justify their extradition. Federal law does not require all documents submitted for extradition purposes to be made under oath. The admissibility of documents offered at an extradition hearing is 8 governed by 18 U.S.C. § 3190, which provides:

Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.

18 U.S.C. § 3190. In this case, the bill of indictment and the other Lithuanian documents were properly certified by Jonathan Floss, Vice Consul at the American Embassy in Lithuania. The unsworn indictment, therefore, was admissible, and 9 the magistrate judge was free to consider it in determining whether to certify Appellants' extradition. See Escobedo, 623 F.2d at 1103 (noting Mexican extradition documents were admissible because they were properly certified). 10

In addition, this Court has observed that the evidence needed to extradite a fugitive differs from the evidence needed to convict a defendant at a criminal trial.

We have explained:

Extradition hearings under § 3184 are in the nature of a preliminary hearing. Accordingly, the Government d[oes] not have to show actual guilt, only probable cause that the fugitive is guilty. The magistrate does not inquire into the guilt or innocence of the accused; he looks only to see if there is evidence sufficient to show reasonable ground to believe the accused guilty.

Kastnerova, 365 F.3d at 987 (internal quotation marks and citations omitted). 11 The Federal Rules of Evidence and the Federal Rules of Criminal Procedure are not applicable to extradition proceedings. Fed. R. Evid. 1101(d)(3); Fed. R. Crim. P. (1)(a)(5)(A). Moreover, we have expressly held that "[h]earsay . . . is permitted in extradition proceedings," Escobedo, 623 F.2d at 1102 n.10, and the Supreme Court has explained "unsworn statements of absent witnesses may be acted upon by the committing magistrate," Collins v. Loisel, 259 U.S. 309, 317, 42 S. Ct. 469, 472 (1922). See also Elias v. Ramirez, 215 U.S. 398, 409, 30 S. Ct. 131, 136 (1910) (holding unsworn statements were admissible and sufficient to justify the fugitive's extradition); Artukovic v. Rison, 784 F.2d 1354, 1356 (9th Cir. 1986) ("[W]e have recognized that unsworn hearsay statements contained in properly authenticated documents can constitute competent evidence to support a certificate of extradition."). In sum, the magistrate's finding of probable cause was not undermined by the fact that the indictment contained unsworn hearsay statements of witnesses and victims. 12

Finally, contrary to Appellants' assertions, the magistrate's probable cause determination was based on more than mere unsupported allegations. As we mentioned earlier, the 106-page bill of indictment describes, in significant detail, Appellants' alleged fraudulent activities. The indictment lists the specific dates of

events, includes the names of witnesses and victims, and details the amount of money that was involved in each transaction. After reviewing the indictment, the magistrate judge found the victims' statements were consistent with each other and were corroborated by the statements of non-victims, such as employees at UAB "Grazna." The veracity of these statements was further supported by the fact that upon questioning, Appellants gave inconsistent answers and did not deny their involvement in the alleged acts. The magistrate judge also undertook the burdensome task of comparing each witness statement with each fraud count to ensure there was adequate support for each of the charges. In doing so, the magistrate judge found sufficient evidence to extradite Appellants on nearly all of the counts of fraud. Furthermore, Appellants' flight from Lithuania after signing written undertakings to remain in the country, and after their case was set for trial, provides additional support for the magistrate's finding of probable cause. See Fernandez, 268 U.S. at 313, 45 S. Ct. at 543 (holding there was evidence to believe the fugitive was guilty because, among other reasons, "he fled the country").

For these reasons, we conclude the district court did not err when it found there was sufficiently reliable evidence in the record to warrant the magistrate judge's probable cause determination. See Terlinden v. Ames, 184 U.S. 270, 279-80, 22 S. Ct. 486, 488 (1902) (noting "the judgment of the magistrate rendered in good faith on legal evidence that accused is guilty of the act charged . . . cannot be reviewed on the weight of evidence, and is final for the purposes of the preliminary examination unless palpably erroneous in law") (internal quotation marks and citation omitted). 13

## IV. CONCLUSION

We hold the district court correctly determined there was competent evidence to support the magistrate judge's conclusion that probable cause existed to extradite Appellants on most of the fraud charges. Accordingly, we affirm the district court's denial of Appellants' habeas petitions.

AFFIRMED.

---

Footnotes:

Honorable Wm. Terrell Hodges, United States District Judge for the Middle District of * Florida, sitting by designation.

1. The charges against Tatjana and Valerij are not identical. Prior to the establishment of UAB "Grazna," Tatjana was the sole proprietor of a business providing commercial services in Lithuania. Some of the charges filed against Tatjana concern her actions while running this individual enterprise from October 1993 until June 1995.

2. Tatjana was also charged under Article 151(2) and (3) for the acts of fraud that allegedly occurred prior to January 1, 1995.

3. For those acts committed prior to January 1, 1995, the applicable statute for violations of rules regarding monetary transactions or transactions in securities is Article 87.

4. The applicable extradition treaty between the United States and Lithuania was signed on April 9, 1924, and entered into force on August 23, 1924. A supplementary extradition treaty enlarged the list of extraditable offenses. This supplementary treaty was signed on May 17, 1934, and entered into force on

January 8, 1935. We recognize that a new extradition treaty recently entered into force on March 31, 2003. The new treaty, however, does not apply here because the United States filed the extradition complaints for Tatjana and Valerij before it went into effect. See Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Lithuania, Oct. 23, 2001, U.S.-Lithuania, S. Treaty Doc. No. 107-4, Art. 22 (entered into force Mar. 31, 2003).

5. Section 3184 provides, in relevant part: Whenever there is a treaty or convention for extradition between the United States and any foreign government . . ., any justice or judge of the United States, or any magistrate judge authorized to do so by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention . . ., issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered. . . . If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention . . ., he shall certify the same, together with a copy of all testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

18 U.S.C. § 3184.

6. To be specific, the magistrate judge found there was probable cause to extradite Appellants on most of the fraud charges. The magistrate concluded there was insufficient support for two of the counts of fraud. With regard to these two specific counts, the magistrate judge determined Appellants were not extraditable.

7. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

8. Similarly, the applicable extradition treaty between the United States and Lithuania does not impose an oath requirement.

9. At the time of the certification, Floss was the principal consular officer of the United States in Lithuania.

10. We further note that while the indictment was not made under oath, it was signed by the investigator and approved by a Lithuanian prosecutor.

11. In their brief, Appellants argue an indictment "is not evidence," and therefore, the Government has failed to meet its evidentiary burden of establishing probable cause. To support this proposition, Appellants cite to the Eleventh Circuit Pattern Jury Instructions, Basic Instruction 2.1, which states: "The indictment or formal charge against any Defendant is not evidence of guilt." Appellants, however, are confusing the difference between evidence of guilt and evidence of probable cause. See Fernandez, 268 U.S. at 312, 45 S. Ct. at 542 ("Competent evidence to establish reasonable grounds is not necessarily evidence competent to convict."). "The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." Collins v. Loisel, 259 U.S. 309, 316, 42 S. Ct. 469, 472 (1922). While an indictment may not

be evidence of guilt, it can, under some circumstances, be sufficient to demonstrate that probable cause exists. See, e.g., Rodriguez v. Ritchey, 556 F.2d 1185, 1191 (5th Cir. 1977) (en banc) ("[I]t has long been settled that an indictment by a properly constituted grand jury conclusively determines the existence of probable cause and provides the authority for an arrest warrant to issue.").

12. In Escobedo, we upheld the magistrate judge's probable cause determination, even though the magistrate relied, in part, on a Mexican document containing "compound hearsay." 623 F.2d at 1102 n.10.

13. In Zanazanian v. United States, 729 F.2d 624 (9th Cir. 1984), the Ninth Circuit reached a similar conclusion. There, the court considered whether unsworn police reports, which summarized witnesses' statements, constituted competent evidence to establish probable cause at an extradition hearing. Id. at 625. The fugitive argued that "the evidence was not competent because it was unsworn multiple hearsay." Id. at 626. The Ninth Circuit rejected this argument, holding the unsworn reports were sufficiently reliable. Id. at 627. The court explained the reports were not "merely fragments of half-forgotten conversations," but rather they were "abundant in detail, containing specifics of time and place, price and quantity." Id.; see also Emani v. U.S. Dist. Ct., 834 F.2d 1444, 1450-52 (9th Cir. 1987) (holding a German investigator's affidavit was competent evidence to establish probable cause even though it contained unsworn hearsay statements).

---

© Lawriter Corporation. All rights reserved.

The Casemaker™ Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

**325 F.3d 1287; In re Commissioner's Subpoenas;**

———————————————— **Page 1287** ————————————————

IN RE: COMMISSIONER'S SUBPOENAS. UNITED STATES OF AMERICA, APPELLANT.

[Cite as In re Commissioner's Subpoenas, 325 F.3d 1287 (11th Cir. 03/31/2003)]

[1] U.S. Court of Appeals, Eleventh Circuit

[2] No. 02-10418

[4] March 31, 2003

[6] Appeal from the United States District Court for the Southern District of Florida D. C. Docket No. 01-CV-782-PAS

[7] Before Edmondson, Chief Judge, Anderson, Circuit Judge, and Pogue fn1, Judge.

[8] The opinion of the court was delivered by: Anderson, Circuit Judge

[9] [PUBLISH]

[10] This case involves a request made by Canadian law enforcement authorities, pursuant to a mutual legal assistance treaty between Canada and the United States, for the legal assistance of the United States government in subpoenaing seven individuals residing in the Southern District of Florida. The Canadian authorities sought to interview these individuals in connection with an ongoing investigation into possible criminal activities. The subpoenas were initially issued, but upon a motion filed by the subpoenaed witnesses, the district judge quashed the subpoenas. The United States, on behalf of the Canadian authorities, appeals the district court's order quashing the subpoenas.

[11] This case presents an issue of first impression for the federal appellate courts. We must ascertain whether this mutual legal assistance treaty between the two countries obligates the United States, at the request of Canada, to issue subpoenas to compel the testimony of witnesses in a criminal investigation prior to the filing of formal charges. Because we construe this Treaty to obligate both countries to execute requests for the issuance of subpoenas for purposes of compelling testimony in criminal investigations and to arrange for the taking of such testimony even prior to the actual initiation of formal charges, we hold that the Canadian request for assistance should have been granted and the subpoenas should not have been quashed by the district court.

[12] I. BACKGROUND

[13] A. The MLAT Between the United States and Canada

[14] The Treaty Between the United States and Canada on Mutual Legal Assistance in Criminal Matters, Mar. 18, 1985, U.S.-Can., 24 I.L.M. 1092 ("MLAT" or "Treaty"), was signed at Quebec City, Canada on March 18, 1985, the advice and consent of the United States Senate was received on October 24, 1989, and the Treaty was entered into force on January 24, 1990. The Treaty obligates the two governments to provide "mutual legal assistance in all matters relating to the investigation, prosecution and suppression of offences."

