**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In the Matter of the Extradition of | ) | |
| MARIA del ROSARIO MORENO-VAZQUEZ | ) | 3:06-CV-761-MEF-CSC |
| a/k/a MARIA COONLEY | ) | |
| | ) | |

---

### United States's Supplemental Extradition Brief

---

Pursuant to the Court's June 12, 2008 Order in this case,[1] and the provisions of Rule 44.1 of the Federal Rules of Civil Procedure, the United States hereby files its supplemental extradition brief on the three issues the Court identified in the Order:

1.    What establishes and what is the nature of the father's *patria potestas*?

2.    What are the custodial rights of each parent? How are these rights created or established?

3.    What, if any, distinctions are there under Mexican law between custodial rights and *patria potestas*?

## I.    Establishment and Nature of *Patria Potestas*.

*Patria potestas*, a concept of parental authority found in many civil law countries, is in Mexico "[t]he whole group of powers–which also entail duties–conferred upon those who exercise them (parents, grandparents, adoptive parents, as the case may be) for the protection of non-emancipated minors with regard to their person and property."[2] *Patria potestas* is derived from

---

[1] Doc. 37.

[2] Stephen Zamora et al., *Mexican Law* 473 (2005) (citing R. DePina Vara, *Diccionario del Derecho* [Law Dictionary] 400 (1992) (Mex.)) (attached as Exhibit A); *Whallon v. Lynn*, 230 F.3d 450, 457 (1st Cir. 2000) (citing Baja California Sur Civil Code, art. 474)  (defining *patria potestas as* "the relationship of rights and obligations that are held reciprocally, on the one hand, by the father and the mother or in some cases the grandparents and, on the other hand, the minor children who are not emancipated.")

Roman law and at that time "signified the power which a Roman father had over the persons of his children, grandchildren, and other descendants . . . . and generally all the rights which he had by virtue of his paternity."[3]  Most civil law countries today, including Latin American countries, "recognize some form of *patria potestas* rights,"[4] albeit in different forms.[5]

In the relevant jurisdiction for this case– the *Districto Federal* (Federal District)[6]–the father's *patria potestas* is established from moment that the father recognizes the child, which is usually when the father identifies himself as such on the child's birth certificate.[7]

---

[3] *Dictionary of Greek and Roman Antiquities*, 873 (William Smith ed. 1878) (attached as Exhibit B); *see also Whallon*, 230 F.3d at 457 n. 7; *Black's Law Dictionary* 1188 (7th ed. 1999) (defining *patria potestas* as "[t]he authority held by the male head of a family over his children and further descendants in the male line, unless emancipated," initially including "the power of life and death").

[4] *Whallon*, 230 F.3d at 457 n. 7.

[5] *Garcia v. Angarita*, 440 F. Supp. 2d 1364, 1375 (S.D. Fla 2006) (noting that the Colombian code "sets forth the rights of *patria potestas*"); *Lalo v. Malca*, 318 F. Supp. 2d 1152 (S.D. Fla. 2004) (providing that Panamanian law gives parents *patria potestas* rights over the child); *Gil v. Rodriguez*, 184 F. Supp. 2d 1221, 1225 (M.D. Fla. 2002) (holding that under Venezuelan law, father had *patria potestas* rights over child born out of wedlock); *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1358 (M.D. Fla. 2002) (providing that a married father had *patria potestas* rights under Argentine law); *Pesin v. Rodriguez*, 77 F. Supp. 2d 1277, 1286 (S.D. Fla. 1999) (noting that under the Venezuela code father and mother "are vested with the parental authority until a judicial decision establishes otherwise") (citations omitted); Sibylla Flugge, *The History of Fathers' Rights and Mothers' Duty of Care*, 3 Cardozo Women's L.J. 377, 383 (1996) (discussing influence of *patria potestas* on Germany's code established in the nineteenth century).

[6] Almost every U.S. case that have interpreted *patria potestas* from Mexico have only examined the law of the particular state at issue. *See Whallon*, 230 F.3d at 456-57 & n.6 (discussing conflicts of law issues and applying the law of the state of Baja California Sur); *Ibarra v. Quintanilla-Garcia*, 476 F. Supp. 2d 630, 634-35 (S.D. Tex. 2007) (applying the law of the state of Nuevo Leon); *Basil v. Sosa*, No. 8:07-cv-918-T-27TGW, 2007 WL 2264599 (M.D. Fla. Aug. 6, 2007) (applying the law of the State of Jalisco); *cf. In re B. del C.S.B.*, 525 F. Supp. 1182, 1196 (C.D. Cal. 2007)(applying the law of the state of Guerro but also noting the similarities of the Federal Code).  None, however, deals only with interpreting sections of the Federal Code, which because of the fact that this case arises out of the *Districo Federal* in Mexico, is the relevant law. Thus, the statutes in these cases, while illuminating for a general understanding of the concept of *patria potestas*, are not the same as the statute in this case.

[7] *See* Código Civil Federal [C.C.F.][Federal Civil Code], art. 412 (Mex.) ("Children under legal age, not emancipated, shall be under the *patria potestas* while there is any of the ascendants [*e.g.*, parents or grandparents] that shall exercise it pursuant to law.") (unofficial translation attached at Exhibit C); Zamora

*Patria potestas* entails obligations (including care and education of the child[8]) and rights (including "the right of cohabiting with their descendants, . . . even if they do not have custody"[9]). Once *patria potestas* is established, these rights and obligations cannot be abridged or waived, absent a judicial order by a family judge.[10]  In fact, a new husband shall never exercise "*patria potestas* over the children of the previous marriage."[11]

In this case, Moreno-Vazquez's and Castillo-Tapia's October 11, 1991 custody agreement

---

et al., *supra* note 1 (citing C.C.F., arts. 366, 369) (Mex.) (noting that parents may acknowledge parenthood by voluntary acknowledgment of parenthood); *see also Whallon*, 230 F.3d at 457 (noting that, under Baja California Sur's code, the *patria potestas* right exists for children born out of wedlock); Telephone Interview with Mari Aponte, Department of Justice Attaché with the United States Embassy in Mexico City (June 24, 2008).

[8] C.C.F., art. 413 (Mex.) (The right of *patria potestas* is constricted by "the care and education of the minors . . . .") (unofficial translation attached at Exhibit C); C.C.F., art. 422 (Mex.) ("The persons who . . . have the *patria potestas* over [the minor, are] obligated to educate him or her conveniently. . .") (unofficial translation attached at Exhibit C).

[9] C.C.F., art. 417 (Mex.) (unofficial translation attached at Exhibit C).

[10] *Id.* ("The personal relationships between the minor and his or her parents can only be limited if there is a justified cause . . . . Only a judicial order may limit, suspend or lose the right to cohabitate that is referred to in the preceding paragraph, as well as in the cases of suspension or loss of *patria potestas* . . . ."). In Moreno-Vazquez's Supplemental Brief, she erroneously interprets two cases, *Whallon*, 230 F.3d 450 and *Gonzalez v. Gutierrez*, 311 F.3d 942 (9th Cir. 2002) and erroneously notes that "U.S. case law establishes that *patria potestas* is a common law right in Mexico, applicable to both parents which may be superseded as to custody rights, either by court order or agreement of the parties." Doc. 39 at 3.

Moreno-Vazquez misinterprets these cases. Both cases were interpreting *patria potestas* in conjunction with the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670, 19 I.L.M. 1501 (1980). As one of the elements to establish a case under the Hague treaty, an aggrieved party must establish that their child was removed to or retained in another party country in violation of the left-behind parent's custodial rights. In interpreting the left-behind parent's custody rights under the treaty, a written agreement trumps any other custody rights. This case, however, is not a Hague case, and normal provisions of the Mexican legal system apply. The United States will further address this issue in its response brief.