MLAT, art. II, ¶ 1. The MLAT with Canada is "one of a series of modern mutual legal assistance treaties being negotiated by the United States in order to counter more effectively criminal activities." Letter of Transmittal from Ronald Reagan, President of the United States, to the United States Senate, February 22, 1988, S. Exec. Rep. 100-14, 100 Cong., 2d Sess. (July 1985).

[15] Traditionally, evidence sought by a foreign government had to be obtained through a process whereby a written request known as a "letter rogatory" was sent from the court of one country to the court of another asking the receiving court to provide the assistance. A federal statute authorizes federal district courts in this country to entertain such requests and provides that "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation." 28 U.S.C. § 1782. Not only can a foreign tribunal bring a request in the form of a "letter rogatory," but section 1782 has been amended to also allow similar requests for assistance to be brought by "interested persons" including foreign governments in foreign investigations or proceedings and private litigants of a foreign proceeding. See id. ("The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person."). Requests for assistance initiated directly by an interested person rather than a foreign court are often referred to as "letters of request." Despite the apparent versatility of 28 U.S.C. § 1782, law enforcement authorities found the statute to be an unattractive option in practice because it provided wide discretion in the district court to refuse the request and did not obligate other nations to return the favor that it grants. MLATs, on the other hand, have the desired quality of compulsion as they contractually obligate the two countries to provide to each other evidence and other forms of assistance needed in criminal cases while streamlining and enhancing the effectiveness of the process for obtaining needed evidence. This MLAT between the United States and Canada provides for a broad range of cooperation in criminal matters. (fn2)

[16] Under this Treaty, Canada makes a request for assistance by contacting the United States' "Central Authority" under the Treaty, which is "the Attorney General or officials designed by him." See MLAT, art. I (Definitions). If the particular type of assistance requested requires action of a federal district court, the Attorney General and his officials utilize existing statutory authority including 28 U.S.C. § 1782 to bring an action seeking the requested evidence or information. Because the Attorney General simply utilizes the pre-existing statutory authority provided under 28 U.S.C. § 1782 when satisfying treaty obligations under the MLAT, the Treaty itself is self-executing obviating the need for implementing legislation. See Letter of Transmittal from Pres. Reagan ("The Treaty is self-executing and utilizes existing statutory authority."); Letter of Submittal, Department of State, Feb. 11, 1988, S. Exec. Rep. 100-14, 100th Cong., 2d Sess. (July 1985) ("The Treaty will not require further implementing legislation and will utilize the existing authority of the Federal courts, particularly 28 U.S.C. 1782."). Upon its entry into force on January 24, 1990, the MLAT became a law of this land on par with a federal statute.

[17] B. Factual Background

[18] For the past several years, Canadian law enforcement authorities have been investigating an alleged smuggling operation. According to Canadian authorities, goods have been legally exported to the United States and then smuggled back into Canada without payment of the Canadian duty, resulting in a revenue loss for the Canadian government. The smuggling activities allegedly began in 1989. The United States began its own investigation. During the investigations, the two governments shared information and resources. Appellees in this case are seven individuals allegedly involved. After unsuccessfully attempting to conduct voluntary interviews with the seven appellees, the Canadian authorities turned to formal legal

process.

[19] C. Procedural Background

[20] In 2000, Canadian authorities asked the United States for assistance. On February 22, 2001, the United States filed a petition in the United States District Court for the Southern District of Florida seeking an order appointing an assistant United States attorney as a "commissioner" to assist the Canadian government in obtaining the requested evidence. This request was made pursuant to the MLAT and 28 U.S.C. § 1782. On March 2, 2001, the district court entered an order appointing an assistant United States attorney from the Southern District of Florida, as the "commissioner" and authorizing him to "take such steps as are necessary, including issuance of commissioner's subpoenas to be served on persons within the jurisdiction of this Court, to collect the evidence requested." On April 30, 2001, he issued subpoenas to each of the appellees commanding their appearance at the federal courthouse in Miami on a given date and time, to give testimony to Canadian authorities concerning the Canadian smuggling investigation. Prior to the scheduled testimony, however, the appellees moved in the district court to quash the subpoenas and for a protective order.

[21] On August 23, 2001, a magistrate judge ordered that the subpoenas be quashed. First, the magistrate judge held that by its own terms, the MLAT fully incorporates the existing substantive law of the United States as the "Requested State," including 28 U.S.C. § 1782. According to this Circuit, section 1782 contains an implicit foreign discoverability requirement. This rule requires that the information sought in the United States be discoverable under the laws of the foreign jurisdiction. The magistrate judge reasoned that since Canadian authorities are not allowed to compel witness testimony in domestic criminal investigations at the pre-charge stage, such testimony cannot be compelled in this case by virtue of this circuit's construction of 28 U.S.C. § 1782. Second, the magistrate judge focused on the second paragraph of section 1782(a) which explicitly states that "a person may not be compelled to give his testimony... in violation of any legally applicable privilege." The magistrate judge held that the inability under Canadian law to compel witness testimony in a criminal investigation prior to the filing of formal charges amounted to a "legally applicable privilege" and therefore, for this additional reason, the appellees could not be compelled to provide the testimony. On behalf of the Canadian authorities, the appointed commissioner and the United States sought reconsideration of the magistrate judge's ruling in the district court. After further briefing by the parties, the district court affirmed the magistrate judge's order quashing the subpoenas, finding the magistrate judge's order not "clearly erroneous or contrary to law." (fn3) The district court entered a final order quashing the subpoenas.

[22] D. Appellate Jurisdiction and Standard of Review

[23] This Court's appellate jurisdiction arises from 28 U.S.C. § 1291. This Court reviews de novo the district court's interpretation of a treaty or federal statute. Yapp v. Reno, 26 F.3d 1562 1565 (11th Cir. 1994). The district court's discretionary authority pursuant to 28 U.S.C. § 1782 is reviewed for abuse of discretion. United Kingdom v. United States, 238 F.3d 1312, 1319 (11th Cir. 2001). The recognition or application of a privilege presents a legal question subject to de novo review. United States v. Hernandez, 141 F.3d 1042, 1049 (11th Cir. 1998).

[24] II. DISCUSSION

[25] In accordance with the terms of the Treaty, officials from the Department of Justice utilized 28 U.S.C. § 1782 to execute Canada's request for assistance under the Treaty. The officials brought a petition in

federal court seeking the appointment of a commissioner to issue seven witness subpoenas. Article II, ¶ 2(e) of the MLAT states that "[a]ssistance [under the Treaty] shall include...taking of evidence of persons" and Article VII, ¶ 1 states, in part, that "[t]he Courts of the Requested State shall have jurisdiction to issue subpoenas, search warrants or other orders necessary to execute the request." (emphasis added). Stated even more directly, Article XII, ¶ 1 provides that "[a] person requested to testify and produce documents, records or other articles in the Requested State may be compelled by subpoena or order to appear and testify and produce such documents, records and other articles, in accordance with the requirements of the law of the Requested State." (emphasis added). Without question, this general type of assistance, the compelled testimony of witnesses, is expressly within the scope of the Treaty. (fn4)

[26] In granting the motion to quash, however, the magistrate judge determined that, according to the Treaty itself, all Canadian requests under the MLAT were subject to the entire substantive law of the United States, including 28 U.S.C. §1782. The magistrate judge reasoned that "[u]nder the MLAT, Canada's request is to be evaluated under U.S. law." This conclusion was based upon the magistrate judge's interpretation of Article VII, ¶ 2 of the Treaty, which states that "[a] request shall be executed in accordance with the law of the Requested State and, to the extent not prohibited by the law of the Requested State, in accordance with the directions stated in the request." (fn5) The magistrate judge concluded that "[b]y its own terms therefore, the MLAT mandates that this Court apply 28 U.S.C. § 1782 as the statutory authority or law of the Requested State."

[27] As a law of the Requested State, the magistrate judge then considered cases from this Circuit construing 28 U.S.C. § 1782. The magistrate judge recognized that the law of this Circuit requires a foreign government conducting a criminal investigation prior to filing formal charges and seeking assistance under 28 U.S.C. § 1782 by way of a letter of request to first establish that the information sought in this country would be discoverable under the domestic laws of the foreign country (the requesting state). In the case of In re Request for Assistance from Ministry of Legal Affairs of Trinidad and Tobago, 848 F.2d 1151, 1156 (11th Cir. 1988) ("Trinidad and Tobago"), government authorities from Trinidad and Tobago sought assistance with an ongoing criminal investigation. This Circuit held that, in order for a district court to grant assistance, the information sought must be discoverable in the foreign country. Id. at 1156. According to Trinidad and Tobago, 28 U.S.C. § 1782 implicitly requires foreign discoverability as a prerequisite to the grant of assistance to foreign authorities. Id. Other cases from this Circuit further establish the foreign discoverability requirement as an implicit and mandatory limitation of the discretion of a district court to grant requests made under 28 U.S.C. § 1782. See Lo Ka Chun v. Lo To, 858 F.2d 1564, 1566 (11th Cir. 1988) (relying on Trinidad and Tobago in a case involving a letter of request of a private litigant and holding that the district court must decide whether the evidence would be discoverable in a foreign country before granting assistance). See also United Kingdom v. United States, 238 F.3d 1312, 1319 (11th Cir. 2001) (noting the foreign discoverability requirement established in Trinidad and Tobago in considering a letter rogatory from an English court). See also Application of Asta Medica, S.A., 981 F.2d 1, 5-7 (1st Cir. 1992) (providing a thorough explanation of the foreign discoverability requirement).

[28] Reading Article VII, ¶ 2 of the MLAT to incorporate by reference the entire substantive law of the Requested State, the magistrate judge concluded that the treaty request was subject to this circuit's interpretation of 28 U.S.C. § 1782 requiring foreign discoverability as a condition precedent to granting requests made by foreign governments through letters of request and letters rogatory. Since the parties agreed that there was no authority under Canadian law to compel this type of testimony from witnesses in a domestic criminal investigation where no charges had yet been filed, the magistrate judge held that 28 U.S.C. § 1782 and its foreign discoverability requirement precluded the assistance in this case.

[29] We must decide whether the magistrate judge correctly interpreted the MLAT between the United States and Canada. That question turns on the intended role of 28 U.S.C. § 1782 in requests for assistance under the MLAT. The precise issue facing this court is whether the MLAT permits, at the request of Canada, the issuance of subpoenas and the taking of compelled testimony in a pre-charge Canadian criminal investigation of seven witnesses who reside in the Southern District of Florida.