[11] C.C.F., art. 446 (Mex.) ("The new husband shall not exercise the *patria potestas* over the children of the previous marriage.") (unofficial translation attached at Exhibit C).

recognized and incorporated their *patria potestas* over their first child, L.F.C.M.[12]  By virtue of Castillo-Tapia's  recognition of M.F.C.M. as his child on her birth certificate,[13] his *patria potestas* right flowed to her, too.

Moreover, Moreno-Vazaquez's actions showed that she knew that her husband possessed these rights.  On November 21, 2003, Moreno-Vazquez appeared before Family Law Judge Guadalupe Adriana Cruz-Lara to request permission for her minor child to travel to America.[14]  On January 30, 2004, Judge Cruz-Lara issued an opinion in which she noted that Moreno-Vazquez and Castillo-Tapia had two children.[15]  The decision noted that Moreno-Vazquez swore under oath that she had gone to the "Ministry of Foreign Affairs to apply for her minor children's passports and she was told that . . . the father's consent or the Judge's authorization was required . . . ."[16]

In an attempt to thwart what she knew was her husband's *patria potestas* right, Moreno-Vazquez then falsely stated under oath that since the time of the divorce "she totally ignored [her husband's] whereabouts" and had not seen him since 1995.[17]  The Judge, nonetheless, denied her request on January 30, 2004.  On February 17, 2004, Moreno-Vazquez then obtained passports for both her children using a forged signature and fingerprint of her husband.[18]

---

[12] *See* Exhibit 6 of the extradition materials.

[13] *See* Exhibit 60 of the extradition materials.

[14] *See* Exhibit B of the extradition materials.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *See* Exhibits 60 and 64-65 of the extradition materials.

## II.     Establishment and Nature of Custodial Rights.

Under Mexican law custody rights are established by a family law judge in the divorce decree (*sentencia de divorcio*).[19] "[C]ustody (called *guarda y custodia* in most Spanish-speaking countries) refers to the personal care of a minor child . . . , and it is understood that the ex-spouse who takes on this obligation is entitled to child support from the other ex-spouse."[20] "Custody is generally understood as a temporary right."[21] "Mexican judges usually award custody to the mother, especially in the case of young children, with the father being granted visitation rights or temporary custody for periods of vacation, etc."[22]

In this case, the October 11, 1991 custody agreement followed the typical form. The agreement recognized and incorporated the *patria potestas* of the couple's first child, L.F.C.M. Additionally, it provided Moreno-Vazquez custody of L.F.C.M. and provided her with alimony and a home. It further provided Castillo-Moreno the right to "visit his son . . . every day of the week . . . , to pass by for him to take [him] to school. . . ," weekend visitation rights every fifteen days, "fifteen days during the Summer vacation," and "half of the Winter vacation period."[23] Moreno-Vazquez's removal of L.F.C.M. from Mexico was in violation of this valid custody agreement.

---

[19] Zamora et al., *supra* note 1 at 473 (citing C.C.F., art. 283 (Mex.)).

[20] Zamora et al., *supra* note 1 at 473.

[21] *Id.*

[22] *Id.*

[23] *See* Exhibit 6 of the extradition materials.

**III.     Distinctions Between Custodial Rights and *Patria Potestas*.**

Mexican law distinguishes between "who shall have custody of the children" and "who shall exercise parental authority" (*patria potestas*).[24]  "The judge normally awards *patria* [*potestas*] to both parents upon divorce, and only in extreme cases, usually based on lifestyle, is one parent deprived of parental authority."[25]  Once the family judge issues the divorce decree, both parents may have parental authority (*patria* [*potestas*]), but only one may have custody."[26]  As *Articulo* 416 of the *Código Civil Federal* notes, "[i]n case of separation of the ones who exercise the *patria potestas*, . . . both shall continue with the performance of their obligations and they may agree upon the terms particularly related to the care and custody of the minor children."[27]

Thus, in this case Moreno-Vazquez took her children away from their father in violation of their custody agreement for L.F.C.M. and against her husband's *patria potestas*. She must be extradited to face her pending charges in Mexico.

Respectfully submitted this the 24th of June, 2008.

> LEURA G. CANARY
> UNITED STATES ATTORNEY
>
> /s/ Christopher Snyder
> CHRISTOPHER A. SNYDER

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] C.C.F., art. 416 (Mex.) (unofficial translation attached at Exhibit C).

Assistant United States Attorney
131 Clayton Street
Montgomery, AL 36104
Phone: (334)223-7280
Fax: (334)223-7135
E-mail: christopher.a.snyder@usdoj.gov

/s/ Andrea Tisi
Andrea Tisi
Senior Trial Attorney
Office of International Affairs
Criminal Division
U.S. Department of Justice
Phone: (202) 353-4469
Fax: (202) 514-0080
E-mail: Andrea.Tisi@usdoj.gov

## **Certificate of Service**

I hereby certify that on June 24, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:  Ben Elton Bruner.

/s/ Christopher Snyder
CHRISTOPHER A. SNYDER



MEXICAN LAW

Stephen Zamora, José Ramón Cossío
Leonel Pereznieto, José Roldán-Xopa, David Lopez

OXFORD

# OXFORD
UNIVERSITY PRESS

Great Clarendon Street, Oxford OX2 6DP

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide in

Oxford  New York

Auckland  Cape Town  Dar es Salaam  Hong Kong  Karachi
Kuala Lumpur  Madrid  Melbourne  Mexico City  Nairobi
New Delhi  Shanghai  Taipei  Toronto

With offices in

Argentina  Austria  Brazil  Chile  Czech Republic  France  Greece
Guatemala  Hungary  Italy  Japan  Poland  Portugal  Singapore
South Korea  Switzerland  Thailand  Turkey  Ukraine  Vietnam

Oxford is a registered trade mark of Oxford University Press
in the UK and in certain other countries

Published in the United States
by Oxford University Press Inc., New York

© S. Zamora, J.R. Cossío, L. Pereznieto, J. Roldán-Xopa and D. Lopez, 2004

Published new as Paperback, 2005

The moral rights of the authors have been asserted

Crown copyright material is reproduced under Class Licence
Number C01P0000148 with the permission of HMSO
and the Queen's Printer for Scotland

Database right Oxford University Press (maker)

First published 2004

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
without the prior permission in writing of Oxford University Press,
or as expressly permitted by law, or under terms agreed with the appropriate
reprographics rights organization. Enquiries concerning reproduction
outside the scope of the above should be sent to the Rights Department,
Oxford University Press, at the address above

You must not circulate this book in any other binding or cover
and you must impose the same condition on any acquirer

British Library Cataloguing in Publication Data

Data available

Library of Congress Cataloging in Publication Data

Data available

Typeset by Newgen Imaging Systems (P) Ltd., Chennai, India
Printed in Great Britain
on acid-free paper by
Biddles Ltd., King's Lynn

ISBN 0–19–826777–0 (Hbk.)
ISBN 0–19–928848–8 (Pbk.)

1  3  5  7  9  10  8  6  4  2

We wish to de
citizens of Me
by a balance
sympathy as w
to the negative
the legal tradit

parties wish to provide for separate property (*separación de bienes*) of property acquired *after marriage*, this may be accomplished by the parties signing *capitulaciones* to this effect, and including a list of the separate property of each spouse.[44] As already noted, if the bride and groom contract marriage without entering into a contract of *capitulaciones*, the marital property acquired after marriage shall be jointly owned, but property that was separately owned by either of the parties prior to marriage shall be deemed separate property.

The prenuptial agreement establishing marital property rights may be amended or terminated by joint agreement of the parties, who may convert from joint ownership to separate ownership, or vice versa (FCC Article 186). In addition, the agreement can be terminated by one spouse, provided that termination is based on certain grounds.[45] (Property rights after the death of a spouse are discussed in the following Chapter, under the topic of inheritance.)