[30] A. Principles of Treaty Interpretation

[31] To decide the question presented, we turn to fundamental principles of treaty construction and interpretation. The goal of treaty interpretation is to determine the actual intention of the parties "because it is our responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties." Air France v. Saks, 470 U.S. 392, 399, 105 S.Ct. 1338, 1342 (1985). The analysis of the parties' intentions "begin[s] with the text of the treaty and the context in which the written words are used." Eastern Airlines, Inc. v. Floyd, 499 U.S. 530, 534, 111 S.Ct. 1489, 1493 (1991); Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 700, 108 S.Ct. 2104, 2108 (1988). See also United States v. Duarte-Acero, 208 F.3d 1282, 1285 (11th Cir. 2000). The clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 180, 102 S.Ct. 2374, 2377 (1982).

[32] "If the language of the treaty is clear and unambiguous, as with any exercise in statutory construction, our analysis ends there and we apply the words of the treaty as written." Duarte-Acero, 208 F.3d at 1285. See also Chan v. Korean Air Lines, Ltd., 490 U.S. 122, 134, 109 S.Ct. 1676, 1684 (1989) ("[W]here the text is clear...we have no power to insert an amendment."). As Justice Story wrote long ago, "to alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be on our part an usurpation of power, and not an exercise of judicial functions. It would be to make, and not to construe a treaty." The Amiable Isabella, 6 Wheat. 1, 71, 5 L.Ed. 191 (1821). But, if the treaty text is ambiguous when read in context in light of its object and purpose, then extraneous sources may be consulted to elucidate the parties' intent from the ambiguous text. See Chan, 490 U.S. at 134, 109 S.Ct. at 1684.

[33] B. Ambiguity in the Text of the Treaty

[34] Upon our reading of the text of this Treaty, we conclude that the magistrate judge erred in construing the MLAT to express a clear and unambiguous intent to make requests under the Treaty subject to the limitations of all other substantive law of the United States including 28 U.S.C. § 1782. Undeniably, the magistrate judge's interpretation finds some support in the treaty text. As the magistrate judge points out, Article VII, ¶ 2 states that "[a] request shall be executed in accordance with the law of the Requested State and, to the extent not prohibited by the law of the Requested State." While not mentioned by the magistrate judge, Article XII, ¶ 1 also contains a similar reference to the "law of the Requested State." Those two sentences, if read in isolation, arguably incorporate the substantive limitations of 28 U.S.C. § 1782 as a law of the United States. And as discussed above, that statute has been held to implicitly require a showing of foreign discoverability, at least in the traditional case involving a letter rogatory or letter of request. Given the fact acknowledged by all parties that Canada lacks the power to compel the taking of testimony in a pre-charge setting, the application of a foreign discoverability requirement to MLAT requests by Canada would deny the court the power to grant Canada the type of assistance sought in this case. But when the entire Treaty is read in context, we conclude that other language in its text, apparently overlooked in the lower court, suggests an alternate, reasonable, construction of the "law of the Requested State" phrases contained

in Articles VII and XII of the MLAT.

[35] Starting with the Preamble, the MLAT expresses an intent to obligate both countries to provide assistance to each other in criminal matters during both the pre-charge "investigation" and post-charge "prosecution" stages. The Preamble states that the United States and Canada desire "to improve the effectiveness of both countries in the investigation, prosecution and suppression of crime through cooperation and mutual assistance in law enforcement matters." MLAT Preamble (emphasis added). Then, Article II, ¶ 1 states that "[t]he Parties shall provide" such assistance, using language that illustrates the obligatory nature of the assistance even at the investigative stage. Article II, ¶ 2 specifically includes the "taking the evidence of persons" in a list of types of assistance the parties shall provide under the Treaty. Certainly, this language indicates that Canada expects to be able to obtain witness subpoenas and compel the testimony of witnesses during an ongoing criminal investigation. Nothing in Article II limits this exercise or expresses a contrary intent with respect to Canadian as opposed to American requests of this type.

[36] Article V of the MLAT is entitled "Limitations on Compliance" and explicitly limits the situations where the Requested State may deny the other parties' request for assistance. Article V limits these situations to those involving requests not in conformity with the provisions of the Treaty and requests that are "contrary to [the Requested State's] public interest." "Public Interest" is defined in Article I as "any substantial interest related to national security or other essential public policy." If Article VII, ¶ 2 is to be construed as placing a much more restrictive limitation by allowing a request only if consistent with the entire substantive law of the Requested State, then the narrow limitations on providing assistance laid out in Article V would be rendered meaningless. We, however, presume that no language contained in a treaty is mere surplusage and we will construe a treaty in a way that gives purpose and effect to all of its language. The phrase in Article VII, ¶ 2 that guided the magistrate judge's interpretation can be reasonably interpreted to address the procedures and methods employed in executing treaty requests and not the substantive law influencing the decision to grant or deny a request. Article VII, entitled "Execution of Requests," states:

[37] 1. The Central Authority of the Requested State shall promptly execute the request, or when appropriate, transmit it to the competent authorities, who shall make best efforts to execute the request. The Courts of the Requested State shall have jurisdiction to issue subpoenas, search warrants or other orders necessary to execute the request.

[38] 2. A request shall be executed in accordance with the law of the Requested State and, to the extent not prohibited by the law of the Requested State, in accordance with the directions stated in the request. MLAT, Art. VII.

[39] While the magistrate judge interpreted ¶ 2 of this article to require a district court to ensure that a MLAT request that is otherwise permitted by the Treaty to also be consistent with all other existing United States substantive law, an alternative construction can be reasonably discerned from a reading of Article VII in its entirety. The article addresses the "Execution of Requests." Paragraph 1 contains two sentences. The first sentence directs the "Central Authority of the Requested State," to make best efforts to promptly "execute" the request. The second sentence of ¶ 1 grants the "Courts of the Requested State" jurisdiction to issue subpoenas and other forms of assistance necessary for the execution of the request. (fn6) The appellees focus solely on ¶ 2 read in isolation. But, in treaty interpretation as in statutory interpretation, particular provisions may not be divorced from the document as a whole and read in insolation. Sea Hunt v. Unidentified Shipwrecked Vessel, 221 F.3d 634, 646 (4th Cir. 2000). In carefully reading all of Article VII, paragraph 2 can reasonably be construed as requiring the Attorney General's office to follow existing procedures of United States law in seeking the requested assistance on behalf of Canada notwithstanding

any contrary directions stated by Canada in the request that are prohibited by United States law.

[40] The text of Article XII adds to the ambiguity of the Treaty with respect to the issue before this court. In addressing the "Taking of Evidence in the Requested State," Article XII, ¶ 1 states that "[a] person requested to testify and produce documents, records or other articles in the Requested State may be compelled by subpoena or order to appear and testify and produce such documents, records and other articles, in accordance with the requirements of the law of the Requested State." This article explicitly embraces the very assistance sought by Canada in this case --subpoenas to compel witness testimony. But at the same time, it uses "in accordance with...the law of the Requested State" language that is similar to that found in Article VII. Again, because subpoenas are expressly embraced, the limiting phrase can reasonably be read to require the taking of the evidence in the Requested State to follow the existing procedures used in the Requested State, i.e., the law of the Requested State with respect to the issuance of subpoenas, the taking of testimony, etc.

[41] In light of our careful examination of the Treaty as a whole read in context and the lack of clarity provided in its language as to the meaning and purpose of the "law of the Requested State" in Articles VII and XII, we conclude that the treaty text is ambiguous with respect to the propriety of Canadian requests under the Treaty for assistance regarding pre-charge compelled testimony in a criminal investigation. We are presented with two reasonable alternative interpretations: on the one hand, the "law of the Requested State" might incorporate all the laws of the Requested State, including laws that provide standards for granting or denying requests made by way of a letter rogatory or letter of request; on the other hand, the "law of the Requested State" might only refer to the laws providing the ways and means for executing valid MLAT requests for assistance. "Where the text--read in the context of its structure and purpose--is ambiguous, we may resort to extraneous tools of interpretation." Croll v. Croll, 229 F.3d 133, 136 (2d Cir. 2000). "Treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." Schlunk, 484 U.S. at 700, 108 S.Ct. at 2108 (quoting Choctaw Nation of Indians v. United States, 318 U.S. 423, 431-32, 63 S.Ct. 672, 678 (1943)).

[42] C. Resolving the Ambiguity: "Law of the Requested State" Addresses Procedural Methods not Substantive Laws

[43] While the foregoing reasoning has led us to conclude that the text of the Treaty is ambiguous with respect to the instant issue, affording two reasonable interpretations, we conclude that our ultimate construction is decidedly the more plausible of the two. We conclude that the most logical construction of the phrase "law of the Requested State" in the MLAT is that the Treaty partners intended to utilize the established procedures set forth in the existing laws of the Requested State to execute the treaty requests, rather than to subject each and every treaty request to any and all limitations of existing law of the Requested State. That is, the Treaty utilizes § 1782 as a procedure for executing requests, but not as a means for deciding whether or not to grant or deny a request so made. This construction is more plausible primarily because of Article V, which delineates only narrowly confined circumstances in which the Requested State "may deny assistance." Article V is entitled "Limitations on Compliance" and provides, in relevant part:

[44] 1. The Requested State may deny assistance to the extent that

[45] a) the request is not made in conformity with the provisions of this Treaty; or

[46] b) execution of the request is contrary to its public interest, as determined by its Central Authority.

[47] Moreover, "public interest" is itself narrowly defined in Article I of the Treaty to mean "any substantial interest related to national security or other essential public policy." If a request could be denied based on any limitation provided by the substantive law of the Requested State, as appellees urge, Article V's specific limitation where the request would be contrary to the public interest of the Requested State would be rendered superfluous.

[48] The treaty negotiations and ratification history, fundamental canons of treaty construction, and analogous cases construing similar language in the text of other treaties also point strongly to our ultimate construction. We now turn to these other considerations.

[49] 1. Treaty Negotiation and Ratification History

[50] (a) Executive Branch's Official Explanation of Article VII, ¶ 2

[51] The negotiators' explanation of ¶ 2 of Article VII, provided in the Technical Analysis, does not support the appellees' reading. The Technical Analysis, included in the ratification history at S. Treaty Doc. 100-14, 100th Cong., 2d Sess. (1988), "was prepared by the United States negotiating team, [and] constitutes the formal executive branch representation as to the meaning of this treaty and the obligations to be assumed by the United States under it." See Technical Analysis at 5. The Analysis states that "Article VII(2) provides that the Requested State is to execute the request pursuant to its own laws, practices, and procedures, except that 'directions stated in the request' will be honored unless prohibited by domestic law." Technical Analysis at 10. Despite appellees' assertion that "law of the Requested State" plainly incorporates the substantive law, nowhere in the treaty negotiators' explanation of ¶ 2 of Article VII do the negotiators make any statements that are consistent with or offer any support for the appellees' reading.