### 3.3. Annulment and Divorce

Mexican law provides for annulment of marriage in certain instances set forth in CCDF Articles 235–263, which include cases involving incest, coercion, or existence of a prior marriage that is still valid. Marriage can also be annulled for failure to follow the formal procedures dictated by the CCDF:[46]

II. A list of specific personal property that each spouse brings into the partnership;

III. An itemized report of all debts that each spouse has upon entering into marriage, stating whether the [marital] partnership shall be responsible for them or only for those [debts] that are incurred during marriage, whether by both spouses or by either one of them;

IV. An express declaration as to whether the marital partnership is to include all assets of each spouse or just part of them, specifying in the second instance which assets are to become jointly owned;

V. An explicit declaration as to whether the marital partnership is to include all assets of the spouses or just their products. In either case, the part of the assets or of their product belonging to each spouse shall be clearly determined;

VI. A declaration as to whether the product of the work of each spouse shall belong exclusively to the one that performs it, or whether he or she shall share that product with the other spouse and in what proportion [it shall be shared];

VII. A definitive declaration as to who shall be the administrator of the partnership, clearly setting forth the powers conferred upon him or her;

VIII. A declaration as to whether future assets that may be acquired by the spouses during matrimony belong exclusively to the acquiring party, or whether they should be divided up among them [both spouses] and in what proportion;

IX. The rules for liquidation of the marriage partnership.

[44] *See* CCDF Articles 207–217.

[45] *See* CCDF Article 188: termination at the request of a spouse if the administrating partner, through dishonesty or wilful negligence, seriously diminishes the joint estate; if the administering partner, without express consent of the spouse, cedes joint property to creditors; if the administering partner files for bankruptcy, or is declared bankrupt; or for other reasons considered justifiable by a competent agency having jurisdiction.

[46] CCDF Article 249. *See generally* Baqueiro and Buenrostro, *supra* note 42 at 127 *et seq.*

*de bienes*) of property
e parties signing *capit-*
arate property of each
ract marriage without
roperty acquired after
; separately owned by
parate property.

perty rights may be
ies, who may convert
(FCC Article 186). In
provided that termin-
the death of a spouse
inheritance.)

in instances set forth
g incest, coercion, or
can also be annulled
: CCDF:[46]

ise brings into the

upon entering into
ll be responsible for
; marriage, whether

iership is to include
ying in the second

iership is to include
er case, the part of
ise shall be clearly

f each spouse shall
vhether he or she
vhat proportion [it

ninistrator of the
pon him or her;
e acquired by the
cquiring party, or
ouses] and in what

if the administrating
the joint estate; if the
: property to creditors;
t; or for other reasons

iote 42 at 127 *et seq.*

For a traditionally Catholic country, Mexico has adopted quite liberal rules governing divorce. This was not always so. The first Civil Codes of Mexico, adopted in 1870 and 1884, failed to include any provision for divorce. Divorce first appeared in the Law of Family Relations of 1915,[47] and the CCDF of 1932 included provisions on divorce (Articles 266–291) that remain in force with few changes to this day. The existence of a liberal regime has not translated into a high incidence of divorce, however: the National Institute of Statistics and Demographics (INEGI) calculates that the divorce rate in Mexico was 8.7 per cent in 1970, but actually declined to 6.5 per cent in 1998.[48] Mexico continues to be a society in which the importance of marriage and family in a Catholic country underlies a strong societal antipathy to divorce. Of course, these values are less evident in the large population centres of Mexico City and Monterrey, where divorce has become increasingly common.

Divorce in Mexico is governed by Articles 266–291 of the FCC, which has been adopted in most of the thirty-one Mexican States. In 2002, however, the Legislative Assembly for the Federal District made numerous changes to its rules of marriage and divorce, adopting a Civil Code for the Federal District that is separate from the Federal Civil Code.[49] These deviations were intended to modernize the civil code provisions, but did not make a fundamental change in divorce law.

Mexican law provides for two types of divorce: divorce by mutual consent, and divorce for cause. Divorce by mutual consent (*divorcio voluntario*, also called *divorcio administrativo*) is governed by FCC Article 272; such a divorce may be granted by an administrative judge, or *juez de Registro Civil*, in the place of domicile. Divorce by mutual consent may be granted if at least one year has lapsed since the marriage took place, and only when the parties have no children, and have decided mutually to submit to an administrative divorce (FCC Articles 266, 267 (section XVII), and 272–276). Divorce for cause (*divorcio necesario*) is authorized by FCC Article 267, may occur upon the petition of one spouse, and may be based on any one of the twenty different grounds for divorce established in FCC Article 267.[50] Both types of divorce require the

---

[47] *See supra*, text following note 6.

[48] According to statistics of INEGI, the government census bureau, the divorce rate in Mexico was (divorces per 100 marriages) 3.2 in 1971, 4.4 in 1980, 7.2 in 1990, 7.4 in 2000, and 8.6 in 2001: www.inegi.gob.mx/información estadística (site visited Jan. 2004).

[49] *See* Chapter 14 above at text accompanying notes 30–34.

[50] FCC Article 267 provides as follows:

[The following] are grounds for divorce:

I. Duly proven adultery committed by one of the spouses;

II. The wife giving birth, during matrimony, to a child conceived before entering into this contract, and who is declared illegitimate by a judge;

III. The husband proposing to prostitute his wife, not only when the husband does so directly on his own but [also] when it is proven that he has received money or any other remuneration for the express purpose of permitting someone else to have intercourse with his wife;

IV. One spouse inciting or using violence towards the other to [get her or him] to commit a crime, even though the crime is unrelated to sexual depravity or excess;

472                    *Mexican Law*

filing of a petition for divorce (*demanda de divorcio*) before a family law judge (*juez de lo familiar*) in the jurisdiction in which the married couple resides.[51]

Divorce dissolves the marital bond, and also results in the separation of jointly owned marital property. Where the parties have entered into a prenuptial agreement, the separation of property must take place before a notary public, in accordance with the provisions of the agreement. Where no such

---

[50] (*cont.*)

    V.  The husband or the wife committing immoral acts for the purpose of corrupting their children, as well as tolerance of corruption;

    VI.  Contracting syphilis, tuberculosis or any other chronic or incurable disease, that may also be contagious and hereditary, and [a spouse] being affected by incurable impotence after entering into marriage;

    VII.  Suffering from incurable mental illness, provided that the spouse has been committed or declared mentally ill by a judge (*declaración de interdicto*);

    VIII.  Absence from the marital home for more than six months without good reason;

    IX.  Absence from the marital home due to a cause that is sufficient to file for divorce, if the separation continues for more than a year without the spouse that separated [ever] filing for divorce;

    X.  A legal declaration of absence, or a legal declaration of the presumption of death, in [certain] cases of exception it [a legal declaration of the presumption of death] is not needed for the declaration of absence to be admissible;

    XI.  Cruel treatment, threats or serious defamation of one spouse to another;

    XII.  Unjustified refusal of a spouse to fulfil his or her obligations as set forth in Article 164, without it being necessary to first exhaust the remedies [intended to bring about] their fulfilment, as well as non-compliance, without good cause, by either of the spouses, with a final judgment in the case of Article 168;

    XIII.  A slanderous accusation made by one spouse against the other, which is a crime that carries a maximum sentence of more than two years in prison;

    XIV.  One of the spouses committing a crime, other than political crimes, that brings shame upon the persons, for which he or she must serve a prison term greater than two years;

    XV.  Habitual gambling or intoxication or improper and persistent use of enervating drugs, when this [activity] threatens to ruin the family or constitutes continuous reason for marital discord;

    XVI.  A spouse committing an act against someone physically or against their property that would be punishable, when it [the act] involves a stranger, provided that such an act is punishable by law with a prison term greater than one year;

    XVII.  Mutual consent;

    XVIII.  Separation of spouses for more than two years, independently of the original motive of the separation that may be argued by either one of them [the spouses];

    XIX.  One of the spouses committing violent family conduct against the other or towards the children of both or of one of them. For the purposes of this article, family violence is understood in accordance with the terms set forth by Article 323 of this Code;

    XX.  Unjustified non-compliance with decisions of administrative or judicial authorities that have been issued so that the spouse obliged to do so corrects acts of family violence toward the other spouse or the children.