[52] Rather, the entire paragraph explaining ¶ 2 addresses the methods and procedures by which treaty requests should be executed. The negotiators construe ¶ 2 to address how the Requested State shall handle "directions stated [by the Requesting State] in the request" concerning the way in which the particular information is to be sought. Unless the Requested State prohibits conformance with the particular "directions stated in the request," then the Requested State should execute the request consistent with those directions. Id. The negotiators then give examples of videotaping, notice to persons, and presence of certain person when evidence is taken, all of which deal with the procedural methods for executing requests. Id. After carefully reading the entire explanation of Article VII, it is clear that the negotiators did not intend ¶ 2 to incorporate and subject all treaty requests to the entire substantive law of the Requested State, but rather they intended Article VII, ¶ 2 to address the procedures and methods to be used by the Requested State in executing the treaty requests. This official interpretation by the executive branch is entitled to great deference by this Court. El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 168, 119 S.Ct. 662, 671 (1999).

[53] (b) Article VII is Intended to Provide "Slightly Broader Authority" than 28 U.S.C. § 1782 In its Technical Analysis, the executive branch states that one purpose of ¶ 1 of Article VII of the MLAT, (fn7) is to "provide[] slightly broader authority than 28 U.S.C. 1782 for U.S. federal courts to use their power to issue subpoenas and other process when Canada needs evidence for use before an administrative agency...." Technical Analysis at 10.

[54] In this statement, the negotiators were apparently concerned with several circuits' restrictive

pretation of 28 U.S.C. § 1782 as it then existed. These courts read the statute in a way that limited its scope to pending proceedings in judicial tribunals. The real significance of this executive branch statement in this case is the fact that the negotiators were making clear that ¶ 1 of Article VII allowed assistance that would not otherwise be permitted under section 1782 as it was being construed at that time. According to the actual words used by the negotiators, Article VII of the Treaty "provides slightly broader authority than 28 U.S.C. 1782 for U.S. federal courts to use their power to issue subpoenas and other process when Canada needs evidence." This makes clear that the negotiators read the MLAT as not being simply subject to the limits of 28 U.S.C. § 1782. If all MLAT requests were subject to the limits of section 1782, then the MLAT necessarily could not "provide slightly broader authority than 28 U.S.C. 1782 for U.S. federal courts to use their power to issue subpoenas... when Canada needs assistance." This interpretation of ¶ 1 of Article VII cannot be reconciled with a reading of ¶ 2 of that same article to fully incorporate 28 U.S.C. § 1782 as a substantive limitation of Canadian MLAT requests. The Technical Analysis, constituting the executive branch's official interpretation of the Treaty, is entitled to much deference by this Court. See El Al Israel Airlines, Ltd., 525 U.S. at 168, 119 S.Ct. at 671. Moreover, we find this interpretation to be entirely reasonable in light of all the facts and circumstances.

[55] (c) Rejection of "Dual Criminality"

[56] Another provision of the Treaty lends additional support to this interpretation. Article II of the MLAT, entitled "Scope of Application," contains a provision rejecting the rule of "dual criminality." "Dual criminality" is the rule that the offense for which the foreign state seeks assistance must also constitute a crime in the requested state. Article II, ¶ 3 explicitly provides that "[a]ssistance shall be provided without regard to whether the conduct under investigation or prosecution in the Requesting State constitutes an offence or may be prosecuted by the Requested State." The negotiators state in the Technical Analysis that "[b]y avoiding a dual criminality provision in this Treaty, the United States expects to receive assistance for such important crimes as, for instance, money laundering, even though Canada has yet to enact similar legislation." Technical Analysis at 5. This provision makes clear an intent that requests for assistance not be routinely impeded or denied by virtue of the Requested State's own laws. If Article VII, as appellees contend, subjects all requests to the limitations of existing Requested State substantive law, then many requests would be impeded by the operation of an indirect dual criminality provision that is explicitly rejected in Article II. Therefore, if Article VII, ¶ 2 is read as the appellees contend, dual criminality provision will be brought into the Treaty through the back door. On the other hand, construing Article VII, ¶ 2 as we do to refer only to the procedures and methods of executing a request and taking evidence pursuant to such a request is completely consistent with and in no way undermines Article II's rejection of the dual criminality rule.

[57] 2. Canons of Treaty Construction

[58] (a) Uniformity and Reciprocity Among Treaty Partners

[59] Interpreting the MLAT to subject each and every request to the existing substantive law of the requested state runs contrary to another fundamental principle of treaty interpretation. "Treaties that lay down rules to be enforced by the parties through their internal courts or administrative agencies should be construed so as to achieve uniformity of result despite differences between national legal systems." Restatement (Third) of Foreign Relations § 325 cmt. d; United States v. Lombera-Camorlinga, 206 F.3d 882, 888 (9th Cir. 2000). Obviously, the United States and Canada have their own domestic substantive law. Consequently, under the appellees' construction of the MLAT, the viability of requests under the Treaty would often turn on which country is entertaining the request, even if the information requested is identical.

[60] We find no statements anywhere in the text of the Treaty or its negotiation and ratification history to suggest that the parties did not intend the obligations to be reciprocal and uniform. In fact, a desire for uniform treatment of similar requests made by the two countries underlies the decision to enter into the MLAT in the first place. The Treaty's ratification history reveals that in conjunction with signing the Treaty, Canada enacted implementing legislation to give its courts the authority to execute requests from the United States for assistance in criminal investigations prior to the filing of formal charges. See Report from the Committee on Foreign Relations, S. Treaty Doc. 100-14, 100th Cong., 2d Sess. (1988) at 2-3. See also Technical Analysis at 1-2. That implementing legislation is known as the Mutual Legal Assistance in Criminal Matters Act (MLACMA), R.S.C. 1985, c. 30 (4th Supp.), s. 18.

[61] Prior to the MLAT, because Canada's domestic law prohibited compelled testimony from witnesses prior to charges being filed, assistance was denied to authorities from the United States. The MLACMA was enacted along with the MLAT "to remove the legal barrier and permit (indeed, obligate) Canada to provide assistance prior to indictment... [and make] assistance available at the investigative stage." Technical Analysis at 2. That legislation was intended to make sure that there would be no remaining legal impediments to MLAT requests made back-and-forth between the two countries.

[62] If the circumstances were reversed in this case and the United States sought this type of assistance from the Canadian courts, such assistance would seemingly be available under the MLAT by virtue of the Canadian implementing legislation. This treaty negotiation and ratification history makes clear that uniformity and reciprocity regarding requests for assistance in criminal matters were a vital concern of the two countries in entering into the MLAT. That is precisely what the United States was seeking to accomplish in requiring Canada to enact the implementing legislation along with the MLAT. See Report from the Committee on Foreign Relations, S. Treaty Doc. 100-14 at 2-3. (explaining that the MLAT along with Canada's implementing legislation "will remove the legal barrier and obligate Canada to provide assistance at the investigative stage" and the MLAT will "add an element of standardization and uniformity to criminal procedures"); Technical Analysis at 1-2. Nevertheless, the appellees urge us to construe this Treaty in a way that destroys the uniformity and reciprocity that the treaty drafters intended to create by requiring Canada to adopt this implementing legislation concurrent with the Treaty. We cannot faithfully construe the Treaty in such a manner.

[63] (b) Liberal Construction to Effectuate Stated Purpose of the Treaty

[64] The purposes and objectives stated in the Treaty's preamble supports an interpretation of the MLAT that allows the issuance of subpoenas at the request of Canada to compel testimony of witnesses pursuant to a criminal investigation occurring prior to the filing of formal charges. The Preamble of the MLAT states that it was created out of a desire "to improve the effectiveness of both countries in the investigation, prosecution and suppression of crime through cooperation and mutual assistance in law enforcement matters." MLAT, Preamble. We agree with the appellant that if the MLAT is read to only allow assistance that is already obtainable through the letter rogatory process, it would have accomplished very little. While such a reading would at least allow the Treaty to serve to make assistance between the two countries part of a binding agreement, the scope of assistance would be unchanged, rendering the Treaty of little practical significance and no great improvement would have been achieved in the area of international criminal investigation and prosecution. Such a narrow reading is contrary to the fundamental principle of treaty interpretation that a treaty "should be construed liberally to give effect to the purpose which animates it and that even where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred." United

States v. Stuart, 489 U.S. 353, 368, 109 S.Ct. 1183, 1192 (1989). See also St. Paul Ins. Co. v. Venezuelan Int'l Airways, 807 F.2d 1543, 1546 (11th Cir. 1987). We reject the appellees' interpretation of treaty language that would make the Treaty nearly superfluous in light of existing law. By reading Article VII, ¶ 2 to refer to procedures and methods rather than to incorporate a serious and debilitating limitation on the permissible scope of assistance under the Treaty, we faithfully interpret the MLAT in the context of its stated purposes and objectives. This construction will fully effectuate the MLAT's intended goal of improving the effectiveness of both countries' ability to investigate, prosecute and suppress crime.

[65] 3. Additional Weaknesses in Appellees' Construction

[66] (a) The Treaty Partners Did Not Contemplate a Foreign Discoverability Requirement

[67] First, in light of the history of the Treaty and the overall context in which it was created, we conclude that the Treaty's reference to the "law of the Requested State" does not in fact indicate that the parties expected to incorporate the doctrine of foreign discoverability. Treaties, "like other contracts, are to be read in the light of the conditions and circumstances existing at the time they were entered into, with a view to effecting the objects and purposes of the States thereby contracting." Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. 243, 262, 104 S.Ct. 1776, 1788 (1984) (Stevens, J., dissenting) (internal quotation omitted). Words in a treaty are to be taken in their ordinary meaning as understood by the contracting parties and should not be construed in an artificial or special sense impressed upon them by local law unless such a restricted sense is clearly intended. Id. at 263, 104 S.Ct. at 1788. The MLAT was signed in Quebec in March of 1985. At that time, the notion of foreign discoverability as an implicit requirement under 28 U.S.C. § 1782 had received very little attention in the lower federal courts. While at least one district court had adopted such a rule in the context of a private litigant seeking assistance by way of a letter of request under section 1782, see In re the Court of the Commissioner of Patents for the Republic of South Africa, 88 F.R.D. 75 (E.D.Pa. 1980), no circuit court had yet fully embraced the concept.