[51] When spouses are separated and living in different jurisdictions, the petition for divorce may be filed in the jurisdiction in which either spouse resides.

agreement exists, the separation of property is overseen by the judge, who will issue a decree declaring the separate property of each spouse, and dividing any communal property acquired during the marriage in an equitable way between the two spouses.

In the divorce decree (*sentencia de divorcio*), the judge provides for the amount of child support; decides who shall exercise parental authority (*patria potestad*); and decides who shall have custody of the children (FCC Article 283). Mexican law distinguishes between the latter two concepts. *Patria potestad* (in Latin, *patria potestas*)[52] or parental authority, derives from Roman law and implies '[t]he whole group of powers—which also entail duties—conferred upon those who exercise them (parents, grandparents, adoptive parents, as the case may be) for the protection of non-emancipated minors[53] with regard to their person and property'.[54] The judge normally awards *patria postedad* to both parents upon divorce, and only in extreme cases, usually based on lifestyle, is one parent deprived of parental authority. On the other hand, custody (called *guarda y custodia* in most Spanish-speaking countries) refers to the personal care of a minor child or incompetent adult, and it is understood that the ex-spouse who takes on this obligation is entitled to child support from the other ex-spouse.[55]

Custody is generally understood as a temporary right. Mexican judges usually award custody to the mother, especially in the case of young children, with the father being granted visitation rights or temporary custody for periods of vacation, etc. Once the divorce decree is issued, both parents may have parental authority (*patria potestad*), but only one may have custody; or one of the parents may lose parental authority as well as custody and the other may only have visitation rights.

In cases of contested divorce, 'the judge, taking into consideration the circumstances of the case, such as the spouses' capacity to work and their economic situation, shall issue a judgment sentencing the guilty party to payment of alimony [*alimentos*] to the innocent party'[56] (FCC Article 288). In cases of divorce by mutual consent, the woman shall have the right to receive alimony over a period of time equal to the length of the marriage, provided that she lacks sufficient income to support herself and does not remarry or enter into a common law marriage (FCC Article 288). The same conditions apply to the man, should he be unable to work.

---

[52] Regarding *patria potestad*, *see*: Baqueiro and Buenrostro, *supra* note 42 at 223 *et seq.*

[53] The term 'non-emancipated minor' refers to persons who are under the age of adulthood (18), or who have been declared by a judge to be legally incompetent due to a mental or physical incapacity.

[54] De Pina Vara, R., *DICCIONARIO DE DERECHO* (Mexico: Porrúa, 1992) at 400.

[55] When custody is awarded to a third party, such as a grandparent, both ex-spouses must provide child support to the third party.

[56] The term *alimentos* refers to a sum of money deemed by the judge to be necessary for the maintenance and support of the divorced spouse.

474                              *Mexican Law*

According to FCC Article 288, if divorce gives rise to damages or losses suffered by the innocent spouse, the guilty spouse shall be held responsible for them 'as author of the unlawful act (*hecho ilícito*)', i.e. as someone liable for a civil wrong that gives rise to damages under the civil code.[57] For example, a victim of spousal violence could bring a civil action against the wrongdoer under FCC Article 1910 (CCDF Article 1910) for injuries suffered as a result of the violence.[58]

### 3.4. Filiation

The Supreme Court of Mexico has defined filiation as the 'origin of children with respect to the parents, which brings as a consequence different correlative and reciprocal rights and obligations, giving rise to parental authority (*patria potestad*)'.[59] Paternity and filiation are intimately connected to the reciprocal rights and obligations that exist between spouses and between parents and children, affecting individuals and their property interests.[60]

The CCDF recognizes four main types of filiation, or parent–child relationship:[61]

(i) *legitimate filiation* or *matrimonial filiation* (*filiación matrimonial*), the result of a child being born in wedlock;

(ii) *illegitimate,* or *extra-marital filiation* (*filiación extramatrimonial*) refers to cases in which a child is born out of wedlock, and the father–child relationship is recognized, either through voluntary recognition by the father, or by a court ruling;

(iii) *legitimation* (*legitimación*) refers to cases in which a couple, after marriage, recognize that they are parents of a child born prior to their marriage; and

(iv) *adoption,* in which, unlike the first three types of filiation, there is no biological connection between the parents and the minor child, and a relationship of family kinship is legally granted to the adopting parents and adopted son or daughter as if they were the biological parents.

### 3.4.1. Legitimate Filiation

The FCC operates under a strong assumption that the offspring of spouses are children born in wedlock. Children born within 180 days of the date of contracting marriage, and children born within the three hundred days following the dissolution of marriage, are presumed to be legitimate children.[62] The

---

[57] The topic of *hechos ilícitos*, similar to common law tort liability, is discussed below in Chapter 19.

[58] For a discussion of moral damages, *see* Chapter 17 below, section 6.4.3.

[59] SJF, 5a, T. XXV, p. 816.    [60] *Ibid.*

[61] *See generally* Elias A.E., PERSONAS Y BIENES EN EL DERECHO CIVIL MEXICANO (Mexico: Porfúa, 1997) at 21 *et seq.*

[62] CCDF Article 324. Dissolution must result from the death of the husband, an annulment of the marriage contract, or divorce. In the last two instances, the term of 300 is counted from the day on which the spouses actually separated pursuant to the judicial decree.

presumption of children being born in wedlock is established in almost absolute terms by the FCC: a father cannot fail to recognize children born in wedlock, with only one exception: where it was physically impossible for the husband to have had intercourse with his wife during the first 120 days of the 300 days preceding the birth (FCC Article 325). If the facts of this exception are not proven, then the father must recognize the child even if he alleges that the mother committed adultery, and despite the fact that the mother affirms that the child is not the husband's.[63]

The FCC provides for settlement of paternity disputes through compromise or arbitration with regard to financial rights stemming from matrimonial filiation (FCC Article 339).

### 3.4.2. Establishing the Legitimacy of Children

According to FCC Article 354, '[s]ubsequent marriage of the parents makes the children born before celebration [of marriage] considered to be born in wedlock'. The FCC, however, makes establishing the legitimacy of children born out of wedlock contingent not only upon the parents subsequently getting married, but also on the parents expressly recognizing the child or children before getting married or during the marriage,[64] with 'both [parents] recognizing [the child or children] in any case [either] together or separately' (FCC Article 355). Even though recognition may be given subsequent to the marriage ceremony, the children's rights are recognized to exist as of the date that the marriage is entered into (Article 357), and this right is extended to the descendants of children who pass away before the marriage is formalized (FCC Article 358).[65]

### 3.4.3. Filiation of Children Born Out of Wedlock and Proof of Paternity

The FCC recognizes three types of filiation of children born out of wedlock. The first type is maternal filiation, based on the fact of a mother's giving birth to a child, which establishes legal filiation to the mother (FCC Article 360). The second type of filiation of children born out of wedlock involves voluntary acknowledgement of the paternity of a child. The third type of filiation involves a declaration of paternity issued by a court of law.

*Voluntary acknowledgement of filiation*  The power to acknowledge the paternity of a child is far-reaching under the FCC. For example, parents may acknowledge parenthood of an unborn child or a child who has died and left

---

[63] If a woman remarries before 300 days following the dissolution of a prior marriage (FCC Article 158), and has a child within that period (FCC Article 334), the law considers the husband from the dissolved marriage to be the father of the child. However, if the child is born after 180 days of the second marriage, then the legal presumption is that the child is from the second marriage, even if the birth occurred within 300 days of dissolution of the first marriage. FCC Article 334, Section II.    [64] Baqueiro and Buenrostro, *supra* note 42 at 203 *et seq.*

[65] The Mexican Supreme Court, in a case involving a request of inheritance, has held that birth certificates may not be sufficient, in and of themselves, to prove a child's filiation to his or her parents. It may also be necessary for the moving party to produce a copy of the parents' marriage certificate. *Amparo directo* 500/95; SJF, 9a, T. II, October 1995, Tesis XI. 2p. 18 C, p. 551.