[68] There was little development in the law after the negotiations and signing of the Treaty in Quebec. Between the Treaty's signing in 1985 and its entry into force in January 1990, only this circuit read a foreign discoverability requirement into section 1782. See Trinidad and Tobago, 848 F.2d 1151, 1156 (11th Cir. 1988) and Lo Ka Chun v. Lo To, 858 F.2d 1564, 1566 (11th Cir. 1988). While these Eleventh Circuit decisions clearly set forth this Circuit's law with respect to letter requests and letters rogatory under 28 U.S.C. § 1782, the almost complete absence in the entire federal courts of any indication of a foreign discoverability requirement as an implicit part of 28 U.S.C. § 1782 makes it a very dubious proposition to suggest that the governments of the United States and Canada intended to subject all Treaty requests to such a limitation. (fn8)

[69] If there were any doubt about our conclusion that the parties did not intend to subject Canadian treaty requests to a foreign discoverability requirement, the Technical Analysis provides significant clarity. And, as the executive branch's official construction of the Treaty, this analysis is entitled to significant deference by this Court. "Although not conclusive, the meaning attributed to treaty provision by the Government agencies charged with their negotiation and enforcement is entitled to great weight." Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184, 102 S.Ct. 2374, 2379 (1982). The "Introduction" section of the Technical Analysis discusses the reasons for the creation of the Treaty and notes the fact that, in the past, the Canadian courts would refuse many requests for assistance by law enforcement officials from the United States because the information sought was for investigative purposes prior to the initiation of formal criminal charges. In so noting, the negotiators recognized that this created "unequal treatment since the United States provided assistance [to Canada] without regard to whether the case was pre-or post-

indictment." Technical Analysis at 1.

[70] In an endnote, the negotiators elaborated that "[a]ssistance is available for a foreign country under 28 U.S.C. 1782 without regard to whether the action has already been filed." Id. at 26 n.2. Here, the negotiating team specifically discussed requests by Canada under section 1782 and understood section 1782 to allow for assistance without regard to lack of discoverability in Canada of compelled testimony prior to the actual filing of criminal charges. These statements in the Technical Analysis, constituting formal executive branch interpretations, all but foreclose any argument that the parties intended to subject the Attorney General's petitions, made honoring a Treaty request, to a foreign discoverability requirement for letters rogatory and letters of request.

[71] (b) Prior Cases Construing Similar Language in Other Treaties

[72] Prior cases involving similar language in other treaties further illustrate that vague and general references to the "law of the Requested State" in treaties must be carefully construed in the context of all the language of the Treaty and cannot simply be read in mechanical fashion as the appellees contend. This Circuit in Martin v. Warden, Atlanta Pen, 993 F.2d 824, 829 (11th Cir. 1993) dealt with similar language in an extradition treaty between the United States and Canada. In Martin, Canada failed to seek Martin's extradition for over seventeen years. Recognizing that there is no direct constitutional right to a speedy extradition, Martin argued that language in the treaty incorporated United States law, including the Sixth Amendment right to a speedy trial, by providing that "the person whose extradition is sought shall have the right to use all remedies and recourses provided by the law of the Requested State." Id. The court rejected Martin's attempt to read the language to incorporate either the Fifth or Sixth Amendment, i.e., the substantive law of the Requested State. Id. Accord Murphy v. United States, 199 F.3d 599, 603 (2d Cir. 1999) (construing same language not to entitle a fugitive to the constitutional protections that underlie a United States statute of limitations).

[73] The Ninth Circuit has reached similar conclusions in two separate cases. That court rejected the argument that the treaty provision entitles the fugitive to invoke the protections that the requested state's laws afford defendants in domestic prosecutions. Matter of Extradition of Kraiselburd, 786 F.2d 1395, 1398 (9th Cir. 1986) (Kennedy, J.); Kamrin v. United States, 725 F.2d 1225, 1227 (9th Cir. 1984). A district court opinion from 2000 explains the reasoning behind interpreting this type of treaty language as failing to incorporate wholesale the substantive law of the requested state. In Elcock v. United States, 80 F.Supp.2d 70, 77 & n.10 (E.D.N.Y. 2000), the extradition treaty provided that "[e]xcept where this Treaty provides, the law of the Requested State shall be applicable with respect to provisional arrest, extradition, and transit." The court acknowledged that this "reference to the 'law of the Requested State' in connection with 'extradition' might be read to suggest that the Treaty incorporates the substantive domestic law of the Requested State into the extradition provision of the Treaty." Id. at 77 n.10. But, looking to ratification history, the court concluded that the treaty provision referred to the Requested State's procedures rather than its substantive law. Id.

[74] The court also noted that "United States courts have consistently ruled that similar provisions in other treaties do not import substantive constitutional or statutory protections into the extradition context," citing Murphy, Martin, Kraiselburd, and Kamrin. The court concluded that:

[75] Had the parties intended that each would apply its own [substantive] law in determining whether the requested extradition would violate double jeopardy principles, they could have clearly stated as much....In the absence of such a provision, a court may not simply rely on the meanings the terms of the

treaty have in the context of domestic law. Id. at 77.

[76] We recognize that all of these extradition cases involve factual scenarios and treaties that are quite distinguishable from the case we decide today. But, given that the seven appellees in this case are relying upon similar language to make the same type of argument that has been consistently rejected, we find these cases instructive. These cases make clear that vague and general treaty language referring to "the law of the Requested State" should not be read in a mechanical fashion and automatically interpreted as incorporating the substantive law of the Requested State, but should rather be read in full context of the purposes and objectives of the Treaty as a whole. (fn9)

[77] 4. Conclusion: Any Ambiguity in the "Law of the Requested State" Resolved

[78] "It is the intention of the parties that must control any attempt to interpret a treaty." United States v. Duarte-Acero, 208 F.3d 1282, 1285-86 (11th Cir. 2000) (quoting Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 675, 99 S.Ct. 3055, 3069 (1979)). "It is our responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties." El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 167, 119 S.Ct. 662, 671 (1999). Considering both textual and nontextual sources, we conclude that the MLAT allows for the issuance of subpoenas in this case pursuant to the Canadian request for assistance.

[79] Granting some ambiguity in the text, we nevertheless conclude that when the "Requested State" language is read in context with the entirety of the Treaty's text, the most plausible interpretation is the one we reach. Our interpretation finds strong, indeed overwhelming, support in the construction given the Treaty by the executive branch. As explained above, it is clear that the executive branch interpreted the Treaty to provide for discovery requests by either the United States or Canada with respect to pre-charge criminal investigations. Our interpretation is consistent with that of the executive branch; appellees' is not. "Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty." Id. at 168, 119 S.Ct. at 671. See also Kolovrat v. Oregon, 366 U.S. 187, 194, 81 S.Ct. 922, 926 (1961) ("[T]he meaning given [treaties] by the departments of government particularly charged with their negotiation and enforcement is given great weight."). Similarly, "[t]he practice of treaty signatories counts as evidence of the treaty's proper interpretation, since their conduct generally evinces their understanding of the agreement they signed." United States v. Stuart, 489 U.S. 353, 369, 109 S.Ct. 1183, 1192-93 (1989). Based on its actions in this particular case, the government of Canada understands the Treaty to allow the assistance that it has requested in this case. The United States Department of Justice obviously agrees. Such deference is a significant factor leading to our conclusion, a conclusion however which is also indicated by the entirety of the text of the Treaty, analogous cases, and application of the canons of treaty interpretation. For the foregoing reasons, we reject appellees' argument that the "law of the Requested State" should be read mechanically to incorporate all of the substantive law of the Requested State such that the foreign discoverability aspect of 28 U.S.C. § 1782 is incorporated; rather, we hold in this case that the language incorporates the procedural aspects of § 1782 for executing requests for assistance under the Treaty.

[80] D. Appellees' Other Contentions

[81] 1. "Legally Applicable Privilege"

[82] Appellees' also argue in their brief that they enjoy a privilege under Canadian domestic law to remain silent and refuse to give compelled testimony as a witness in a pre-charge criminal investigation. This argument is based upon the second paragraph of 28 U.S.C. § 1782(a) which provides that "[a] person

may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." The appellees correctly note that the legislative history makes clear that this language embraces privileges recognized by foreign law." S. Rep. 1580, 88th Cong., 2d Sess. (1964), reprinted in U.S.C.C.A.N. 3782, 3790. Therefore, if this case involved a letter of request brought under 28 U.S.C. § 1782, then this court would have to ascertain whether the inability of a Canadian court in a domestic criminal pre-charge investigation to compel witness testimony amounts to a "legally applicable privilege" under Canadian law.

[83] But we need not determine whether appellees had a "legally applicable privilege" under Canadian law. The Canadian request in this case was made pursuant to an MLAT rather than a letter of request under 28 U.S.C. § 1782. And for all the reasons already discussed in this opinion, we do not read the MLAT to incorporate and subject itself to the substantive law of the Requested State including 28 U.S.C. § 1782(a) and its "legally applicable privilege" limitation. Like the foreign discoverability requirement which, according to this Circuit, is an implicit part of 28 U.S.C. § 1782 at least with respect to letters of request and letter rogatory cases, the "legally applicable privilege" is an explicit part of section 1782 but does not control the resolution of this case for the reasons above discussed.

[84] Our conclusion in this particular case is supported by the ratification history which provides that "[t]he parties agreed that questions concerning the applicability of privileges provided by the law of the Requesting State would be preserved for consideration by the courts of that State." Technical Analysis at 10. This, constituting the official executive branch interpretation of the Treaty, makes clear that the drafters did not intend to apply 28 U.S.C. § 1782(a)'s "legally applicable privilege" rule to MLAT requests and is entitled to considerable deference by this court. Without considering whether appellees would have a privilege under Canadian law, we reject the application of the privilege restriction to petitions by the Attorney General pursuant to his Treaty obligations and, consistent with the ratification history, leave this issue for the Canadian courts.

[85] 2. The Mere Utilization of 28 U.S.C. § 1782

[86] Any argument that 28 U.S.C. § 1782 and its foreign discoverability requirement applies simply because it was referenced in the subpoenas and utilized as the procedural vehicle in executing the MLAT request likewise fails. The MLAT is self-executing and this court is bound to give it effect as a law of the land without further legislation. "Procedural legislation which makes operation of a Treaty more convenient cannot amend or abrogate a self-executing Treaty." Bishop v. Reno, 210 F.3d 1295, 1299 (11th Cir. 2000) (quoting Cannon v. United States Dep't of Justice, 973 F.2d 1190, 1197 (5th Cir. 1992)). "A treaty, when ratified, supersedes prior domestic law to the contrary, and is equivalent to an act of Congress." Xerox Corp. v. United States, 41 F.3d 647, 658 (Fed. Cir. 1994) (internal citation omitted). While 28 U.S.C. § 1782 may be utilized as the vehicle by which MLAT requests are executed, the Treaty substantively stands on its own as a law and therefore such MLAT requests need not comply with the substantive restraints associated with requests made solely under 28 U.S.C. § 1782.