476                                    *Mexican Law*

descendants (FCC Article 364). Nonetheless, the effects produced by voluntary acknowledgement of parenthood only apply to the person who acknowledges paternity of the child, and are not extended to the other progenitor (FCC Article 366).[66] Voluntary acknowledgement of paternity of a child born out of wedlock must be made by means of one of the forms specifically set out in FCC Article 369.[67]

If the person who acknowledges paternity of child born out of wedlock is married, he or she may not acknowledge paternity and take a child born outside of marriage into the matrimonial domicile without prior permission from his or her spouse (FCC Article 372). If a married woman gives birth during marriage to a child fathered by someone other than her husband, the biological father is not permitted to acknowledge paternity of the child, unless the husband refuses to recognize paternity and a court order has also been issued declaring that the child is not the husband's (FCC Article 374).

*Court-ordered recognition of filiation*   The FCC grants to an illegitimate child, or to the descendant of an illegitimate child, the opportunity to prove paternity (that the child is the offspring of the biological father) through an investigation conducted pursuant to FCC Article 382.[68] An illegitimate child or his or her descendants can also investigate and attempt to prove maternity, 'but the investigation will not be permitted when it is designed to attribute maternity

---

[66] *See also* CCDF Article 370: 'When the father and the mother separately recognize children, he or she may not, at the time of the act of recognition, reveal the name of the person with whom he or she had the child, nor state any circumstances whereby this person could be identified. Words [to this effect] contained in the revelation shall be expunged *sua sponte* [on the court's initiative], so they will remain absolutely illegible.' The Supreme Court applied this provision in *Valdovinos de Barrero María*, 28 October 1930; SJF, 5a, T. XXX, p. 1188.

[67] Any of the following documents is sufficient: birth certificate; a special certificate (*acta especial*) issued by a judge of the Civil Registry; a public document [official record] issued before a notary public, or an official agent (*corredor público*); a last will and testament; or evidence of a direct or express confession before a court of law.

[68] *See* CCDF Article 382:
The investigation of paternity of children born out of wedlock is permitted:
I. In cases of abduction, statutory rape, and rape, when the date of the crime is consistent with that of conception;
II. When the child has enjoyed the status of being the son or daughter of the alleged father;
III. When the child was conceived during the time in which the mother lived under the same roof as the alleged father, as a married couple;
IV. When the son has written evidence (*principio de prueba*) in his favour against the alleged father.
As mentioned in the previous Chapter, in 1932 the CCDF departed from the prior versions of the Civil Code by providing for recognition of children born out of wedlock. The 1932 Code finally recognized the widespread practice in Mexican society, dating back to colonial times, of children being born outside of marriage. Although having children outside of marriage may have been condemned officially by the Catholic Church and by conservative society in general, it was nevertheless common, particularly in rural areas. To alleviate the problems arising from illegitimacy, the Civil Code of 1932 for the first time permitted illegitimate children to use the courts to establish their parentage and related rights.

[of an illegitimate child] to a married woman'.[69] This provision is an example of the reverential status granted to the Mexican mother;[70] it is plainly calculated to protect married women and reinforce traditional family values.

The FCC provides important rights to illegitimate persons whose parentage is recognized by the biological parent or parents. Upon securing a favourable court order, children born out of wedlock are entitled to bear the first and last name of the father and mother who recognize them as well as to receive child support and to inherit property from their estate (FCC Article 389). Since this provision gave the same status to children born out of wedlock as to those born in wedlock, the CCDF of 1932 was harshly criticized at the time of its adoption. Nevertheless, the Supreme Court has been liberal in recognizing the rights of illegitimate children.[71]

The CCDF also recognizes the legal effects of another widespread practice in Mexican society, *concubinato*, commonly known in the United States as common law marriage. *Concubinato* is recognized not only in the Civil Codes but also in other laws,[72] and children of common law marriages have rights that are similar to those that arise under marriage. According to CCDF Article 383, the following children are 'presumed to be the children of the common law husband (*concubinario*) and wife (*concubina*): I. Children born after 180 days from the time the common law marriage began; and II. Children born within 300 days following the day common life ceased between the common law husband and wife'. However, in order for rights under a common law marriage to be recognized, neither spouse may be a party to a valid marriage during the *concubinato*.

The 2002 Civil Code adopted for the Federal District added Chapter XI of Book Five, in which certain rules were added that could be interpreted as furnishing property rights for spouses in a common law marriage. Thus, CCDF Article 291*ter* states that 'the rights and obligations inherent in a legal marriage shall govern a common law marriage, to the extent applicable'. Similarly, CCDF Article 291*quater* states that 'common law marriage establishes alimony and inheritance rights between common law spouses'. These provisions could be interpreted as granting property rights to a common law spouse, although no case-law has yet been generated interpreting them.

---

[69] CCDF Article 385. Despite the prohibition quoted in the text, an investigation may proceed if the alleged maternity can be inferred from a civil or criminal judgment. CCDF Article 386.

[70] The Mexican mother is revered not only as the foundation of a strong family, but the bedrock of society. If one hears that someone '*no tiene madre*' (does not have a mother), it means that whatever the person has done is beyond the pale.

[71] In 1969, the Supreme Court ruled that although CCDF Articles 352 and 353, which preserve the property rights of children, apply expressly to children born in wedlock, nevertheless 'they provide equal protection to natural children [i.e., biological or illegitimate children], by virtue of the well known principle of analogous application, where the same legal reason exists, the same provision of the law should exist'. *Apéndice* 1917–1985, SJF, 7a, T. VI, Cuarta Parte, Tercera Sala, p. 71 (26 June 1969).

[72] *See*, for example, Article 501, section III of the Federal Labour Law, D.O. 21 Dec. 1995, which recognizes the rights of the common law wife in the case of the death or disability of her common law husband. *See also* the Social Security Law, D.O. 21 Dec. 1995, Article 130.

478 *Mexican Law*

Finally, the reader should note that children also have certain rights with regard to recognition of filiation. For example, should the child who is the subject of an act of recognition be of adult age, he or she must expressly consent to recognition (FCC Article 375). On the other hand, should the child be a minor, consent must be given by the guardian and, should no guardian have been previously appointed, the court shall appoint one specifically for this purpose (FCC Article 375). If filiation of a minor child was recognized by a guardian, the child may 'challenge the recognition when he or she reaches legal age' (FCC Article 376).

*Custody of children born out of wedlock* The Civil Code has special provisions concerning the custody of children born out of wedlock. For instance, when parents who do not live together both recognize a child in the same proceeding, an agreement must be reached on which parent shall be granted custody. Should the parents fail to reach such agreement, the judge shall decide who has custody (FCC Article 380). Appellate courts have held that when children are born out of wedlock and the parents later separate, and do not agree on custody, a family court judge shall have the power to award custody according to the best interests of the child.[73]

If the parents of a child born out of wedlock recognize the child at separate times, custody shall be exercised by the first parent to recognize the child, unless the parents agree on who shall have custody and their agreement is approved by the court (FCC Article 381).

### 3.4.4. Adoption

The Mexican law of adoption[74] has undergone significant changes in recent years, due to Mexico's adherence to several international conventions that directly or indirectly influence the laws of adoption.[75] As a result, in 1998 the Mexican Congress adopted reforms to the Civil Code for the Federal District, adding Article 410-E, to modernize the law governing this subject matter;[76] this change has been carried over into CCDF Article 410-E.

Under the FCC, both married and unmarried adults of twenty-five years and older are qualified to adopt in Mexico, provided that the age difference between

---

[73] *Amparo directo 3080/90; Semanario Judicial de la Federación, Octava Época,* T. VI Segunda Parte-1, p. 200.

[74] Both minors and incompetent adults are treated in the chapter on adoption in the Civil Code. Nonetheless, we refer in this Chapter of the book specifically to minors, since they are the subject of most adoptions.