[87] E. Trinidad and Tobago Distinguished

[88] In closing, we must emphasize that we have not abandoned this circuit's holding in Trinidad and Tobago, 848 F.2d 1151, 1156 (11th Cir. 1988). We in no way alter or amend its holding that letters of request made pursuant to 28 U.S.C. § 1782 in a criminal investigation require a showing that the information sought is discoverable in the foreign country. Nor could we as a panel do that in any event. See United States v. Hogan, 986 F.2d 1364, 1369 (11th Cir. 1993) ("[I]t is the firmly established rule of this

Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court."). This case is simply distinguishable as it involves an MLAT request rather than a letter of request under 28 U.S.C. § 1782. Because the MLAT obligates both countries to provide the assistance in this case regardless of whether the information sought would actually be discoverable in the requesting state, we find Trinidad and Tobago inapplicable.

[89] III. CONCLUSION

[90] For the foregoing reasons, we hold that the information sought by Canada in this case, subpoena-compelled testimony pursuant to a Canadian criminal investigation occurring prior to the filing of formal charges, was within the scope of the two countries' obligations under the MLAT. Consequently, the subpoenas should not have been quashed. Accordingly, we VACATE the order of the district court quashing the commissioner's subpoenas. On receipt of our mandate, the district court shall enter an appropriate order enforcing the subpoenas.

[91] VACATED AND REMANDED WITH INSTRUCTIONS.

---

Footnotes:

[92] 1. Honorable Donald C. Pogue, Judge for the United States Court of International Trade, sitting by designation.

[93] 2. Mutual assistance available under the Treaty includes: (1) the taking of testimony or statements of witnesses; (2) the provision of documents, records, and evidence; (3) the execution of requests for searches and seizures; (4) the serving of documents; and (5) the provision of assistance in proceedings relating to the forfeiture of the proceeds of crime, restitution to the victims of crime, and the collection of fines imposed as a sentence in a criminal prosecution. Letter of Transmittal from Pres. Reagan.

[94] 3. The district court correctly observed that the standard of review by which it reconsidered the magistrate judge's determination of the instant pretrial matter is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A).

[95] 4. See also Letter of Transmittal from Pres. Reagan, supra note 1 ("Mutual assistance available under the treaty includes... the taking of testimony or statements of witnesses."); Letter of Submittal, Department of State ("The Treaty thereby provides for assistance at the investigative stage" which includes "taking testimony or statements of persons"). See generally Technical Analysis of the Treaty between the United States and Canada on Mutual Legal Assistance in Criminal Matters ("Technical Analysis") (reprinted in S. Treaty Doc. 100-14, 100th Cong., 2d Sess. at 10 & 13-14 (1988)) (discussing use of Treaty to issue subpoenas to compel testimony in criminal investigations).

[96] 5. See also Article XII, ¶ 1 providing that evidence shall be taken in the requested state "in accordance with the requirements of the law of the Requested State." Article VII, ¶ 2 and Article XII, ¶ 1 are the two provisions in the MLAT that contain "law of the Requested State" language. In this case, the appellees have focused their arguments entirely upon Article VII, ¶ 2.

[97] 6. It is also noteworthy that this sentence expressly recognizes and embraces the courts' authority to

issue subpoenas in an MLAT request for assistance without stating any limitations with respect to Canada or criminal investigations occurring prior to the filing of formal charges.

[98] 7. Notably, this is the lead paragraph of the very same article upon which the appellees here place almost exclusive reliance. This first paragraph provides that: The Central Authority of the Requested State shall promptly execute the request, or, when appropriate, transmit it to the competent authorities, who shall make best efforts to execute the request. The Courts of the Requested State shall have jurisdiction to issue subpoenas, search warrants of other orders necessary to execute the request. MLAT, art. VII, ¶ 1. Of course, appellees focus only on the second paragraph of this article.

[99] 8. For this same reason, appellees' argument regarding President Reagan's statement in his February 22, 1988 Letter of Transmittal to the Senate that "[t]he Treaty is self-executing and utilizes existing statutory authority" and the statement contained in the February 11, 1988 Letter of Submittal that "[t]he treaty will not require further implementing legislation and will utilize the existing authority of the Federal courts, particularly 28 U.S.C. § 1782" is unpersuasive. There is no indication anywhere in the record that President Reagan was even aware of the single district court decision issued in 1980, much less that he was actually contemplating its application to Canadian requests under the MLAT. Additionally, the Trinidad and Tobago (issued July 7, 1988) and Lo Ka Chun (Nov. 8, 1988) decisions by this Circuit were issued months after the President's transmittal letter. Moreover, the President's use of the word "utilize" in his statement in the letter suggests that he was referring to the mere procedural use of section 1782 to execute treaty requests rather than the substantive incorporation of section 1782 into the MLAT. If the President's words were indeed intended to drastically curtail the scope of MLAT assistance by incorporating a foreign discoverability rule as a limitation of all requests, we believe that he would have stated that position in a more explicit and direct way.

[100] 9. We note that appellees place significant reliance on the Second Circuit case of In re Erato, 2 F.3d 11 (2d Cir. 1993). There, the court was addressing the interplay between 28 U.S.C. § 1782 and an MLAT between the United States and the Netherlands. Id. at 12. In its opinion, the Erato court did suggest that a different phrase in that treaty--"according to the domestic law and procedures of the Requested State"--might incorporate United States law including 28 U.S.C. § 1782. See id. at 14-15. But, a careful reading of the entire case will show that the court held, consistent with our holding in this case, that the request under the self-executing treaty is not controlled by section 1782's substantive limitations. "Erato's second contention is that the original order compelling her to testify is invalid because it violates section 1782....While we doubt the force of Erato's arguments under section 1782, existing law under section 1782 does not control this case." Id. at 15 (internal citation omitted). Therefore, not only is Erato distinguishable, as it involves a different treaty utilizing different language, but its eventual holding actually refutes the position taken by appellees in this case.

© Lawriter Corporation. All rights reserved.

The Casemaker™ Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

**286 F.3d 1223; Valenzuela v. United States;**

———————————————————— **Page 1223** ————————————————————

MIRTA ROSA VALENZUELA, FREDERICK KIRK REPPER, PETITIONERS-APPELLANTS, v. UNITED STATES OF AMERICA, RESPONDENT-APPELLEE.

[Cite as Valenzuela v. United States, 286 F.3d 1223 (11th Cir. 03/25/2002)]

[1] U.S. Court of Appeals, Eleventh Circuit

[2] No. 00-13729

[4] March 25, 2002

[6] Appeals from the United States District Court for the Southern District of Florida D. C. Docket No. 00-08402 CV-KLR

[7] Before Tjoflat and Wilson, Circuit Judges, and RESTANIfn1, Judge.

[8] The opinion of the court was delivered by: Tjoflat, Circuit Judge

[9] [PUBLISH]

[10] Petitioners in this case, Mirta Rosa Valenzuela ("Valenzuela") and Frederick Kirk Repper ("Repper"), are American citizens sought for prosecution by Italy for their alleged roles in an international drug smuggling ring. A magistrate judge certified their extradition to Italy and the district court denied their petition for a writ of habeas corpus. They now appeal.

[11] We conclude that the magistrate judge erred in admitting into evidence an affidavit containing statements petitioners made in exchange for a promise of confidentiality made by agents of the Drug Enforcement Administration ("DEA"). Because the affidavit was indispensable to the finding of probable cause necessary to extradite petitioners, we reverse the district court's judgment and direct that the writ of habeas corpus issue.

[12] I.

[13] On September 27, 1997, Theresa Bailey ("Bailey"), a United States citizen, was arrested by Italian police in Padua, Italy, who discovered 3.2 kilograms of cocaine in her possession. She agreed to cooperate with the police, and informed them that in April, 1997 she was recruited as a drug courier by two individuals in Lantana, Florida, who were later identified as petitioners Valenzuela and Repper. Bailey claimed that Valenzuela and Repper offered her "a good reward" for her services, and put her in touch with Nwangu Ernst ("Ernst"), a Nigerian citizen, who directed her to make two trips from Sao Paolo, Brazil to Padua to deliver drugs in August and September, 1997. She also stated that Valenzuela and Repper admitted having made similar trips for Ernst in the past, and provided her with the names of hotels in Padua where they had stayed. Acting on this information, Italian police confirmed that Repper and Valenzuela had stayed at these hotels in December 1994, November 1996, and January 1997. On February 16, 1998, an Italian judge in Padua issued warrants for the arrest of Repper and Valenzuela for importing and conspiracy to import 3.2 kilograms of cocaine into Italy in violation of articles 73 and 80 of Presidential Decree 309/90,

punishable by imprisonment of more than one year. (fn2)

[14] Meanwhile, beginning in early December, 1997, Valenzuela and Repper initiated meetings with Palm Beach County Deputy Sheriff Pat Tenety ("Tenety") and DEA Agents Dan Bruce ("Bruce") and Ed Duffy ("Duffy") to provide them with information about the multinational drug smuggling activities in which they had been involved. During these meetings, Valenzuela and Repper discussed their roles as couriers and recruiters for the drug smuggling ring. The agents told Repper and Valenzuela that they had not committed any crime for which they could be prosecuted in the United States and gave both Repper and Valenzuela use and transactional immunity for their statements.

[15] On December 23, 1997, Repper signed a DEA Cooperating Individual Agreement (the "Agreement"), agreeing to gather and provide information to the DEA and testify to that information if necessary. In return, the Agreement guaranteed that the DEA would "use all lawful means to protect [Repper's] confidentiality." Repper subsequently signed three other documents establishing him as a paid informant for the DEA. Valenzuela did not sign any of these documents and was never documented by the DEA as a confidential informant. However, the government concedes that "Valenzuela took actions on behalf of DEA under the same terms as Repper," and that "both [petitioners] became confidential informants." In May of 1998, the agents informed Repper and Valenzuela that they were terminating the informant relationship because they had contacted members of the drug smuggling ring without the agents' permission, and had otherwise failed to cooperate with the DEA.

[16] I.

[17] A.

[18] On July 29, 1998, Italy submitted its request for the extradition of Valenzuela and Repper, along with the supporting documents required under the Treaty, to the United States Embassy in Rome. A counselor at the Embassy certified these documents, as required under Article X of the Treaty and 18 U.S.C. § 3190, on August 12, 1998. The request for extradition, supporting documents, certification, and a copy of the extradition treaty were then forwarded by the United States Department of State to the Department of Justice. On July 16, 1999, the United States Attorney for the Southern District of Florida filed complaints for the provisional arrests of Valenzuela and Repper in aid of extradition to Italy in the district court. (fn3) A magistrate judge issued arrest warrants for Valenzuela and Repper based on those complaints, and petitioners were arrested on July 30, 1999, in Palm Beach County, Florida.