[75] *See* the Inter-American Convention on Conflicts of Laws regarding Adoption of Minors, in effect for Mexico as of 21 August 1987; the U.N. Convention on the Rights of Children, in effect for Mexico as of 25 January 1991; and the Hague Convention on the Protection of Minors and Cooperation regarding International Adoption, in effect in Mexico as of 24 October 1994.

*See generally* Siqueiros, J.L., 'La convención relativa a la protección de menores y a la cooperación en materia de adopción internacional', 23 Jurídica (Universidad Iberoamericana) 313 (1994). *See also* Pereznieto and Silva, *supra* note 10, at chapter 8.

[76] D.O. 28 May 1998.

# DICTIONARY

## OF

# GREEK AND ROMAN ANTIQUITIES.

*London England*
*10/8/83*

# A DICTIONARY

OF

# GREEK AND ROMAN ANTIQUITIES.

BY VARIOUS WRITERS.

EDITED

## BY WILLIAM SMITH, D.C.L., LL.D.



ILLUSTRATED BY NUMEROUS ENGRAVINGS ON WOOD.

LONDON:

### JOHN MURRAY, ALBEMARLE STREET.

1878.

i. 40 ; Plin. *H. N.* xxxiv. 11. s. 25) or silver. (Treb. Poll. *Claud.* p. 208, c.)

A patina, covered with a lid (*operculum*), was sometimes used to keep grapes instead of a jar (Col. *de Re Rust.* xii. 43), a proof that this vessel was of a form intermediate between the PATERA and the OLLA, not so flat as the former, nor so deep as the latter. Hence it is compared to the crater. (Schol. *in Aristoph. Acharn.* 1109.) [CRATER.] This account of its shape accords with a variety of uses to which it was applied, viz., to hold water and a sponge for washing (Aristoph. *Vesp.* 598), and clay for making bricks (*Aves*, 1143, 1146), in vomiting (*Nub.* 904), and in smelting the ore of quicksilver. (Plin. *H. N.* xxxiii. 8. s. 41.) But its most frequent use was in cookery and pharmacy. (Plin. *H. N.* xxiii. 2. s. 33.) Although the patera and the olla were also used, the articles of diet were commonly prepared, sometimes over a fire (Plaut. *Pseud.* iii. 2. 51 ; Plin. *H. N.* xviii. 11. s. 26, xxii. 25. s. 80), and sometimes without fire, in a patina, and more especially when they were accompanied with sauce or fluid. (Hor. *Sat.* i. 3. 80.) Hence the word occurs in almost every page of Apicius *De Opsoniis* [OPSONIUM] ; and hence came its synonym, ἐμβάφη. (Photius, *Lex. s. v.*) In the same bowl the food was commonly brought to table (Xen. *Cyrop.* i. 3. § 4 ; Athen. iv. p. 149, f. ; Plaut. *Mil.* iii. 1. 164 ; Ter. *Eun.* iv. 7. 46 ; Hor. *Sat.* ii. 8. 43), an example of which is λεκάνιον τῶν λαγῴων κρεῶν, *i. e.* "a basin of stewed hare." (Aristoph. *Acharn.* 1109.) But it is to be observed, that dishes [LANX, PATERA] were used to bring to table those articles of food, the form and solidity of which were adapted to such vessels.

The silver bowl was sometimes ornamented, as with ivy-leaves (*hederata*, Treb. Poll. *l. c.*), or by the insertion of mirrors (*speculata*, Fl. Vopisc. *Probus*, p. 234, ed. Salmasii). These bowls weighed from 10 to 20 lbs. each. Vitellius, wishing to obtain an earthenware bowl of immense size, had a furnace constructed on purpose to bake it. (Plin. *H. N.* xxxv. 12. s. 46 ; Juv. iv. 130—134.)

A method of divination by the use of a basin (λεκανομαντεία) is mentioned by Tzetzes on Lycophron, v. 813.                    [J. Y.]

PATRES. [PATRICII ; SENATUS.]

PATRIA POTESTAS. Potestas signifies generally a power or faculty of any kind by which we do any thing. "Potestas," says Paulus (Dig. 50. tit. 16. s. 215), "has several significations: when applied to Magistratus, it is Imperium ; in the case of Children, it is the Patria Potestas ; in the case of Slaves, it is Dominium." According to Paulus then, Potestas, as applied to Magistratus, is equivalent to Imperium. Thus we find Potestas associated with the adjectives Praetoria, Consularia. But Potestas is applied to Magistratus who had not the Imperium, as for instance to Quaestors and Tribuni Plebis (Cic. *pro Cluent.* c. 27) ; and Potestas and Imperium are often opposed in Cicero. Both the expressions Tribunicium Jus and Tribunicia Potestas are used (Tacit. *Ann.* i. 2, 3). Thus it seems that this word Potestas, like many other Roman terms, had both a wider signification and a narrower one. In its wider signification it might mean all the power that was delegated to any person by the State, whatever might be the extent of that power. In its narrower signification, it was on the one

hand equivalent to Imperium ; and on the other, it expressed the power of those functionaries who had not the Imperium. Sometimes it was used to express a Magistratus, as a person (Sueton. *Claud.* 13 ; Juv. *Sat.* x. 100) ; and hence in the Italian language the word Podestà signifies a Magistrate.

Potestas is also one of the words by which is expressed the power that one private person has over another, the other two being Manus and Mancipium. The Potestas is either Dominica, that is, ownership as exhibited in the relation of Master and Slave [SERVUS] ; or Patria as exhibited in the relation of Father and Child. The Mancipium was framed after the analogy of the Potestas Dominica. [MANCIPIUM.]

Patria Potestas then signifies the power which a Roman father had over the persons of his children, grandchildren, and other descendants (*filiifamilias, filiaefamilias*), and generally all the rights which he had by virtue of his paternity. The foundation of the Patria Potestas was a Roman marriage, and the birth of a child gave it full effect. [MATRIMONIUM.]

It does not seem that the Patria Potestas was ever viewed among the Romans as absolutely equivalent to the Dominica Potestas, or as involving ownership of the child ; and yet the original notion of the Patria came very near to that of the Dominica Potestas. Originally the father had the power of life and death over his son as a member of his familia : he could sell him and so bring him into the mancipii causa ; and he had the jus noxae dandi as a necessary consequence of his being liable for the delicts of his child. He could also give his child in adoption, and emancipate a child at his pleasure.

The father could exheredate his son, he could substitute another person as heir to him [HERES], and he could by his will appoint him a tutor.

The general rights and disabilities of a filiusfamilias may be thus briefly expressed :—" The child is incapable, in his private rights, of any power or dominion ; in every other respect he is capable of legal rights." (Savigny, *System*, &c. ii. 52.) The incapacity of the child is not really an incapacity of acquiring legal rights, for the child could acquire by contract, for instance ; but every thing that he acquired, was acquired for his father.

As to matters that belonged to the Jus Publicum, the son laboured under no incapacities : he could vote at the Comitia Tributa, he could fill a magistratus ; and he could be a tutor : for the Tutela was considered a part of Jus Publicum. (Dig. i. tit. 6. s. 9 ; Liv. xxiv. 44 ; Gell. ii. 2.)

The child had Connubium and Commercium, like any Roman citizen who was sui juris, but these legal capacities brought to him no present power or ownership. His marriage with his father's consent was legal (*justum*), but if it was accompanied with the In Manum conventio, his wife came into the power of his father, and not into the power of the son. The son's children were in all cases in the power of their grandfather, when the son was. The son could also divorce his wife with his father's consent.

Inasmuch as he had Commercium, he could be a witness to Mancipationes and Testaments ; but he could not have property nor servitutes. He had the testamenti factio, as already stated, so far

as to be a witness to a testament; but he could not make a testament, for he had nothing to dispose of; and he could not have a heres.