[19] The magistrate judge held a hearing on August 18, 1999, as required under 18 U.S.C. § 3184, to determine whether the evidence established probable cause sufficient to sustain their extradition under the requirements of the Treaty. (fn4) Pending her decision, the United States Attorney attempted to supplement this evidence by filing under seal the affidavit of DEA Agent Bruce (hereinafter "Bruce Affidavit"), which contained incriminating statements petitioners had made to him and Duffy regarding their involvement in drug smuggling activities in Italy. The magistrate judge refused to consider the Bruce Affidavit, however, because the "reports had not come to the court through proper Italian channels required by treaty," (fn5) and because petitioners, citing the transactional and use immunity the DEA agents had given them and their Fifth Amendment privilege against self-incrimination, objected to her consideration of the statements contained in the affidavit. (fn6) Relying on the remaining, properly submitted evidence, the magistrate judge determined that there was a lack of probable cause to extradite petitioners, and thus dismissed Italy's extradition request on November 29, 1999.

[20] That same day, however, the United States Attorney filed a second complaint seeking new provisional arrest warrants for petitioners. Along with this complaint, and in addition to the evidence produced during the first extradition hearing, he resubmitted, through proper Italian channels, the Bruce Affidavit. (fn7) The magistrate judge immediately issued the new warrants, and Repper and Valenzuela remained in custody. After several continuances, a second extradition hearing was held on March 8 and 13, 2000. The purpose of the hearing was again to determine whether probable cause existed to extradite Valenzuela and Repper for the crimes alleged in the Italian arrest warrants. That determination turned on the admissibility of the Bruce Affidavit. (fn8) Petitioners reasserted their objections to the court's consideration of the affidavit. In addition, petitioners contended that the Fifth Amendment's Due Process Clause precluded the court's use of the affidavit because the Agreement required the DEA to "use all lawful means to protect [their] confidentiality."

[21] On May 10, 2000, the magistrate judge concluded that the Bruce Affidavit was admissible and entered an order certifying the extraditability of Valenzuela and Repper. (fn9) Although the she found that petitioners had indeed been given transactional and use immunity, which would bar the United States from prosecuting them for their involvement in the drug smuggling operation, the magistrate judge rejected their argument that such immunity protected them from prosecution, or the use of their statements to the agents, by Italy. In so holding, the magistrate judge considered, and rejected out of hand, petitioners' argument that the Italian and American authorities were cooperating to such an extent that the Italian prosecution should be treated as a prosecution initiated by the United States.

[22] Turning to petitioners' argument that their Fifth Amendment privilege against self-incrimination precluded her from considering such statements, (fn10) the magistrate judge concluded that the statements, though "not compelled by statute nor by formal agreement . . . [were nevertheless] subject to the protection of the Fifth Amendment." After reaching this conclusion, the magistrate judge went on to say that "since the[] statements cannot be used against [petitioners] in a criminal prosecution in the United States, there is no Fifth Amendment bar to the admission of those statements at the extradition hearing." "The protections inuring to [petitioners] by virtue of the hip pocket immunity conferred by DEA agents in the U.S. are co-extensive with the protection of the Fifth Amendment." (fn11) In sum, neither the grant of transactional and use immunity nor the Fifth Amendment's Self-Incrimination Clause barred the magistrate judge from considering the Bruce Affidavit. The magistrate judge's order did not address petitioners' due process argument based on the Agreement - that the DEA's promise to protect petitioners' confidentiality precluded the United States Attorney from using the Bruce Affidavit to establish probable cause.

[23] B.

[24] After the magistrate judge certified their extradition, petitioners repaired to the district court, filing a joint petition for a writ of habeas corpus. (fn12) Their petition was based on the objections they had made to the magistrate judge's entertainment of the Bruce Affidavit, to-wit: (1) the grant of transactional and use immunity rendered inadmissible the statements attributed to them in the affidavit; (2) alternatively, the Self-Incrimination Clause precluded the United States Attorney's use of the statements to establish probable cause; and (3) by using the statements, the United States Attorney breached the Agreement DEA agents had made with petitioners and thereby denied petitioners of due process of law.

[25] The district court treated the petition as having raised the first two points set out above but not the third point, and, relying on the record established before the magistrate judge, denied the writ. Addressing the first point, the court held that the immunity granted by the DEA agents applied solely to prosecutions in the United States; that is, it had no extraterritorial application. The court disposed of the second point in the

same fashion; the Self-Incrimination Clause did not apply extraterritorially. Petitioners now appeal the district court's decision, contending that, for the reasons they presented to the district court, the magistrate judge was precluded from using the statements contained in the Bruce Affidavit to determine whether the extradition application established probable cause that petitioners committed the criminal acts described in the Italian arrest warrant.

[26] III.

[27] Habeas corpus review of a magistrate judge's decision regarding extradition is limited to deciding "whether the magistrate had jurisdiction, whether the offense charged is within the treaty, and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was a reasonable ground to believe the accused guilty." Martin v. Warden, Atlanta Penitentiary, 993 F.2d 824, 828 (11th Cir. 1993) (citation omitted). On review of a denial of a habeas petition, we review findings of fact for clear error. See King v. Moore, 196 F.3d 1327, 1330 (11th Cir. 1999). Mixed questions of law and fact are reviewed de novo. See id. Despite our limited role in extradition proceedings, the judiciary must ensure that the constitutional rights of individuals subject to extradition are observed. We turn therefore to consider petitioners' claims of error.

[28] First, the magistrate judge's finding of fact, which the district court accepted as not clearly erroneous, that the DEA agents never promised petitioners immunity from Italian prosecution in exchange for their cooperation, has solid support in the record. The agents gave petitioners transactional and use immunity, but it only applied to criminal proceedings occurring in the United States.

[29] Second, the Supreme Court's decision in United States v. Balsys forecloses petitioners' argument that the Self-Incrimination Clause has extraterritorial application. United States v. Balsys, 524 U.S. 666, 672, 118 S. Ct. 2218, 2222, 141 L. Ed. 2d 575 (1998). Thus, even if the statements of petitioners contained in the Bruce Affidavit were compelled, the Clause would not bar their use in the extradition hearing. See id.; United States v. Gecas, 120 F. 3d 1419, 1430 (11th Cir. 1997). We also agree with the magistrate judge and the district court that there is simply nothing in the record to support a finding that the investigation by Italy was so jointly and cooperatively conducted with the United States as to allow petitioners to take advantage of dicta in Balsys that may allow individuals to claim that "fear of foreign prosecution [is] tantamount to fear of a criminal case brought by the Government itself." Balsys, 524 U.S. at 698-99, 118 S. Ct. at 2235.

[30] We turn now to consider petitioners' third claim -- that the United States Attorney's use of the Bruce Affidavit to establish probable cause breached the DEA agents' promise to "use all lawful means to protect [petitioners'] confidentiality." The substance of this promise (contained in the Agreement) was that Repper and Valenzuela would provide the agents with information in exchange for DEA's promise that it would use its "best efforts" to protect their identity. Despite this promise, Agent Bruce disclosed both petitioners' identities and their incriminating statements to Italian authorities when it became apparent that the Italian government had supplied insufficient proof to establish probable cause linking petitioners to the crimes charged in the Italian arrest warrant. (fn13) It is therefore plain that the United States Attorney's submission of the Bruce Affidavit operated to breach the Agreement petitioners had made with the agents. (fn14) Such breach, petitioners submit, rendered the extradition hearing fundamentally unfair and denied them due process of law.

[31] Petitioners rely on our en banc decision in United States v. Harvey, which holds that "[d]ue process requires the government to adhere to the terms of any plea bargain or immunity agreement it makes." United States v. Harvey, 869 F.2d 1439, 1443-44 (11th Cir. 1989) (en banc). Harvey, in turn, relies on Santobello v.

New York, in which the Supreme Court held that a defendant may challenge his sentence under the Due Process Clause if he can show that the prosecutor's breach of the plea agreement renders the defendant's plea fundamentally unfair. See Santobello v. New York, 404 U.S. 257, 262, 92 S. Ct. 495, 499, 30 L. Ed. 2d 427 (1971).

[32] In this case, petitioners were aware that they had committed crimes in Italy for which they could be prosecuted. They conditioned their cooperation with the DEA, in part, on the agents' promise of confidentiality. They no doubt would have refused to provide the agents with the inculpatory information regarding the drug transactions if the agents had told them that the information they provided, along with their identities, might be disclosed to the Italian authorities and might result in their extradition to Italy for trial. In this case, the Government not only ignored the agents' promise - by revealing petitioners' identity and the information they provided to the Italian authorities - but it went one step further: it used the fruits of the breach by presenting the information to the magistrate judge, all to petitioners' detriment. To affirm the district court's judgment would be to countenance the Government's conduct. We can no more do this than the Court could in Santobello.

[33] The magistrate judge explicitly concluded that without the Bruce Affidavit, the evidence presented was insufficient to sustain the extradition of Valenzuela and Repper under the Treaty and 18 U.S.C. § 3184. Having concluded that this evidence was admitted contrary to petitioners' due process right to a fundamentally fair hearing, we have no choice but to reverse the district court's judgment and to direct the court to grant petitioners' application for a writ of habeas corpus.

[34] SO ORDERED.

[35] WILSON, Circuit Judge, dissenting:

[36] The petitioners, Valenzuela and Repper argue that the use of a DEA affidavit as evidence to support a finding of probable cause during the extradition proceeding violates their Fifth Amendment right against self-incrimination, as well as their due process rights. The majority holds that the DEA affidavit does not violate the petitioners' Fifth Amendment right, but that the affidavit violates their due process right to a fundamentally fair hearing. I agree with the former holding, but not the latter. After reviewing the record and the testimony of DEA Agents Bruce and Duffy, Detective Tenety, and the petitioners to determine exactly what the immunity/cooperation agreement between the DEA and the petitioners entailed, I find no breach of the agreement, and thus, no due process violation. Therefore, I must respectfully dissent.

[37] As we have held, the government must adhere to the terms of any plea bargain or immunity agreement that it makes in order to satisfy a defendant's due process rights. United States v. Harvey, 869 F.2d 1439, 1443 (11th Cir. 1989). The due process requirements surrounding immunity and cooperation agreements also apply during extradition proceedings. In re Extradition of Burt, 737 F.2d 1477, 1484 (7th Cir. 1984). If the government breaches an immunity/cooperation agreement and violates the petitioner's due process rights, courts have "sufficient reason to grant habeas relief in the face of a request for extradition." In re Extradition of Drayer, 190 F.3d 410, 412 (6th Cir. 1999). We must therefore determine whether the United States breached its immunity/cooperation agreement with Repper and Valenzuela in order to determine whether their due process rights were violated.

[38] The immunity/cooperation agreement in this case is comprised of both written and oral promises made by DEA Agent Bruce and Detective Tenety. (fn15) Repper apparently signed three DEA forms, the most important being the DEA Cooperating Individual Agreement, DEA Form-473, dated December 23,

1997, which reads as follows: (fn16)

[39] The undersigned cooperating individual agrees to the following: I will not violate criminal laws in furtherance of gathering information or providing services to DEA, and any evidence of such a violation will be reported by DEA to the appropriate law enforcement agency. I have no official status, complied or otherwise, as agent or employee of DEA. That the information I provide may be used in a criminal proceeding, and I may be called upon to testify to such information in a court of law. And although DEA will use all lawful means to protect my confidentiality, this can not be guaranteed.