He could, as already observed, acquire rights for his father by contract, but none for himself, except in the case of an Adstipulatio, an instance which shows the difference between a son and a slave. [OBLIGATIONES.] But a filius pubes could incur obligations and could be sued, like a paterfamilias. (Dig. 45. tit. 1. s. 141. § 2 ; 44. tit. 7. s. 39.) The foundation of these rules of law was the maxim that the condition of a master could be improved by the acts of his slaves, but not made worse; and this maxim applied equally to a son and a slave. Between the father and the son no civiles obligationes could exist; neither of them consequently could have a right of action against the other. But naturales obligationes might be established between them. Some writers have supposed that there was a difference between the capacities and incapacities of a filiusfamilias and a filiafamilias as to obligationes; but the reasons alleged by Savigny seem conclusively to show that there was no difference at all. (*System*, &c. ii. Beylage, v.)

In the case of delict by a filiusfamilias noxales actiones were allowed against the father. (Gaius, iv. 75.) But Justinian abolished the noxae deditio in the case of a filius or filiafamilias, "cum apud veteres legum commentatores invenimus saepius dictum, ipsos filiosfamilias pro suis delictis posse conveniri." (Inst. 4. tit. 8. s. 7; Dig. 45. tit. 29. s. 1. 3. § 4.) [NOXALIS ACTIO; FILIUSFAMILIAS.]

The incapacity of the child to acquire for himself and his capacity to acquire for his father, as well as their mutual incapacity of acquiring rights of action against one another, are viewed by some modern writers as a consequence of a legal unity of person, while others affirm that there is no trace of such a fiction in the Roman law, and that the assumption is by no means necessary to explain the rule of law. (Böcking, *Inst.* i. 228, n. 20.) Indeed the fiction of such a unity is quite unnecessary, for the fundamental maxim, already referred to, that a man may be made richer but not poorer by his slaves and children is a simple positive rule. Though the child could not acquire for himself, yet all that he did acquire for his father, might become his own in the event of his father's death, a circumstance which materially distinguished the acquisitions of a son from those of a slave; and accordingly the son is sometimes, though not with strict propriety, considered as a kind of joint owner with his father.

The rule as to the incapacity of a filiusfamilias for acquiring property was first varied about the time of Augustus, when the son was empowered to acquire for himself and to treat as his own whatever he got in military service. This was the Castrense Peculium, with respect to which the son was considered as a person sui juris. (Juv. *Sat.* xvi. 51; Gaius, ii. 106.) But if the filiusfamilias died without having made any disposition of this peculium, it came to the father, and this continued to be the law till Justinian altered it; but in this case the property came as Peculium, not as Hereditas. The privileges of a filiusfamilias as to the acquisition of property were extended under Constantine to his acquisitions made during the discharge of civil offices, and as this new privilege was framed after the analogy of the Castrense Peculium, it was designated by the name Quasi Castrense Peculium. Further privileges of the same kind were also given by Constantine and extended under subsequent emperors (*bona quae patri non adquiruntur*).

The Patria Potestas began with the birth of a child in a Roman marriage. If a Roman had by mistake married a woman with whom he had no connubium, thinking that connubium existed, he was allowed to prove his case (*causae erroris probatio*), upon doing which the child that had been born and the wife also became Roman citizens, and from that time the son was in the power of the father. This causae probatio was allowed by a Senatus-consultum (Gaius, i. 67), which, as it appears from the context, and a comparison with Ulpian's Fragments (vii. 4), was an amendment of the Lex Aelia Sentia. Other instances of the causae probatio are mentioned by Gaius.

It was a condition of the Patria Potestas that the child should be begotten in matrimonium legitimum. (Gaius, i. 55—107; Inst. 1. tit. 9—11.) By the old law, the subsequent marriage of the parents did not legitimate a child born before the marriage. But it seems to have early become the fashion for the Emperor, as an act of grace, to place such child on the same footing as legitimate children. The legitimation per subsequens matrimonium only became an established rule of law under Constantine, and was introduced for the advantage of children who were born in concubinage. [CONCUBINA.] In the time of Theodosius II., the rule was established by which a child was legitimated per oblationem curiae. To these two modes of legitimation, Justinian added that per rescriptum principis. The child thus legitimated came into the familia and the potestas of his father, as if he had been born in lawful marriage.

The Patria Potestas could also be acquired by either of the modes of Adoption. [ADOPTIO, p. 15, b.]

The Patria Potestas was dissolved in various ways. It was dissolved by the death of the father, upon which event, the grandchildren, if there were any, who had hitherto been in the power of their grandfather, came into the power of their father who was now sui juris. It could also be dissolved in various ways during the lifetime of the father. A maxima or media capitis diminutio either of the parent or child dissolved the Patria Potestas; though in the case of either party sustaining a capitis diminutio by falling into the hands of an enemy, the relation might be revived by Postliminium. A father who was adrogated, and consequently sustained a minima capitis diminutio, came together with his children, who had hitherto been in his power, into the power of his adoptive father. The emancipation of the child by the father was a common mode of dissolving the Patria Potestas, and was accompanied by the Minima Capitis diminutio. If a son was elected Flamen Dialis or a daughter was chosen a Vestal, the Patria Potestas ceased; and in the later period, it was also dissolved by the son's attaining certain civil or ecclesiastical honours. The Potestas of the father might cease without the son becoming sui juris, as in the case of the son being given in adoption.

The term Patria Potestas strictly expresses the power of the father, as such, which arises from the paternal relation; but the term also imports the

rights of the child as a filiusfamilias or filiafamilias.
Of these rights, the most important was the capacity of being the sun heres of the father. Generally, the parent could emancipate his child at his pleasure, and thus deprive him of the rights of agnation ; but the law in this respect was altered by Justinian (*Nov.* 89. c. 11), who made the consent of the child necessary. (Savigny, *System, &c.,* ii. 49, &c. ; Puchta, *Inst.* iii. 142 ; Bücking, *Inst.* i. 224.)                                          [G. L.]

PATRI′CII. This word is a derivative from *pater,* which in the early times invariably denoted a patrician, and in the later times of the republic frequently occurs in the Roman writers as equivalent to senator. Patricii therefore signifies those who belonged to the patres "rex patres eos (*senatores*) voluit nominari, patriciosque eorum liberos." (Cic. *de Re Publ.* ii. 12 ; Liv. i. 8 ; Dionys. ii. 8.) It is a mistake in those writers to suppose that the patricii were only the offspring of the patres in the sense of senators, and necessarily connected with them by blood. Patres and patricii were originally convertible terms. (Plut. *Romul.* 13 ; Lydus, *de Mens.* i. 20, *de Mag.* i. 16 ; Niebuhr, *Hist. of Rome,* i. p. 336.) The words *patres* and *patricii* have radically and essentially the same meaning, and some of the ancients believed that the name patres was given to that particular class of the Roman population from the fact that they were fathers of families (Plut. *Dionys. l. c.*) ; others, that they were called so from their age (Sallust, *Catil.* 6) ; or because they distributed land among the poorer citizens, as fathers did among their children. (Fest. *s. v. Patres Senatores ;* Lyd. *de Mens.* iv. 50.) But most writers justly refer the name to the patrocinium which the patricians exercised over the whole state, and over all classes of persons of whom it was composed. (Plut. and Sallust, *l. c.* ; Zonaras, vii. 8 ; Suidas, *s. v.* Πατρικιοι.)

In considering who the patricians were, we have to distinguish three periods in the history of Rome. The first extends from the foundation of the city down to the establishment of the plebeians as a second order ; the second, from this event down to the time of Constantine, during which time the patricians were a real aristocracy of birth, and as such formed a distinct class of Roman citizens opposed to the plebeians, and afterwards to the new plebeian aristocracy of the nobiles : the third period extends from Constantine down to the middle ages, during which the patricians were no longer an aristocracy of birth, but were persons who merely enjoyed a title, first granted by the emperors and afterwards by the popes also.