[40] I am advised that this is a federal offense to threaten, harass or mislead anyone who provides information about a federal crime to a federal law enforcement agency. If I experience anything of this nature as a result of my cooperation with DEA I will contact my controlling agent immediately. I have read and understand the following regarding my conduct as a DEA cooperating individual. Signature. (fn17)

[41] Repper also signed a payment for information/purchase of evidence form, which provided him with subsequent payments for his services.

[42] None of the DEA forms Repper signed appear to grant Repper or Valenzuela any immunity from future prosecution by the United States. However, at the extradition hearing, both the DEA agents and the petitioners testified that a verbal agreement was made that the petitioners would be free from any United States prosecution if they provided the DEA with information regarding an international drug smuggling operation. Agent Bruce testified that during a meeting on December 17, 1997, "[w]e basically told them that it is apparent you have committed crimes in other countries. Again, you have to understand that we cannot protect you from these crimes that you may have committed in these countries. We cannot give you immunity of any kind."

[43] On cross-examination, Agent Bruce testified that he and Detective Tenety told the petitioners on December 17th that they were not going to prosecute them in the United States - "We told them that we as DEA were not interested in prosecuting them in the United States. But we did tell them that they had to understand that based on what you have told us you have obviously committed crimes in other countries, and because of this we can't protect you in any way from being arrested for these crimes."

[44] As to the government's promise of confidentiality, the DEA Form-473 indicated that the agents were to use "all lawful means" to keep their identities confidential; however, the form notes that "this can not be guaranteed." When asked what it meant when Valenzuela and Repper were told that their statements would be protected and kept confidential, DEA Agent Duffy explained that "[w]e protect the confidentiality of our sources to the best of our ability."

[45] Based on the agents' and the petitioners' testimony, Valenzuela and Repper clearly received immunity from United States prosecution. It is also equally clear that they did not receive promises of immunity from Italian prosecution - nor were they given assurances that they would be protected from the Italian authorities if the Italians wished to prosecute them in the future for crimes they had committed in Italy. The DEA could not protect them "in any way from being arrested for these crimes." Thus, the government did not breach any immunity/cooperation agreement because the petitioners are not being prosecuted in the United States for any crimes committed here.

[46] In addition, Valenzuela and Repper contend that the government breached the agreement by not keeping their identities and information confidential. However, it was made clear that this confidentiality

was not absolute - the written agreement specifically provides that confidentiality cannot be guaranteed.

[47] Certainly the information Valenzuela and Repper provided the DEA was not meant to be confidential because according to DEA Form-473, this information could be "used in a criminal proceeding," and Valenzuela and/or Repper could "be called upon to testify to such information." As to protecting their identities as confidential informants, the DEA office in West Palm Beach repeatedly provided the DEA office in Rome with information provided by the petitioners, yet the agents never disclosed their identities. Moreover, the fact that the Italian authorities initially presented a formal request for extradition without including any incriminating information the DEA might have had clearly suggests that the Italian authorities had no knowledge that the defendants were confidential informants of the DEA. (fn18) Thus, by keeping the petitioners' identities confidential while Italy was requesting their extradition, the DEA agents fulfilled their obligation to protect the petitioners' confidentiality to "the best of their ability."

[48] In conclusion, Italy is requesting extradition of Valenzuela and Repper for crimes they committed in Italy prior to becoming informants for the DEA. No law enforcement officer in the United States ever told the petitioners that they would not be held accountable for crimes they had previously committed in Italy. In fact, the record demonstrates that: (1) the DEA made no promises as to extradition (to the contrary, the DEA agents stated they could not protect them "in any way"); (2) the DEA never granted the petitioners any immunity from Italian prosecution; (3) the DEA never promised that the information the petitioners provided them would remain confidential ( DEA Form-473 indicates that they may have to testify at a later date); and (4) the government only revealed the petitioners' identities after the Italian authorities formally requested their extraditions and arrest warrants were issued. The DEA's promise of confidentiality was not absolute; the petitioners were clearly aware that the DEA could not protect them from prosecution for crimes they had previously committed in Italy. Therefore, I find that the government did not breach its immunity/cooperation agreement, and as a result, the petitioners' due process rights have not been violated. I would therefore affirm the district court's order finding probable cause to extradite and deny the petitioners' application for a writ of habeas corpus.

---

Footnotes:

[49] 1. Honorable Jane A. Restani, Judge, U.S. Court of International Trade, sitting by designation.

[50] 2. This constitutes an extraditable offense under Article II of the extradition treaty between the United States and Italy [hereinafter the "Treaty"]. See Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Italy, Oct. 13, 1983, U.S.-Italy, 35 U.S.T. 3023, art. II.

[51] 3. The Treaty provides for the provisional arrest, "in case of urgency," of persons charged or convicted of an extraditable offense upon an application by the requesting state which contains: a description of the person sought . . . ; the probable location of that person; a brief statement of the facts of the case . . . ; a statement of the existence of a warrant of arrest . . . ; a description of the type of offenses, a citation to the sections of law violated and the maximum penalty possible upon conviction, or a statement of the existence of a judgment of conviction against that person . . . ; and a statement that a formal request for extradition of the person sought will follow. Extradition Treaty, supra note 2, art. XII, 35 U.S.T. at 3023. Once a provisional arrest has been made under the Treaty, the requesting state, in this case Italy, must make a formal request for extradition under Article X of the Treaty, which must include supporting documents,

within 45 days. See id. If such a request is not timely submitted, the provisional arrest is terminated. See id. A formal request for the extradition of persons who, like petitioners, have yet to be convicted by the requesting country of any crime, must be accompanied by three items in addition to those required for a provisional arrest: (1) a certified copy of the arrest warrant; (2) "a summary of the facts of the case, of the relevant evidence and of the conclusions reached, providing a reasonable basis to believe that the person sought committed the offense for which extradition is requested"; and (3) documents establishing that the person sought is the person identified by the arrest warrant. See id. at art. X.

[52] 4. 18 U.S.C. §§ 3181-96 govern the limited role of the courts in extradition proceedings. Specifically, § 3184 instructs an extradition judge to conduct a hearing to determine whether there is "evidence sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 1384. If the evidence is sufficient, the judge certifies the extraditability of the individual in custody to the Secretary of State. Id.

[53] 5. Article X of the Treaty requires that documents accompanying an extradition request from Italy are "signed by a judge or other Italian judicial authority and are certified by the principal diplomatic or consular officer of the United States in Italy." See Extradition Treaty, supra note 2, art. X, 35 U.S.T. at 3023.

[54] 6. Petitioners cited the Fifth Amendment's Self-Incrimination Clause as an alternative basis for barring admission of the Bruce Affidavit. That is, if the magistrate judge should find that their statements to the DEA agents were not given under a grant of immunity, then the statements were compelled in violation of the Self-Incrimination Clause.

[55] 7. Although the Bruce Affidavit was submitted only in English, the complaint pledged to have the Italian translation filed with the court, as required under Article X of the Treaty, within the Treaty time limit of 45 days. See Extradition Treaty, supra note 2, art. X, art. XII, 35 U.S.T. at 3023. This translation was timely filed on January 11, 2000, and the Bruce Affidavit was properly admitted under the guidelines for admissibility of documents in support of extradition under Article X of the Treaty.

[56] 8. In addition to the Bruce Affidavit, the record before the magistrate judge included all of the evidence presented at the August 18, 1999 hearing.

[57] 9. The magistrate judge treated the inculpatory statements contained in the Bruce Affidavit "as a supplement to probable cause," and thereby determined that "probable cause exist[ed] to believe that both Valenzuela and Repper committed the crimes with which they [were] charged by the Italian authorities."

[58] 10. This was an alternative argument: if the court held that the grants of transactional and use immunity did not protect petitioners from prosecution in Italy, the Fifth Amendment's Self-Incrimination Clause barred the use of their statements at the extradition hearing.

[59] 11. In other words, the magistrate judge concluded that, were it not for the grant of immunity, the Fifth Amendment's Self-Incrimination Clause would have barred the admissibility of the incriminating statements contained in the Bruce Affidavit notwithstanding the fact that such statements had not been compelled. The magistrate judge cited no authority for the proposition that the Clause protects a person from the government's use of statements the person has made freely and voluntarily.

[60] 12. There is no direct appeal from extradition decisions. Martin v. Warden, Atlanta Penitentiary,

993 F.2d 824, 827 n.3 (11th Cir. 1993).

[61] 13. In defense, the government claims that the Affidavit was only submitted after petitioners themselves disclosed their status as confidential informants, rendering the government's actions harmless. We dismiss this argument first because any such disclosure is not reflected on the record before us, and second because the government admits that the petitioners only disclosed their status to the judge as a defense to the admission of the Bruce Affidavit.

[62] 14. The dissent claims that "by keeping the petitioners' identities confidential while Italy was requesting their extradition, the DEA agents fulfilled their obligation to protect the petitioners' confidentiality to 'the best of their ability.'" To accept this notion would be to conclude either that the confidentiality agreement somehow expired upon Italy's filing of its request for extradition in this case or that once Italy had filed this request, it was beyond the "best abilities" of the agents to keep the petitioners' identities confidential. We can accept neither.

[63] 15. We must rely on the DEA agents', the petitioners', and the detective's testimony to determine what was promised under the alleged immunity/cooperation agreement. Informal grants of immunity are difficult to piece together. As we stated in Harvey, 869 F.2d at 1443: [T]he magistrate and district court have been put through the arduous task of reconstructing the terms of the agreement with the government, a task made still more difficult by the astonishing failure of the DEA agents who interviewed [the petitioner] to keep any written records of those interviews. Informal grants of immunity are by their very nature less certain than formal grants, and thus are much more likely to create confusion for the government and for the courts in the future. As long as prosecutors continue the practice of unwritten grants of immunity, they open the door for subsequent litigation such as this, and for adverse decisions as well.

[64] 16. According to Agent Bruce, although Valenzuela did not sign the agreement, the protections that were given to Repper were extended to her as well.

[65] 17. DEA Form-473 is not found in the record; therefore, we must rely on Agent Bruce's reading of the form at the extradition hearing.

[66] 18. In fact, according to the Government's Supplemental Response to Defendant Valenzuela's Motion to Deny Extradition Request, the government filed under seal DEA Agent Bruce's affidavit containing statements made by the petitioners to the DEA only after the petitioners themselves disclosed their status as confidential informants to the court.

---

© Lawriter Corporation. All rights reserved.

The Casemaker™ Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.