*First Period : from the foundation of the city, to the establishment of the plebeian order.* Niebuhr's researches into the early history of Rome have established it as a fact beyond all doubt, that during this period the patricians comprised the whole body of Romans who enjoyed the full franchise, that they were the *populus Romanus,* and that there were no other real citizens besides them. (Niebuhr, *Hist. of Rome,* ii. pp. 224, 225. note 507 ; Cic. *pro Caecin.* 35.) The patricians must be regarded as conquerors who reduced the earlier inhabitants of the places they occupied to a state of servitude, which in our authorities is designated by the terms *aliens* and *plebs.* The other parts of the Roman population, namely clients and slaves, did not belong to the populus Romanus, or sovereign

people, and were not burghers or patricians The senators were a select body of the populus or patricians, which acted as their representative The burghers or patricians consisted originally of three distinct tribes, which gradually became united into the sovereign populus. These tribes had founded settlements upon several of the hills which were subsequently included within the precincts of the city of Rome. Their names were Ramnes, Tities, and Luceres, or Ramnenses, Titienses, and Lucerenses. Each of these tribes consisted of ten curiae, and each curia of ten decuriae, which were established for representative and military purposes. [SENATUS.] The first tribe, or the Ramnes, were a Latin colony on the Palatine hill, said to have been founded by Romulus. As long as it stood alone, it contained only one hundred gentes, and had a senate of one hundred members. When the Tities, or Sabine settlers on the Quirinal and Viminal hills, under king Tatius, became united with the Ramnes, the number of gentes as well as that of senators was increased to 200. These two tribes after their union continued probably for a considerable time to be the patricians of Rome, until the third tribe, the Luceres, which chiefly consisted of Etruscans, who had settled on the Caelian Hill, also became united with the other two as a third tribe. When this settlement was made is not certain : some say that it was in the time of Romulus (Fest. *s. v. Caelius Mons* and *Luceres ;* Varro, *de Ling. Lat.* v. 55) ; others that it took place at a later time. (Tacit. *Annal.* iv. 65 ; Fest. *s. v. Tuscum vicum.*) But the Etruscan settlement was in all probability older than that of the Sabines (see Göttling, *Gesch. der Röm. Staatsverf.* p. 54, &c.), though it seems occasionally to have received new bands of Etruscan settlers even as late as the time of the republic.

The amalgamation of these three tribes did not take place at once : the union between Latins and Sabines is ascribed to the reign of Romulus, though it does not appear to have been quite perfect, since the Latins on some occasions claimed a superiority over the Sabines. (Dionys. ii. 62.) The Luceres existed for a long time as a separate tribe without enjoying the same rights as the two others until Tarquinius Priscus, himself an Etruscan, caused them to be placed on a footing of equality with the others. For this reason he is said to have increased the number of senators to 300 (Dionys. iii. 67 ; Liv. i. 35 ; Cic. *de Re Publ.* ii. 20 ; compare SENATUS), and to have added two Vestal virgins to the existing number of four. (Dionys. *l. c.* ; Fest. *s. v. Sex Vestae sacerdotes ;* Niebuhr, *Hist. of Rome,* i. p. 302, &c.) The Luceres, however, are, notwithstanding this equalisation, sometimes distinguished from the other tribes by the name *patres minorum gentium ;* though this name is also applied to other members of the patricians, *e. g.* to those plebeian families who were admitted by Tarquinius Priscus into the three tribes, and in comparison with these, the Luceres are again called *patres majorum gentium.* (Compare Niebuhr, i. p. 304, and Göttling, p. 226, &c.) That this distinction between patres majorum and minorum gentium was kept up in private life, at a time when it had no value whatever in a political point of view, is clear from Cicero (*ad Fam.* ix. 21). Tullus Hostilius admitted several of the noble gentes of Alba among the patricians (in

[UNOFFICIAL TRANSLATION]

**Federal Civil Code**

**Official Gazette of the Federation of the 26th of May, 14th of July, 3rd and 31st of August, 1928. Last amendment published in the Official Gazette of the Federation on April 13th, 2007.**

The Mexican Constitutional President has been so kind as to submit to me the following Decree:

**PLUTARCO ELIAS CALLES,** President of the United Mexican States, to Mexicans, to be known:

That in the exercise of the powers vested in me by the Congress of the Union by means of decrees dated January 7th and December 6th, 1926 and January 3, 1928; I hereby issue the following decree:

**FEDERAL CIVIL CODE**

**FIRST SECTION**
**Individuals**

**EIGHTH TITLE**
**Patria Potestas**

**CHAPTER I**
**Effects of the Patria Potestas Regarding the Children as Individuals**

Article 411. In the relationship among the ascendants and descendants, mutual respect and consideration should prevail, whatever their status, age and condition is.

Article 412. Children under legal age, not emancipated, shall be under the patria potestas while there is any of the ascendants that shall exercise it pursuant to law.

Article 413. *Patria potestas* is exercised over the persons and assets of the children. Its exercise is subject, regarding the care and education of the minors, to the fashions provided to do so by resolutions according to the law on social prevention of infants criminality in the Federal District.

Article 414. *Patria potestas* over the children is exercised by the parents; should one of the parents fail to exercise the *patria potestas* for any reason, then *patria postestas* is exercised by the other parent. If both parents are absent or any other circumstance foreseen in this Code, the ascendants in second grade shall exercise the *patria potestas* over the children, in whichever the order determined by the familiar judge, having into consideration the circumstances of the case.

Article 416. In case of separation of the ones who exercise the *patria potestas*, they both shall continue with the performance of their obligations and they may agree upon the terms particularly related to the care and custody of the minor children.  Should the parents disagree, the family Judge shall resolve whatever is appropriate by hearing the

Public Prosecutor, regardless the foreseen in article 94 of the Civil Procedure Code for the Federal District.

In this case, based on the best interests of the minor, the latter shall remain under the care and attention of one of them. The other parent is obligated to cooperate for their nourishment and shall retain the right of supervision and cohabitation with the minor child, in keeping with the modalities foreseen in the judicial agreement or resolution.

Article 417. The persons, who exercise the *patria potestas,* even if they do not have the custody, have the right of cohabiting with their descendants, unless there is a danger to do so. The personal relationships between the minor and his or her parents can only be limited if there is a justified cause. Should one of the parents oppose the relationship, then the family judge, at the request of either of the parents, may resolve whatever is appropriate to the best interests of the minor. Only a judicial order may limit, suspend or lose the right to cohabitate that is referred to in the preceding paragraph, as well as in the cases of suspension or loss of *patria potestas*, in keeping with the modalities that are established in the judicial agreement or resolution for the exercise of *patria potestas.*

* * *

Article 422. The persons who have the minor under their custody or have the patria potestas over him or her, is obligated to educate him or her conveniently; whenever comes to the knowledge of the Tutorial Local Committee or of any other administrative authority, that the said persons do not perform the aforementioned obligation, the authorities shall inform the Public Prosecutor in order for him/her to proceed according to law.

* * *

## CHAPTER III
### "Modes in which Patria Potestas is Suspended and Terminated"

Article 444. *Patria Potestas* is lost by judicial resolution:

I.     Whenever the person who exercises it is expressly condemned to lose such right.
II.    In case of divorce, having into consideration the foreseen in article 283.
III.   When, given the depraved behavior of the parents, mistreating or failing to perform their obligations, the health, security or morality of the children is in risk, even when those facts are not punished by the criminal law.
IV.    Should any of the parents exposes his or her children or abandon them for more than six months.
V.     When the person who exercises it is condemned for the commission of an intentional crime in which the minor is the victim; and
VI.    When the person who exercises it is condemned two or more times for a grave crime.

Article 444 bis. *Patria potestas* may be limited when the person who exercises it commits familiar violence foreseen in article 323 ter of this code, against the persons over the ones he or her exercises it.

Article 445. The mother or grandmother, who marries for second time, does not lose because of it the *patria potestas.*

Article 446. The new husband shall not exercise the *patria potestas* over the children of the previous marriage.